**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Anchor Blue Holding Corp., <u>et al.</u>,[1] | Case No. 11-10110 (___) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF THOMAS A. SHAW
## IN SUPPORT OF FIRST DAY MOTIONS

Thomas A. Shaw, being duly sworn, deposes and says:

1.     I am the Interim Chief Executive Officer, Senior Vice President, Chief Financial Officer and Treasurer of Anchor Blue Holding Corp. ("<u>Anchor Parent</u>"), a corporation organized under the laws of the state of Delaware, and Anchor Blue, Inc., a corporation organized under the laws of Florida ("<u>Anchor Blue</u>", and together with Anchor Parent, the "<u>Company</u>" or the "<u>Debtors</u>"),  the debtors and debtors in possession in the above-captioned chapter 11 cases.  I am authorized to submit this Declaration in support of the Debtors' chapter 11 petitions and the first day pleadings (the "<u>First Day Motions</u>") described herein.[2]

2.     I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  I have also reviewed the Debtors' First Day Motions and accompanying forms of orders and am familiar with the facts alleged therein and relief requested.  Except as otherwise indicated, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisers that report to me in the ordinary

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Anchor Blue Holding Corp. (1314) and Anchor Blue, Inc. (9916).  The mailing address for both of the Debtors is 1260 Corona Pointe Ct, Corona, CA 92879.

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motion (defined below).

course of my responsibilities as Interim Chief Executive Officer, Senior Vice President, Chief Financial Officer and Treasurer and, if called as a witness, would testify thereto.[3]

## I. GENERAL BACKGROUND

### A. The Bankruptcy Cases

3. As of the date of filing hereof (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief in this Court under chapter 11 of title 11 of the United States Code, §§ 101-1532, as amended (the "Bankruptcy Code").

### B. The Debtors' Corporate Structure

4. Anchor Blue is a wholly-owned subsidiary of Anchor Parent which is wholly owned by Sun Anchor Blue, LP ("Sun Anchor Blue"), a Delaware limited partnership and an indirect affiliate of Sun Capital Partners, a Florida-based investment firm ("Sun Capital"). Certain non-voting shares, representing approximately 1% of the outstanding stock of Anchor Parent, are held by H.I.G. Sun Partners, Inc., a Cayman Islands entity which is also a Sun Capital affiliate.

### C. The Debtors' Business and Recent Performance

5. Based in Corona, California, the Debtors operate apparel stores that sell clothing and accessories bearing the Anchor Blue name. As of the Petition Date the Debtors operate 117 stores under the Anchor Blue name in nine western and southwestern states: Arizona, California, Colorado, New Mexico, Oregon, Texas, Utah and Washington. The Debtors also maintain a website, www.anchorblue.com, for, among other things, online purchases, product information, and customer service.

---

[3] Certain of the disclosures herein relate to matters within the knowledge of other employees of the Debtors and are based on information provided by them.

6.	The Debtors' stores are located primarily in shopping malls and are staffed with highly-trained sales associates.  As of the Petition Date, the Debtors employed approximately 1,446 full and part-time employees in their stores and their corporate headquarters in Corona.

7.	The Debtors differentiate themselves from other clothing retailers by producing affordable youth-oriented casual clothing, outerwear and accessories.  As of January 1, 2011, the Debtors' books and records reflected total combined assets of approximately $24.7 million (book value) and total combined liabilities of approximately $38.5 million.  Notwithstanding the substantial efforts of the Debtors and their employees, for the twelve fiscal months ended January 1, 2011, the Debtors generated revenues of approximately $ 112.6 million but incurred net pre-tax operating losses, including restructuring costs, of approximately $ 23.9 million.

**D.	The Debtors' Pre-Filing Debt Structure**

8.	The First Lien Credit Agreement.  Prior to the Petition Date, Anchor Blue was a borrower under that certain Revolving Credit and Security Agreement, dated as of August 14, 2009 (as amended, modified or supplemented from time to time, the "First Lien Credit Agreement") with PNC Bank, National Association as agent and lender (the "First Lien Lender"), which provided for a revolving credit facility in the maximum amount of $15 million, inclusive of a letter of credit sublimit (the "Revolving Credit Facility").[4]  The Revolving Credit Facility and letters of credit issued thereunder are secured by first priority liens on and security interests in substantially all of the assets of the Anchor Blue, including a floating lien on Anchor Blue's inventory.  Anchor Parent guaranteed the obligations of Anchor Blue under the Revolving Credit Facility.  As of the Petition Date, approximately $3.498 million remained outstanding under the First Lien Credit Agreement (including approximately $150,000 in letters of credit).

---

[4] The actual availability is based principally upon a borrowing base formula of certain eligible accounts receivable and inventory.

9. _The Second Lien Credit Agreement_. Prior to the Petition Date, Anchor Blue was also a borrower under that certain Financing Agreement, dated as of August 19, 2009 (as amended, modified or supplemented from time to time, the "Second Lien Credit Agreement"), with Ableco Finance LLC ("Ableco"), as Administrative Agent, Collateral Agent and Lender (the "Second Lien Agent"), as well as the other Lenders parties thereto.[5] Under the Second Lien Credit Agreement, the Lenders provided a term loan in the original principal amount of $16.50 million. As of the Petition Date, the principal amount outstanding under the Second Lien Credit Agreement remains approximately $16.50 million. The obligations under the Second Lien Credit Agreement are secured by second priority liens on and security interests in substantially all of the assets of Anchor Blue. Anchor Parent guaranteed the obligations of Anchor Blue under the Second Lien Credit Facility, and granted a lien on and security interest in substantially all of its assets to support such obligations.

10. _The Subordinated Promissory Note_. Prior to the Petition Date, Anchor Blue executed a Subordinated Secured Promissory Note (the "Subordinated Note"), dated November 19, 2010, in favor of Sun Anchor Blue Finance, LLC ("Sun AB Finance"), in the amount of $3.25 million. Sun AB Finance is an affiliate of Sun Anchor Blue, the sole owner of Anchor Parent's voting stock, and is an indirect affiliate of Sun Capital. As of the Petition Date, the amount outstanding under the Subordinated Note remains $3.25 million. The obligations under the Subordinated Note are secured by third priority liens on and security interests in substantially all of the assets of Anchor Blue. Anchor Parent guaranteed the obligations of Anchor Blue under the Subordinated Note, and granted a subordinated lien on and security interest in substantially all of its assets to support such obligations. Pursuant to that certain Subordination Agreement,

---

[5] SCSF Hub, LLC, an affiliate of Sun Capital, holds a participation interest in the loans extended under in the Second Lien Credit Agreement.

dated as of November 19, 2010, by and among the Debtors, the First Lien Lender, the Second Lien Agent and Sun Anchor Blue Finance, all rights of Sun Anchor Blue Finance under the Subordinated Note and the related security documents are subordinated to the prior payment in full of the loans outstanding under the First Lien Credit Agreement and the Second Lien Credit Agreement.

**E.    Events Leading to the Filing of the Chapter 11 Cases.**

11.    On May 27, 2009, the predecessors of the Debtors (the "Predecessor Debtors") each filed a Chapter 11 Petition in the United States Bankruptcy Court for the District of Delaware (the "First Bankruptcy").  In August 2009, following an auction approved by the Bankruptcy Court, a designee of Ableco (the "Designee") acquired a substantial portion of the assets of the Predecessor Debtors in a sale pursuant to Section 363 of the Bankruptcy Code. Thereafter, through a series of transactions, the Debtors' current owners acquired ownership from the Designee.

12.    Prior to the First Bankruptcy, the Predecessor Debtors had experienced operational losses.  Those losses were funded by increased borrowings under the previous credit facilities as well as by the infusion of additional debt capital provided to the Predecessor Debtors.  The Predecessor Debtors continued to experience significant losses in early 2009, leading to the First Bankruptcy.

13.    The Predecessor Debtors closed approximately 65 underperforming stores during the First Bankruptcy, including their stores in Florida and Georgia.  Following their ultimate acquisition by Sun Anchor Blue, the Debtors focused on performing in a smaller geographic area, namely, the western and southwestern United States.

14.    It was anticipated that modest losses would occur in the months following the acquisition of the Debtors.  Unfortunately, the ongoing downturn in the national economy caused

severe and unexpected financial pressures.  Since August 2009, the Debtors have suffered from unexpectedly poor sales during the holiday season, traditionally the strongest season for sales.

15.     In October, 2010, the Company began a process to obtain additional funding from existing investors in order to maintain the Company as a going concern.  In late November 2010, the Company successfully raised an additional $3,250,000 in capital in the form of a Subordinated Secured Promissory Note from Sun Anchor Blue Finance, LLC.

16.     By December 23, 2010, after three straight weeks of declining sales and profit margin, it became apparent that further financing would be necessary, and once again we approached our existing investors for additional funding.  Our efforts were unsuccessful.  To that end, as with many retail businesses in today's economic times, the Debtors concluded that the business was not likely to be viable and that the best means of maximizing the value of their assets for the benefit of creditors was to conduct an orderly liquidation through the use of a professional liquidator.

17.     In an effort to streamline and expedite the liquidation process, the Debtors created an on-line data room and contacted various liquidating agents and entered into confidentiality agreements (and diligence) with three competing liquidators.   The professional liquidators indicated that there would be more value created for the estate if sales could begin promptly after the Christmas holiday, and if the liquidation were conducted under the protection and oversight of the bankruptcy court.   In order to expedite the selection of a liquidator and begin the immediate liquidation process, the Debtors conducted a competitive bidding process to assure the highest and best bid for the liquidation so as to maximize value of the assets.  The Debtors then entered into a "stalking horse" agency agreement with SB Capital Group, LLC, Great American Group, LLC, Hudson Capital Partners, LLC, and Tiger Capital Group, LLC

(collectively, the "Horse Agent," and such agreement, the "Horse AA"). On January 5, 2011, the Debtors conducted an auction between the competing liquidators based upon the form of and terms in the Horse AA. I, along with FTI, as well as representatives of the Prepetition Lenders (in addition to the bidders), attended the auction, which lasted for approximately 4 hours and was duly transcribed. After more than 10 rounds of bidding (and a significant increase in the guaranteed minimum price), and careful consideration of the submitted bids, the Debtors determined (in consultation with the Prepetition Lenders) that the bid from GB/Hilco represented the highest and best offer, and that entry into the Agency Agreement with GB/Hilco to conduct the Store Closing Sales was in the Debtors' best interest and the best interest of their creditors.

18.     Accordingly, on January 6, 2011, the Debtors executed the Agency Agreement with GB/Hilco. On January 7, 2011, the Agent officially commenced the Store Closing Sales at all of the Debtors' retail locations in accordance with the terms of the Agency Agreement and the Store Closing Guidelines therein. The Agent is presently operating store liquidation sales pursuant to the Agency Agreement.

19.     A more detailed description of the significant provisions of the Agency Agreement is below in the discussion of the motion seeking to assume the Agency Agreement.

**F.     Objectives of the Chapter 11 Filing.**

20.     The Debtors commenced these Chapter 11 cases to promptly and efficiently liquidate their assets so as to provide maximum value to their creditors. The Agency Agreement is a critical part of that process, and the Debtors seek Bankruptcy Court approval of the assumption of that agreement. The Debtors have also received the consent of their prepetition secured lenders to use cash collateral, which will provide adequate financing for these Chapter 11 cases through the liquidation process.

21.     The Agency Agreement provides a guaranteed minimum amount of cash sufficient to pay the Debtors' first lien secured lenders in full as well as the anticipated administrative expenses of the Bankruptcy Estate, including professional fees and rent during the liquidation sales.   There should also be funds remaining to provide a partial payment to the Debtors' second lien secured lenders. The Debtors do not anticipate recovery of funds sufficient to provide their third lien lenders or general unsecured creditors with a distribution.

## II.     FIRST DAY MOTIONS

22.     Concurrently with the filing of their Chapter 11 Cases, the Debtors will be filing a number of First Day Motions.  The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' Chapter 11 Cases (the "First Day Hearing"), at which the Court will hear the First Day Motions.

23.     As set forth above, the First Day Motions are generally designed to satisfy the following goals:  (a) continue the Debtors' operations in Chapter 11 with as little disruption and loss of productivity as possible, (b) maintain the confidence and support of customers, employees, suppliers and certain other key constituencies during the orderly liquidation, and (c) establish procedures for the smooth and efficient administration of these cases.  I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above, and ultimately will be critical to the Debtors' ability to achieve a successful reorganization.

### A.    Debtors' Motion for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases

24.     These cases involve two affiliated Debtors with thousands of potential creditors.  I have been advised that the entry of an order of joint administration will (a) significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, (b) render the

completion of various administrative tasks less costly, and (c) minimize the number of unnecessary delays associated with the administration of separate Chapter 11 cases. Accordingly, I believe that the joint administration of the Debtors' estates is appropriate under the circumstances.

### B. Debtors' Motion for an Order Extending the Time to File Schedules and Statements of Financial Affairs

25.     Pursuant to this Motion, the Debtors seek an order granting the Debtors an extension of thirty (30) days, in addition to the automatic 30-day extension under Local Rule 1007-1(b), to file their Schedules and Statements, without prejudice to the Debtors' ability to request an additional extension if necessary.  Such extension would give the Debtors a total of sixty (60) days from the Petition Date to file their Schedules and Statements.

26.     The Debtors believe, and I agree, that cause exists to extend the deadline for the Debtors to file their Schedules and Statements given (i) the size and complexity of the Debtors' businesses, (ii) the number of potential creditors, and (iii) the numerous burdens the liquidation efforts will impose on the Debtors, particularly in the early days of these chapter 11 cases.  The Debtors' management and employees, together with their outside advisors, have been working diligently to begin the process of compiling the information necessary for the Schedules and Statements.  The magnitude of that task, when taken together with the considerable stresses of preparing to file these chapter 11 cases, the varying demands on management's time related to the Debtors' transition into chapter 11, and the ongoing burdens of operating the Debtors' businesses on a day-to-day basis, supports the requested extension of the Current Deadline.

27.     Based on the foregoing, I believe that the entry of an order granting this motion is in the best interests of the Debtors' estates and their creditors

### C. Debtors' Motion for Entry of an Order Authorizing the Retention and Employment of Epiq Bankruptcy Solutions, LLC as Notice, Claims and Solicitation Agent

28.     I have been advised that creditors and parties in interest in these cases are entitled to notice generally, that many of the Debtors' thousands of creditors can be expected to file proofs of claims in the Debtors' Chapter 11 cases and that the noticing, receiving, docketing and maintaining of proofs of claims in this volume would be unduly time consuming and burdensome for the Office of the Clerk of the Court (the "Clerk's Office").

29.     I believe that the most effective and efficient manner of providing notice to creditors and parties in interest in these Chapter 11 cases, and administering the claims process, is for the Debtors to retain an independent third party, Epiq Bankruptcy Solutions, LLC ("Epiq"), to act as the Debtors' Claims and Noticing Agent.  I understand that Epiq is a data processing firm that specializes in Chapter 11 administration and related tasks, including noticing, claims processing, voting and other administrative tasks in Chapter 11 cases.  The Debtors desire to engage Epiq to distribute certain designated notices and to maintain claims files and a claims and voting register.  The Debtors believe that such assistance will expedite service of notices, streamline the claims administration process and permit the Debtors to focus on their reorganization efforts.

30.     Utilizing Epiq as the Claims and Noticing Agent in these cases will allow the Debtors to avoid duplication in claims administration and in providing notices to their creditors.  Additionally, the large number of creditors and other parties in interest involved in the Debtors' Chapter 11 cases would almost certainly impose heavy administrative and other burdens upon the Court and the Clerk's Office.  To relieve the Court and the Clerk's Office of these burdens, the Debtors propose to engage Epiq as the Claims and Noticing Agent in their Chapter 11 cases.

31.     Based on the foregoing, I believe that Epiq's retention is in the best interests of the Debtors' estates and their creditors.

**D.     Debtors' Motion for Entry of an Interim and Final Order, Inter Alia, Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services**

32.     In the ordinary course of their business, the Debtors incur utility expenses for water, sewer service, electricity, natural gas, telephone service, internet service, waste management service and other services. Approximately 66 utility providers (as such term is used in Section 366 of the Bankruptcy Code, collectively, the "Utility Providers") provide these services through approximately 215 accounts. The Utility Providers do not include parties that are obligated to provide services to the Debtors pursuant to the terms of a contract.

33.     On average, the Debtors spend approximately $315,000.00 each month on utility costs. In the ordinary course, the Debtors pay their utility costs through a third-party payment processor, Cass Information Systems, Inc. Prior to the Petition Date, the Debtors had a history of timely payment of utility costs. The Debtors are not currently aware of any past due amounts. However, due to the timing of the filings in relationship to the Utility Providers' billing cycles, certain utility costs have been invoiced to the Debtors for which payment is not yet due and other utility costs for services provided since the end of the last billing cycle have not been invoiced to the Debtors. As of the Petition Date, the Debtors estimate that they have approximately $1.6 million in unpaid, but not overdue, utility costs.

34.     Given the number of Utility Providers from which the Debtors receive services, I understand, based on the advice of counsel, that procedures are necessary to deal with the adequate assurance requirements of Section 366 of the Bankruptcy Code and to avoid any interruption of the utility services provided to the Debtors. Uninterrupted utility services are

essential to the Debtors' ongoing retail operations and, therefore, to the success of these Chapter 11 cases.

35. Based on the foregoing, I believe that the entry of an order granting this motion is in the best interests of the Debtors' estates and their creditors

**E. Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to (I) Pay Certain Prepetition Employee Obligations, and (II) Continue Certain Employee Obligations in the Ordinary Course Postpetition and (B) Authorizing and Directing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

36. The maintenance of the Debtors' workforce is vital to the continuation of their business in the ordinary course and to the success of their orderly liquidation process. Any deterioration in employee morale or departures at this critical juncture would undoubtedly have a devastating impact on the Debtors, the value of their assets and business, their operations, and ultimately, their ability to conduct an orderly liquidation.

37. Any interruption in the payment of Employee Obligations would have a devastating effect on employee morale and dedication prompting large numbers of employees to seek other employment and having a material, negative impact on the Debtors' performance. Indeed, for many employees, the loss of a single paycheck or health benefits would cause hardship for the employees and their families which would likely provoke these consequences in short order. Accordingly, I believe that the payment of the prepetition Employee Obligations and the continuation of the Employee Obligations set forth in the motion are in the best interest of the Debtors' estates and creditors

a. **Salary and Wages**

38. The Debtors employ over 1400 full-time and part-time employees in their home office and across approximately 117 store locations in nine states, including executives, store managers, sales associates, and support staff. Store location employees are paid every other

Friday, through Saturday of the previous week.  Corporate Office employees are paid every other Friday and are paid on a current cycle.   All employees are paid either through direct deposit or by physical check.

39.     The Debtors utilize an outside service provider, ADP ("ADP"), for human resources, 401(k) plan contributions, and payroll processing in order to facilitate payment of wages and salaries and deductions for benefits and 401(k) contributions.   In exchange for services provided, ADP is paid a monthly fee which fluctuates depending upon the types of checks issued, direct deposit voided,  manual checks voided, COBRA eligibility notices sent, number of COBRA participants, debit cards issued under the Debtors' Flex Spending Account Program (described below), electronic I-9's requested, and background checks requested by the Debtors.    The average monthly cost to the Debtors for services provided by ADP is approximately $30,500.00.  The Debtors are seeking authorization to pay prepetition obligations to ADP in an amount not to exceed $55,000.00 and to continue to honor their obligations to ADP postpetition in the ordinary course of business.

40.     All wage and salary payments, withholdings for taxes, deductions for 401(k) contributions, garnishments, child support payments and similar deductions, and deductions for health benefits are processed by ADP.   The Debtors fund such amounts through a separate concentration account at PNC Bank ("PNC") on the day of payment (i.e., every other Wednesday and every other Thursday).   The Debtors' average monthly payroll for all employees is approximately $2,438,000.00.

41.     The Debtors' most recent payroll cycle was completed on January 1, 2011, for store employees (with payment occurring on January 7, 2011), and for corporate office staff, the on January 8, 2011 (with payment occurring on January 7, 2011).   The next cycle for store

employees will be completed on January 15, 2011, with payment on January 21, 2011; the next cycle for corporate office employees will be completed January 22, 2011, with payment occurring on January 21, 2011. The Debtors seek permission to pay the January 21, 2011 payroll, in the aggregate amount of approximately $350,000[6] a portion of which relates to the prepetition period. As of the Petition Date, the Debtors believe that no employee is owed in excess of $11,725.00 for pre-petition salary, wages and/or any Reimbursable Expenses (as defined herein), and the Debtors are not requesting and do not propose to pay any employee in excess of $11,725.00 on account of pre-petition salary, wages and/or Reimbursable Expenses.

42.     The Debtors also further seek permission to pay prepetition wages, salaries and related withholdings and deductions in respect of checks drawn prepetition which have not yet been presented for payment. The Debtors do not know the number of employees who have not yet presented checks for payment but represent that no individual check exceeds the statutory priority cap of $11,725.00. Accordingly, the Debtors request that PNC, and all applicable banks and other financial institutions, be authorized and directed to honor any remaining physical paychecks for prepetition payroll periods, which may not have been presented as of the Petition Date.

43.     Finally, the Debtors seek permission to continue to pay wages and salaries in the ordinary course of business postpetition. For the foregoing reasons, I believe that payment of these obligations is in the best interest of the Debtors' estates and creditors.

b.     **Employment Agencies**

44.     The Debtors utilize employment agencies to provide additional support in the Debtors' home office, distribution centers, and retail stores on a temporary or project-oriented

---

[6] The Debtors prepare payroll numbers at the end of each payroll cycle after all information relevant to the pay cycle is known. As the Petition Date occurred in between two payroll cycles, the dollar amounts to be paid on January 21, 2011 are not yet fixed.

basis, including Kimco and Apple One, which provide temporary personnel in various areas. Kimco and Apple One are each paid on a weekly basis.

45.     As of the Petition Date, the Debtors estimate that approximately $15,100.00 is due or will become due to Kimco and $1,000.00 is due or will become due to Apple One, in each case, for the month of December with respect to temporary employees provided to the Debtors and fees owed to the agencies, all or most of which relates to the prepetition period.  The Debtors request authority to pay such amounts and to continue to honor any postpetition obligations to such temporary employment agencies in the ordinary course of business.

c.     **Payroll Taxes and other Deductions**

46.     The Debtors are required by law to withhold from employees' wages and salaries amounts related to federal, state, and local taxes (the "<u>Withholding Taxes</u>") and to remit such Withholding Taxes to the appropriate taxing authorities.  The Debtors are also required to make matching payments on account of social security, Medicare and FICA taxes (together with the Withholding Taxes, the "<u>Payroll Taxes</u>").  In addition, the Debtors may be required by law to process other deductions, including garnishments and child support payments, none of which increases the overall compensation amounts paid by the Debtors.  All such deductions and Payroll Taxes are administered by ADP through the payroll process.

47.     The Debtors respectfully request permission to withhold and pay prepetition Payroll Taxes and to process other mandated deductions for salaried employees and for hourly employees, and to continue to do so postpetition in the ordinary course of business.

d.     **Reimbursable Business Expenses**

48.     The Debtors maintain a business expense policy pursuant to which employees are reimbursed for certain business related expenses incurred in the scope of their employment, including business-related travel, business meals and entertainment, and other miscellaneous

expenses (collectively, the "Reimbursable Expenses").  Reimbursable Expenses are reimbursed to the employees through the Debtors' regular payroll process and administered through ADP. The Debtors' average monthly cost for Reimbursable Expenses for the last twelve (12) months is approximately $70,000.00.

49.    As of the Petition Date, the Debtors estimate that prepetition Reimbursable Expenses are approximately $15,000.00.  The Debtors seek authority to pay such prepetition obligations and to pay Reimbursable Expenses as they arise in the ordinary course of business.

e.    **Employee Health Insurance Plans**

50.    In the ordinary course of their business, and as is customary for most large retailers, the Debtors maintain various employee benefit plans and policies that provide eligible employees with medical, dental, vision, disability and life insurance, prescription drug coverage, employee savings, and other similar benefits.  Only salaried employees and full-time hourly benefited employees are eligible to participate in the employee benefits.

51.    An important component of the employee benefits provided by the Debtors is the health insurance, including medical, prescription, dental and vision coverage (collectively, the "Health Benefits").  Employees may choose from various PPO and Debtor self-insured plans provided through third party carriers.[7]  For all health insurance plans, the Debtors pay all administrative fees as well as a portion of the insurance premiums thereunder on a monthly basis and the employees pay the remainder through payroll deductions.  For self-insured plans, the Debtors pay the claims on a rolling basis.  The Debtors also offer flexible spending accounts, which are fully funded by employee contributions (the "Flex Spending Account Program").

---

[7]  The Debtors maintain one self-insured plan, the Execu-Care executive health expense reimbursement plan.

52.     The Debtors are current with respect to (i) all premiums and administrative fees in connection with Health Benefits through December 10, 2010, and (ii) claims under self-insured plans through on or about November 30, 2010.   The aggregate amount for premiums, administrative fees and claims for all Health Benefit policies currently due or which will become due postpetition with respect to the prepetition period is approximately $15,000.00.  The Debtors seek authority to pay such prepetition premiums, fees and claims in an amount not to exceed $15,000.00, and to continue paying the employee Health Benefit premiums, administrative fees and claims postpetition in the ordinary course of business.  Finally, the Debtors seek authority to continue to offer flexible spending accounts to their employees.

f.     **Employee Life Insurance and Disability Insurance**

53.     The Debtors also provide all eligible employees with basic life, accidental death and dismemberment, and long-term disability insurance (collectively, the "Other Insurance Benefits") in amounts corresponding to the employee's salary.  The Debtors pay the premiums for basic life, accidental death and dismemberment, and long-term disability insurance on behalf of their employees.  Employees may elect short-term disability, supplemental life insurance, and supplemental accidental death and dismemberment at their own expense.

54.     The Debtors believe that they are current with respect to premiums, administrative fees and claims for the Other Insurance Benefits through December 31, 2010.  Amounts due, or which will become due, postpetition for the prepetition period in respect of Other Insurance Benefits total approximately $2,000.00.   The Debtors seek authority to pay such amounts, and to continue to pay obligations accruing in respect of the Other Insurance Benefits in the ordinary course postpetition.

g.    **401(k) Plan**

55.    The Debtors offer all eligible U.S. employees the opportunity to participate in a 401(k) savings plan (the "401(k) Plan").  State Street Bank and Trust ("State Street") acts as the plan trustee and Transamerica and Mercer serve as the investment advisors.  Under the 401(k) Plan, employees may contribute from 1% to 75% of their eligible earnings on a pre-tax basis. The Debtors do not maintain a matching program.

56.    For the payroll periods ending on January 1, 2011 and January 8, 2011, the Debtors seek permission to continue to process 401(k) deductions and loans in an aggregate amount not to exceed $26,000.00.    In addition, the Debtors seek permission to continue processing 401(k) deductions and loans consistent with their prepetition practices described herein.

h.    **Vacation and Personal Days**

57.    The Debtors' employee policy provides for Time Off Benefits ("TOB") for vacation and personal days for benefited hourly employees and salaried employees.  All benefit-eligible employees accrue TOB days based on the number of years of service and rank.  Accruals for TOB days for each employee are capped at one and half times such employee's annual TOB benefit.  Benefits are calculated as of January 1 of each calendar year.  Upon termination of employment, whether voluntarily or involuntarily, the employee's unused TOB time is calculated and paid in his/her final paycheck.  As of the Petition Date, the Debtors estimate that they have approximately $215,000.00 of accrued and unpaid obligations for TOB days.

58.    The Debtors do not seek to honor their pre-petition policy of paying employees for accrued TOB time upon termination, except to the extent required by law.  To the extent required by law, the Debtors seek permission to continue to honor such obligations post-petition in the ordinary course of business.  To the extent permitted under applicable law, the Debtors

intend to honor the TOB policy by permitting employees to use their TOB time, in the ordinary course, during the post-petition period.

59.     I believe that the payment of the amounts described herein and the continuation of the employee programs is in the best interests of the Debtors' estates and creditors, and is critical to the success of the Debtors' reorganization efforts

### F.  Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Customer Programs

60.     In the ordinary course of business and as is customary in the retail industry, the Debtors engage in certain activities to develop and sustain a positive reputation and relationship with their customers and effectively promote their products.  To that end, the Debtors have implemented various customer programs and policies (collectively, the "Customer Programs") designed to ensure customer satisfaction, increase sales, maintain customer loyalty, improve profitability, and generate goodwill for the Debtors and their products.

61.     The Debtors seek authority to temporarily continue the Customer Programs in the ordinary course of business.  The Debtors will continue honoring Gift Cards (as defined below) until January 17, 2011 (the "Gift Card Cutoff Date") and will continue to honor the Return Policy (as defined below) until January 17, 2011 (the "Return Policy Cutoff Date" and collectively with the Gift Card Cutoff Date, the "Cutoff Dates").

62.     Prepetition, the Debtors sold gift cards (the "Gift Cards") to customers through the Debtors' retail stores and internet website.  The Gift Cards were purchased in any amounts designated by customers.  Upon purchase, the Gift Cards were "activated" and could then be redeemed at any time with no expiration date.  Gift Card sales accounted for approximately .76% of the Debtors' annual sales. On average, approximately 56% of Gift Cards are redeemed within

one year of purchase. Gift Cards are not redeemable for cash. As of the Petition Date, the Debtors had an outstanding liability on account of Gift Cards of approximately $1 million.

63.     Historically, the Debtors' return policy (the "Return Policy") provides that a customer may return a purchased item to any retail store for a full refund or store credit within thirty days of purchase and with a receipt. Purchases made with a Gift Card will be returned in the form of a Gift Card. Further, items returned or exchanged must be new, unused and in their original packaging. The average return rate is approximately 3.19%. Although the Agent is now conducting going out of business sales on an "all sales final" basis, the Debtors will continue to honor its prior return policy through the Return Policy Cutoff Date. If the customer has a receipt, the customer is entitled to a full refund or exchange of merchandise. If the customer does not have a receipt, the customer is entitled to an exchange of merchandise or an in-store credit for the item's lowest sales price.

64.     I believe the continuation of the Customer Programs is vital to the Debtors' business and fully support the requested relief.

### G. Debtors' Motion for Entry of an Order Authorizing the Debtors to Pay Prepetition Amounts Owed to Common Carriers and Customs Brokers

65.     The Debtors seek entry of an order authorizing, but not directing, the Debtors to pay, in their sole discretion, prepetition amounts owed to certain domestic and international common carriers, shippers, freight forwarders, truckers, consolidators and customs brokers (collectively, the "Common Carriers") that the Debtors use for the shipment, transport, delivery and storage of goods in the ordinary course of the Debtors' business.

66.     In connection with the normal operation of their business, the Debtors rely upon the Common Carriers to obtain, store and transport the Merchandise. In most cases, the Debtors currently hold title to the Merchandise in transit.

67.    The Debtors' business operations and the success of these Chapter 11 cases depend on the delivery of the Merchandise in a timely manner.  If the Common Carriers discontinue or delay shipping the Merchandise, the Debtors' inventory levels will fall substantially and disrupt the Debtors' orderly liquidation.  More importantly, the Debtors will be unable to sell such Merchandise, and, accordingly, unable to maximize the value of such assets for the benefit of their creditors.

68.    As of the Petition Date, the approximate retail value of the Merchandise ordered and either awaiting transit or in transit to the Debtors' stores and distribution centers is $175,747.00.   In contrast, the Debtors estimate that the total amount owing to all Common Carriers and the maximum amount required to obtain or deliver the Merchandise is approximately $297,055.00.  Accordingly, the amounts owed to the Common Carriers represent a small fraction of the value of the Merchandise.

69.    If these charges are not paid by the Debtors, I am informed by counsel that goods held by the Common Carriers might be subject to possessory liens under applicable state law.  If the Common Carriers were to hold the Debtors' goods, severe disturbance to the Debtors' ability to stock their retail stores and to sell merchandise postpetition would occur.  Based on the foregoing, I believe the payment of the undisputed amounts owed to the Common Carriers will prevent disruption of the Debtors' business and harm to the Debtors' estates.

### H. Debtors' Motion for an Order Authorizing the Debtors to Pay Prepetition Sales and Use Taxes, Certain Other Government Charges and Related Obligations

70.     The Debtors are seeking authority to pay certain prepetition sales and use taxes and related obligations (collectively, the "Taxes") owed to various state and local taxing authorities (the "Taxing Authorities").

71.     In the ordinary course of business, the Debtors are required to collect sales taxes (the "Sales Taxes") from purchasers of their products on a per sale basis and periodically remit the Sales Taxes to the applicable Taxing Authorities.  Typically, Sales Taxes accrue as products are sold, and such taxes are calculated based on a statutory percentage of the sale price.  The statutory percentage required to be withheld by each store varies by state and county in which the store operates.  The process by which the Debtors remit the Sales Taxes also varies, depending on the nature of the tax and the Taxing Authority to be paid.

72.     Most Taxing Authorities require that the Sales Taxes be remitted monthly, whereas others require quarterly or semi-annual remittances.  The frequency required by a Taxing Authority is generally dependent upon the level of sales volume of the stores located within that Taxing Authority's jurisdiction. Most jurisdictions require the Debtors to submit the appropriate tax returns and remit the tax withholdings on the 20th day of the month following the end of a tax period; others set the 15th, 25th or 30th day of the month as the date on which tax returns and remittances are due.  Sales Taxes are remitted to the relevant Taxing Authorities on the basis of sales taxes actually collected from customers during the prior period.

73.     The Debtors also incur use taxes (the "Use Taxes").  The Debtors' liability for Use Taxes arises from purchases of fixed assets, supplies or signage without sales tax.

74.     The Debtors traditionally remit Sales Taxes and Use Taxes through an automatic clearing house ("ACH") system or by mailing physical checks.  As of the Petition Date, the

Debtors estimate that approximately $2,000,000.00 in Sales Taxes and Use Taxes relating to the prepetition period will be due and owing to the Taxing Authorities in the ordinary course of business. The Debtors seek authority to pay all prepetition obligations in respect of the Taxes owed to the Taxing Authorities.[8]

75. Payment of the Taxes is critical to the Debtors' continued, uninterrupted obligations. Nonpayment of these obligations may cause the Taxing Authorities to take precipitous action, including, among others, filing liens, preventing the Debtor from conducting business in the applicable jurisdictions, seeking to lift the automatic stay, and imposing personal liability on the Debtors' officers and directors, all of which would disrupt the Debtors' ongoing business operations and could potentially impose significant costs on the Debtors' estates. I believe that the timely payment of the Sales Taxes and Use Taxes is necessary to avoid such distractions, and that the relief requested in this motion is necessary and in the best interest of the Debtors' estates and creditors.

## I. Debtors' Motion for Authority to (I) Pay Prepetition Obligations Under Workers Compensation, General Liability Insurance, Property Insurance, and Cyber Liability Insurance Programs and (II) Continue Such Insurance Programs and Honor Postpetition Obligations in Respect Thereof In The Ordinary Course of Business

76. In connection with the operation of the Debtors' business, the Debtors maintain various insurance programs, including with respect to general liability, property, automobile liability, casualty, professional, and workers compensation. Premiums due under each of the foregoing insurance programs are financed by third parties pursuant to financing arrangements.

---

[8] Certain taxes such as income, FICA and Medicare taxes are withheld from the Debtors' employees' paychecks and remitted by the Debtors' payroll administrator to the appropriate federal, state or local taxing authorities. Concurrently with the filing of this Motion, the Debtors also have filed a motion seeking authority to satisfy certain obligations relating to prepetition employee wages and benefits, including obligations with respect to prepetition taxes withheld from employee paychecks but not yet remitted to the applicable taxing authority or other intended recipient.

a. **Workers Compensation Program**

77. Under the laws of the various states in which they operate, the Debtors are required to maintain for workers compensation coverage for claims arising from or related to employment with the Debtors (the "Workers Compensation Insurance") with respect to which The CNA Insurance Company ("CNA"), is the carrier. The Debtors finance premiums payable to CNA pursuant to the arrangements described below. As of the Petition Date, there are claims being processed by CNA; however, the Debtors have no deductible obligation with respect to these claims.

b. **General Liability Insurance Program**

78. The Debtors have coverage for general liability (the "General Liability") with respect to which National Fire Insurance of Hartford ("National Fire"), a CNA subsidiary, is the carrier. The Debtors finance premiums payable to National Fire pursuant to the arrangements described below. As of the Petition Date, there are claims being processed by National Fire; however, the Debtors have no deductible obligation with respect to these claims.

c. **Property Insurance**

79. The Debtors have coverage for, among others things, real and personal property, machinery and equipment, improvement and betterments, inventory, electronic data equipment, business interruptions and motor vehicles (the "Property Insurance") with respect to which AXIS Insurance Company ("Axis") is the carrier. The Debtors finance premiums payable to Axis pursuant to the arrangements described below. The Debtors also have a deductible that is netted on claims once settled. As of the Petition Date, there are no claims being processed by Axis.

d. **Automobile Liability Insurance**

80. The Debtors have automobile liability insurance coverage (the "Auto Liability") with respect to which Continental Casualty Company ("Continental"), a CNA subsidiary, is the

carrier. The Debtors finance premiums payable to Continental pursuant to the arrangements described below. The Debtors also have a deductible that is netted on claims once settled. As of the Petition Date, there are no claims being processed by Continental. The Debtors seek authority to continue to pay the Auto Liability Claims Payments as they become due in the ordinary course.

e. **Umbrella Liability Insurance**

81.     The Debtors have umbrella liability insurance coverage (the "Umbrella Liability") with respect to which Continental is the carrier. The Debtors finance premiums payable to Continental pursuant to the arrangements described below. The Debtors also have a deductible that is netted on claims once settled. As of the Petition Date, there are no claims being processed by Continental.

f. **Insurance Premium Financing Agreements**

82.     Prior to the Petition Date, the Debtors determined, in the ordinary course of business in their business judgment, to finance the annual premiums payable under certain of their insurance programs. Specifically, with respect to their Workers Compensation Insurance, General Liability, Auto Liability and Umbrella Liability programs, the Debtors entered into a premium installment plan with their broker, Integro, covering $425,193.00 of annual premiums (the "Integro Financing Arrangement"). With respect to the Debtors' Property Insurance programs, the Debtors entered into a Premium Finance Agreement with Premium Assignment Corporation ("Premium"), covering $200,000.00 of annual premiums (the "Premium Financing Agreement", and together with the Integro Financing Arrangement, the "Financing Agreements").

83.    Under the terms of the Integro Financing Arrangement, the Debtors made a pre-petition deposit of $106,307.75 in August 2010, and are obligated to make monthly payments of $45,555.04.  The next monthly payment is due on or about January 14, 2011.

84.    Under the Terms of the Premium Financing Agreement, the Debtors made an initial payment of $20,000.00, and are obligated to make monthly payments of principal and interest totaling $16,601.04.  The next monthly payment is due on or about February 3, 2011.

85.    The Debtors are current on their obligations under the Integro Financing Arrangement and the Premium Financing Agreement.  Therefore, the Debtors are requesting authority to continue to pay all financing obligations under the Integro Financing Arrangement and the Premium Financing Agreement in the ordinary course of business postpetition.

86.    Pursuant to the Premium Financing Agreement, the Debtors granted to Premium a security interest in all unearned premiums or other sums that may become payable under the Property Insurance program.  These financing agreements also provide Premium with the right to cancel the financed property insurance policies in the event that a payment default occurs under the Premium Financing Agreement.  Similarly, if the Debtors failed to make payment to Integro in the ordinary course, Integro might seek to cancel the Debtors' Workers Compensation Insurance, General Liability, Auto Liability and Umbrella Liability programs.

87.    If Premium were to cancel the Debtors' Property Insurance, or Integro were to cancel the Debtors' Workers Compensation Insurance, General Liability, Auto Liability or Umbrella Liability coverage, there are no assurances that the Debtors could secure replacement policies, or that the replacement policies would provide the same level and scope of coverage.  Even if comparable coverage could be obtained on an expedited basis and without significant gaps in the time period covered, the Debtors believe that the costs associated with obtaining such

coverage would be well in excess of the amounts that remain owing under these financing agreements.

88.     Accordingly, the Debtors are requesting authority to pay all obligations under the Integro Financing Arrangement and the Premium Financing Agreement in the ordinary course of business postpetition.

> **J.   Debtors' Motion for Entry of an Order Pursuant to Section 503(b) of the Bankruptcy Code Granting Administrative Priority Status for Undisputed Obligations to Vendors Arising from the Postpetition Delivery or Receipt of Goods Ordered Prepetition and Authorizing the Debtors to Pay Such Obligations in the Ordinary Course of Business**

89.     In connection with the normal operation of their businesses, the Debtors rely on their vendor community (collectively, the "Vendors") for the provision of goods to be sold in the Debtors' retail store locations.  As of the Petition Date, the Debtors have certain prepetition purchase orders (the "Prepetition Orders") outstanding with various Vendors for goods and services ordered by the Debtors.  The Debtors estimate that, as of the Petition Date, approximately $11,854,145 (based on cost) is outstanding on account of Prepetition Orders, for which the Debtors have not yet received the goods from Vendors.

90.     As a consequence of the commencement of these chapter 11 cases, Vendors may be concerned that the obligations arising from goods shipped or services ordered prepetition, but not yet received by the Debtors, pursuant to the Prepetition Orders, will be treated as general unsecured claims against the Debtors' estates.  Vendors may refuse to ship such goods (or recall shipments thereof) or perform services with respect to such Prepetition Orders unless the Debtors issue substitute postpetition purchase orders or obtain an order of the Court (i) providing that all undisputed obligations of the Debtors arising from the postpetition delivery of goods and services subject to Prepetition Orders and goods that are en route to the Debtors on the Petition

date are afforded administrative priority status under Section 503(b) of the Bankruptcy Code[9] and (ii) authorizing the Debtors to satisfy such obligations in the ordinary course of their businesses. Accordingly, out of abundance of caution, the Debtors respectfully request entry of an order deeming goods and services ordered prepetition and delivered to and/or received by the Debtors postpetition as administrative obligations of the Debtors' estates.

**K. Debtors' Motion for Entry of an Order (A) Authorizing Debtors to (I) Continue Use of Existing Cash Management Systems, Bank Accounts and Business Forms, (II) Authorizing Debtors to Open New Debtor in Possession Accounts, and (III) Continue Performing Ordinary Course Intercompany Transactions, and (B) Extending the Debtors' Time to Comply with Section 345(b) of the Bankruptcy Code**

91.     The Debtors utilize an integrated, centralized cash management system to collect funds, transfer them to a concentration account and disburse them, through other accounts, to pay operating expenses (collectively, the "Cash Management System"). In the ordinary course, the Debtors maintain current and accurate accounting records of all daily cash transactions.

92.     As of the Petition Date, the Debtors maintained the following bank accounts (the "Bank Accounts") with various banks (the "Cash Management Banks"):

a)      Collection Account:  The Debtors maintain this account at PNC Bank, National Association ("PNC"). The Collection Account serves as the collection point for all funds (cash and credit card deposits) moved into and through the Cash Management System. The Collection Account is subject to that certain Blocked Account Agreement dated as of October 5, 2009 by and among Anchor Blue, Inc., PNC Bank, National Association, in its capacity as agent under that certain Revolving Credit and Security Agreement dated August 14, 2009 (the "Senior Agent"), Ableco Finance, LLC, in its capacity as agent under that certain Financing Agreement dated as of August 14, 2009 (the "Term Loan Agent") and PNC (the "PNC Blocked Account Agreement"). Prepetition, the funds collected in this account were automatically swept into the Revolving Credit Facility. Once the Revolving Credit Facility is paid off, the sweep of the Collection Account will

---

[9]      If title passes to the Debtors at the time the Vendor places the goods with the shipper, the goods may be deemed to have been "delivered" to the Debtors even though the Debtors are not yet in possession of such goods. This Motion seeks authority to pay obligations, in the Debtors' discretion, relating to all Prepetition Orders placed by the Debtors for which the goods have not yet been received by the Debtors or, alternatively, to cancel and/or refuse delivery of any goods in order to avoid incurring an administrative expense.

be terminated and the Payables Account and the Operating Account will be funded subject to the terms of the Agency Agreement and the Proposed Cash Collateral Order.

b)  <u>Operating Account</u>:  The Debtors maintain this account at PNC.  The Operating Account is subject to the Blocked Account Agreement.  Prepetition, the Operating Account was funded by transfers from the Revolving Credit Facility, as needed.  Once the Revolving Credit Facility is paid off, the Operating Account will be funded in accordance with the Budget as provided in the Proposed Cash Collateral Order.  This account is used to fund wire transfers for expenses, payroll, payroll taxes, garnishments, and the Wells Fargo FSA Account.

c)  <u>Manual Payroll Account</u>:  The Debtors maintain this account at PNC. The Debtors fund the Manual Payroll Account by transferring funds from the Operating Account.

d)  <u>Payables Account</u>: The Debtors maintain this account at PNC and use it to pay accounts payable, sales and use taxes and other expenses. Prepetition, the Payables Account was funded by transfers from the Revolving Credit Facility, as needed. Once the Revolving Credit Facility is paid off, the Payables Account will be funded in accordance with the Budget as provided in the Proposed Cash Collateral Order.  The Payables Account is a zero-balance account.

e)  <u>Depository Accounts</u>: The Debtors maintain numerous depository accounts at Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>"). In the ordinary course, the Debtors deposit cash and checks from various store locations into the Depository Accounts.  Wells Fargo wires these deposits into the Collection Account daily. The depository accounts at Wells Fargo are subject to that certain Deposit Account Control Agreement (Access Restricted Immediately - Two Secured Parties) dated as of December 4, 2009 by and among Anchor Blue, Inc., the Senior Agent, the Term Loan Agent and Wells Fargo (the "<u>Wells Fargo Blocked Account Agreement</u>" and together with the PNC Blocked Account Agreement, the "<u>Blocked Account Agreements</u>")

f)  <u>Wells Fargo FSA Account</u>: The Debtors fund this account from the Operating Account for flexible spending account reimbursements.

93.  The Debtors' Cash Management System is similar to those commonly employed by corporate entities of comparable size and complexity.  Such systems provide numerous benefits, including, without limitation, the ability to:  (a) quickly create status reports on the location and amount of funds, which allows management to track and control such funds; (b)

ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds. Granting the Debtors authority to continue using the Cash Management System will help facilitate a smooth transition into chapter 11, particularly since the Prepetition Secured Lenders have consented, subject to entry of the Proposed Cash Collateral Order, to the use of cash collateral based in part on their familiarity with the Debtors' Cash Management System.

94.     In the ordinary course of business, the Debtors use numerous varieties of business forms. To minimize expenses to their estates and avoid confusion on the part of employees, customers and suppliers, the Debtors respectfully request that the Court authorize the Debtors to continue to use all correspondence and business forms (including, without limitation, checks, letterhead, purchase orders and invoices) as such forms were in existence immediately before the Petition Date without reference to the Debtors' status as debtors-in-possession, <u>provided</u>, <u>however</u>, that upon depletion of the Debtors' check stock and other business forms, the Debtors will obtain new check stock and business forms reflecting their status as debtors-in-possession. With such authorization, the Debtors will be able to avoid the expense and delay of ordering entirely new business forms.

95.     Based on the foregoing, I believe that granting the Debtors authority to continue using the Cash Management System is necessary and appropriate to facilitate a smooth transition into Chapter 11, and is in the best interests of the Debtors' estates and their creditors.

**L.  Debtors' Motion for Entry of an Order Authorizing and Approving (I) Assumption of Agency Agreement, (II) Continued Store Closing Sales, (III) Granting of Lien to Agent, (IV) Payment of Break-Up Fee, (V) Abandonment of Property, and (VI) Other Related Relief**

96.     The Debtors seek an order authorizing and approving the (i) assumption of the Agency Agreement and the Store Closing Guidelines attached thereto, (ii) continued Store

Closing Sales at all of the Debtors' retail locations pursuant to the terms of the Agency Agreement, (iii) grant of a security interest in the inventory and Owned FF&E to the Agent in connection with such Store Closing Sales, (iv) payment of a break-up fee to the Horse Agent, and (v) abandonment of any remaining property at the Closing Stores upon the conclusion of the Store Closing Sales.

      97.    While the Debtors respectfully refer this Court to the Agency Agreement in its entirety, the significant terms of the Agency Agreement are summarized below:[10]

    a.    <u>Services</u>:  The Agent shall serve as the exclusive agent for conducting the Store Closing Sales and disposing of the Owned FF&E pursuant to the terms of the Agency Agreement.  In addition, to the extent that Proceeds exceed the sum of (i) the Guaranteed Amount, (ii) Expenses of the Sale, and (iii) two percent (2%) of the aggregate Retail Value of the Merchandise (the sum of (i), (ii) and (iii), the "Sharing Threshold"), then all Proceeds of the Sale above the Sharing Threshold shall be shared equally between the Debtors and the Agent.  (Any amounts to be received by the Debtors in excess of the Sharing Threshold shall be referred to as the "Recovery Amount.")

    b.    <u>Guaranteed Amount</u>:  The Agent has guaranteed a minimum recovery of twenty-seven and one-tenth (27.1%) of the aggregate Retail Value of the Merchandise included in the Sales (the "<u>Guaranteed Amount</u>").

    c.    <u>Sale of FF&E</u>:  The Agent shall sell the Owned FF&E free and clear of any liens, claims and encumbrances in any such Stores and shall have the right to retain all proceeds received from such sales, net only of sales taxes (and such FF&E sales proceeds shall not be deemed "Proceeds").  The Agent shall be responsible for payment of expenses incurred in connection with the disposition of the Owned FF&E.  In exchange, the Agent shall, in addition to all other amounts contemplated by the Agency Agreement, pay to the Debtors on the Payment Date, four hundred fifty thousand dollars ($450,000).

    d.    <u>Payment and Security to the Debtors</u>:  Eighty-five percent (85%) of the Guaranteed Amount shall be payable on a date (the "<u>Payment Date</u>") not later than one (1) business day following the entry of this Order and the execution of the Agency Agreement.  The Agent shall pay to the Debtors the remaining undisputed Guaranteed Amount no later than the earlier of: (i) the date that is thirty (30) business days following the Sale Commencement Date, and (ii) the

---

[10]    Defined terms used in this section but not defined herein shall have the meanings assigned to them in the Agency Agreement.

second business day following the issuance of the audit report of the aggregate Retail Value of the Merchandise by the Inventory Taking Service.  To secure Agent's payment of the remaining unpaid Guaranteed Amount, the Agent shall deliver to the Debtors, naming Lender Agent as beneficiary, an irrevocable standby letter of credit (the "<u>Agent Letter of Credit</u>") in the original face amount equal to the unpaid portion of the Estimated Guaranteed Amount as of the Payment Date.

e.      <u>Compensation to the Agent</u>:  As compensation for its services, the Agent shall be entitled to the Proceeds of the Sale after payment of the Guaranteed Amount, Expenses of the Sale, Recovery Amount, and all other amounts payable to the Debtors from the Proceeds thereof.  In addition, provided that no Event of Default has occurred and continues to exist on the part of the Agent, and after all payments have been made to the Debtors pursuant to the terms of the Agency Agreement, all remaining Merchandise following the Sale Termination Date shall become property of the Agent, free and clear of all liens, claims, and encumbrances, and the proceeds from the disposition of such remaining Merchandise shall constitutes Proceeds under the Agency Agreement.

f.      <u>Expenses of the Store Closing Sales</u>:  The Agent shall be responsible for all Store level operating expenses of conducting the Sale which arise during the Sale Term (the "<u>Expenses</u>").  To secure payment of the Expenses, the Agent shall deliver an irrevocable and unconditional standby letter of credit, naming Lender Agent as beneficiary, in the original face amount equal to two (2) weeks estimated Occupancy Expenses and Payroll Expenses.  Additionally, the Debtors shall fund an Expense Retainer prior to the Debtors' filing of their bankruptcy petitions, in the amount of $400,000 for advertising and supervision Expenses, which Expense Retainer shall be returned to the Debtors on the Payment Date (subject to any applicable setoff provisions under the Agency Agreement).

g.      <u>Sale Period</u>:  The Agent shall complete the Sale on or before February 28, 2011 unless the Sale is extended by mutual agreement between the Agent, Debtors, and Lender Agent, provided that the Agent may also terminate the Sale at any retail store location upon seven (7) days' notice to the Debtors.  At the conclusion of the Sale, the Agent agrees to vacate the Stores in "broom clean" condition, ordinary wear and tear excepted, and except for unsold items of Owned FF&E.

h.      <u>Additional Goods</u>:  Subject to authorization by the Court, and at the Agent's sole cost and expense, the Agent may (but is not required to) supplement the Merchandise in the Stores with goods of like kind and quality as is customarily sold in the Stores ("<u>Additional Goods</u>"), not to exceed 20% of the aggregate Retail Value of the Merchandise.  Sales of the Additional Goods shall run through the Debtors' cash register systems, provided that the Agent shall mark the Additional Goods so as to distinguish the sale of Additional Goods from the sale of Merchandise.  At all times and for all purposes, the Additional Goods and their proceeds shall be the exclusive property, and remain subject to the exclusive

control, of the Agent, and the Agent shall, at its sole cost and expense, insure the Additional Goods. As consideration for allowing the Agent to supplement the Merchandise with Additional Goods, the Agent shall pay to the Debtors seven percent (7%) of the gross proceeds of the sale of Additional Goods after payment of applicable Sales Taxes.

i.      <u>Employee Matters</u>: The Agent may use the Debtors' employees in the conduct of the Sale, and the Agent may select and schedule the number and type of the Debtors' employees so required (the "Retained Employees"). The Retained Employees shall at all times remain employees of the Debtors and shall not be deemed to be employees of the Agent. The Agent may, in its discretion, stop using any Retained Employee at any time during the Sale, and shall provide the Debtors with at least seven (7) days' prior notice so that the Debtors may coordinate the termination of such employee. During the Sale Term, the Debtors shall process the base payroll for all Retained Employees and any former and temporary labor retained by the Agent. In addition, the Agent shall have the right to elect to pay (as an Expense of the Sale), retention bonuses (the "<u>Retention Bonus</u>es") up to a maximum of 10% of base payroll for all Retained Employees who do not voluntarily leave employment and are not terminated "for cause." Such Retention Bonuses shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through the Debtors' payroll system.

j.      <u>Terms of Sale to Customers</u>: All sales of Merchandise will be on a "final sales" and "as is" basis, and all advertisements and sales receipts will reflect the same. The Agent shall accept the Debtors' gift certificates/cards and Store credits issued by the Debtors prior to the Sale Commencement Date until January 17, 2011, but will not honor other customer programs required by the Store Closing Guidelines, including but not limited to all customer satisfaction programs for items purchased prior to the commencement of the Sale. The Agent will accept returns of Merchandise sold by the Debtors prior to the Sale Commencement Date until January 17, 2011.

k.      <u>Security Interest</u>: In consideration of the Agent's payment of the Guaranteed Amount Deposit, Expenses, and the provision of services, the Agent shall have, as of the Payment Date, a valid and perfected first priority security interest in and lien upon the Merchandise, the Owned FF&E and all proceeds from the sale of the Owned FF&E, and the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods, and the Proceeds, junior only to (1) the unpaid portion of the Guaranteed Amount, (2) any amount owed by the Agent to the Debtors on account of Expenses (subject to the Agent's setoff rights, if any), (3) the Recovery Amount, and (4) any other amounts owed by the Agent to the Debtors under the Agency Agreement, without the necessity of filing financing statements to perfect its security interest.

98.     I strongly believe that assumption of the Agency Agreement will provide numerous benefits to the estate and its stakeholders.  First, utilizing a professional liquidating agent with substantial experience and expertise to conduct orderly simultaneous Store Closing Sales will maximize profits for the Debtors in a short amount of time.  In particular, the terms of the Agency Agreement provides for a guaranteed return for the Merchandise (with an additional increased potential shared recovery in accordance with certain thresholds), which minimizes the Debtors' risks and motivates the Agent to maximize proceeds from the Store Closing Sales.

99.     Second, assumption of the Agency agreement will reduce the Debtors' administrative expenses associated with the Closing Stores.  Under the Agency Agreement, the Agent is obligated to pay certain costs of conducting the Store Closing Sales such as the post-petition rent and other carrying costs for the leased Closing Stores during the Sale Term and, in the Agent's discretion, retention bonuses to those eligible store employees.  These significant cost savings increases the overall recovery for the estate's creditors.

100.    Third, the Debtors have already expended substantial efforts soliciting bids and negotiating with other national liquidation firms pre-petition before selecting GB/Hilco as the best offer.  GB/Hilco is not an "insider" (as such term is defined in section 101(3) of the Bankruptcy Code) and the terms of the Agency Agreement are the results of an arms' length transaction.  The Agency Agreement contains the best terms the Debtors could obtain and tested through a fair auction process.  In addition, the Store Closing Guidelines are standard industry guidelines used by professional agents in almost every liquidation sale (and similar to guidelines routinely approved in this District).  Likewise, the terms of sale to customers and the public in the Agency Agreement are reasonable, including honoring prepetition gift cards, and accepting returns of merchandise, until a specified and duly advertised "cut-off" date.

101.     If the Agency Agreement were not assumed, there would be tremendous harm to all stakeholders.  The estate would lose the benefit of the momentum and preparation that has already been started by GB/Hilco in conducting the Store Closing Sales -- all while Debtors (rather than the Agent) paid the carrying costs for the retail stores.  The Debtors and their advisors would also have to devote further time, expense, and efforts in securing an alternative liquidating agent, who then has to become familiar with the Debtors' operations and undertake additional preparations in restarting the Store Closing Sales.

102.     Finally, while the Debtors would continue to negotiate for the best possible terms, it is not at all certain that an alternative agency agreement would provide terms as favorable to the Debtors as those in the GB/Hilco Agency Agreement.

103.     Pursuant to the Agency Agreement, the Debtors' obligations thereunder are entitled to the status of superpriority claims in these Chapter 11 cases, which claims shall be equal in priority to claims under section 364(c)(1) of the Bankruptcy Code and have priority over all other administrative expenses of the kinds specified in, without limitation, sections 105, 326, 503(b), 507(a) or 507(b) of the Bankruptcy Code.  Further, such superpriority claims are to be secured under section 364(d) of the Bankruptcy Code by a valid and perfected first priority security interest in and lien (i) upon the Merchandise, the Owned FF&E and all proceeds from the sale of the Owned FF&E, and the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods, and the Proceeds; and (ii) junior in priority only to (a) an amount equal to the unpaid portion of the Guaranteed Amount, (b) any amount owed by the Agent to the Debtors for Expenses, (c) the Recovery Amount, and (d) any other amount owed by the Agent to the Debtors pursuant to the Agency Agreement (the "Agent Security Interest").

104.	The Agent Security Interest should be properly perfected without the necessity of filing financing statements or further documentation.  The liens, claims, and security interests and other protections granted to the Agent shall continue and shall maintain their priority until all of the Debtors' obligations to the Agent have been indefeasibly paid in full.  The Prepetition Lenders have further agreed that, upon payment of the Guaranteed Amount Deposit and the delivery of the Agent Letter of Credit (as set forth in the Agency Agreement), any presently existing liens or security interest on or in any or all of the Merchandise or the Proceeds shall attach only to the Guaranteed Amount, the FF&E Payment, and the amounts to be reimbursed by the Agent to the Debtors.

105.	The Agent's extension of credit, as well as the other financial accommodations, as set forth in the Agency Agreement, constitute the extension of credit in good faith under section 364(e) of the Bankruptcy Code.  I believe that the consideration provided by the agent pursuant to the Agency Agreement is fair and constitutes reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act and Uniform Fraudulent Conveyance Act and other applicable Federal and State laws of the United States, any territory or possession, and the District of Columbia.

106.	In sum, the Debtors have exercised their sound business judgment in seeking to assume the Agency Agreement, including the terms therein, including, specifically, (i) the grant of a first priority duly perfected lien as described therein, and the (ii) Store Closing Guidelines.

107.	Moreover, ample business reasons exist for continuing the conduct of the Store Closing Sales.  As previously described, the Debtors and FTI had exhaustively analyzed the Debtors' business and various reorganization strategies and determined that an immediate liquidation of the Debtors' retail locations would maximize recoveries for the estate and its

creditors and stop the deterioration of the Debtors' business and assets. There are significant levels of inventory merchandise and FF&E that will be monetized most efficiently and quickly through an orderly process conducted by an experienced liquidation firm.

108.    Immediate Store Closing Sales in accordance with the terms of the Agency Agreement will also minimize the administrative expenses of the estate by reallocating a significant portion of the risks and costs of the Store Closing Sales to the Agent. If the Debtors are not allowed to continue the Store Closing Sales, the estate would suffer significant detriment from the resulting delay, added post-petition expenses, depreciation in the value of the assets, and further time and efforts the Debtors must expend to reformulate a different liquidation strategy.

109.    Therefore, I believe it is imperative that this Court authorize the Debtors to continue with the Store Closing Sales.

110.    To facilitate the sale of the Assets, the Debtors requests authority to sell the Assets through the Store Closing Sales on a final, "as is" basis, free and clear of all liens, claims, encumbrances, mortgages, security interests, conditional sales, or title retention agreements, pledges, hypothecations, judgments or claims of any kind or nature and other interests, with any such Liens in the Assets attaching to the Guaranteed Amount in the same order or priority and with the same force, validity and effect with respect to such Assets prior to the Store Closing Sales.

111.    I understand that the Prepetition Lenders have consented to conduct of the Store Closing Sales by the Agent pursuant to the terms of the Agency Agreement. The Debtors' obligations under the Prepetition Loan can be also satisfied by the payment of the Proceeds from the Store Closing Sales. Finally, the terms of the Agency Agreement provide sufficient

protection to the Prepetition Lenders, including, for example, provisions for the payment of a Guaranteed Amount Deposit and delivery of an irrevocable standby Agent Letter of Credit. Therefore, I understand that the sale of the Assets, to the extent such Assets are subject to the Prepetition Lenders' collateral, is authorized under the Bankruptcy Code.

112.    The Debtors lease all of their retail store locations and thus, the Store Closing Sales may be inconsistent with certain provisions of the governing leases or other documents to which the Debtors are a party, whether or not filed of record, with respect to any of the leased Closing Stores, including, for example, reciprocal easements, "go dark" provisions, landlord recapture rights, and other covenants that purport to restrict or prohibit the Debtors from conducting store closing or similar themed sales. I understand that such restrictive provisions are unenforceable in bankruptcy as they constitute an impermissible restraint on a debtor's ability to effectively administer its estate and maximize the value of its assets under the Bankruptcy Code. Similarly, to the extent there are restrictive provisions in any of the governing leases dictating the manner, method, dimensions relating to or otherwise prohibiting the use of advertising materials or signage to be used relating to the conduct of the Store Closing Sales, the Debtors request that such restrictive provisions be invalidated as improper interference with the Debtors' ability to effectively conduct the Store Closing Sales and maximize the liquidation value of the Assets.

113.    Accordingly, to the extent that any provisions or restrictions exist in any of the leases governing the Closing Stores, this Court should invalidate such provisions and authorize the Agent to conduct the Store Closing Sales in accordance with the Store Closing Guidelines without interference by any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

114.     The Debtors operate their retail locations across numerous States which may have cumbersome state and local laws, statutes, regulations, rules and ordinances governing store closing, liquidation, or similar themed sales, that require long waiting periods, special licenses and permits, or restrictions against bulk sales and augmentation (collectively, "Liquidation Laws").  Compliance by the Debtors of each state's applicable local liquidation laws would be extremely burdensome and adjudication of disputes with local authorities over the application and interpretation of local laws would be tremendously expensive for the estates.  The Debtors' ability to use and sell its assets (including through GOB sales) pursuant to section 363 of the Bankruptcy Code, in order to maximize recovery for the estate's creditors, would be severely undermined if the Court does not provide for a waiver of the Liquidation Laws.

115.     Moreover, in the context of the a bankruptcy proceeding, waiving compliance with Liquidations Laws is entirely appropriate as the Debtors and their assets are subject to this Court's exclusive jurisdiction and this Court would be able to supervise and ensure proper conduct of the Store Closing Sales.  Additionally, governmental units and parties in interest will receive notice of this Motion and the opportunity to be heard on any objections.  Thus, the Debtors respectfully request that the Court expressly approve the Store Closing Guidelines and authorize the Debtors and/or the Agent to conduct the Store Closing Sales without the added costs and delay of complying with applicable local Liquidation Laws.

116.     As set forth above, the Debtors initially entered into the Horse AA, pursuant to which the Debtors shall pay the Horse Agent a break-up fee equal to approximately $165,000 (the "Break-up Fee") on the second business day following the receipt of the proceeds of the winning bidder from the auction (if the Horse Agent is not the successful bidder and the Horse AA is not consummated).

117. Such a Break-up Fee is entirely appropriate here because first, the Break-up Fee is fair and reasonable in amount (representing only 2% of the guaranteed recovery under the Horse AA), particularly in light of the efforts and expenses that the Horse Agent has undertaken in, its due diligence review, negotiating the terms of the Horse Agreement (which served as the basis against which all other competing bids were submitted and compared), and preparing for the commencement of the Store Closing Sales. Second, the Horse AA enabled the Debtors to secure a committed proposal from a liquidator to serve as the agent for the Store Closing Sales, and establish a minimum floor for the subsequent auction. Third, the Break-up Fee has resulted in multiple bids (including the initial overbid that covers the payment of the Break-Up Fee) that are materially higher that in the Horse AA. The winning bid, as reflected in Agency Agreement, represents a significantly better proposal and was achieved in part due to the Break-up Fee.

118. In fact, of all the multiple interested potential bidders, the Horse Agent was the only party who negotiated a full agency agreement, signed an agreement, prepared and submitted the numerous key schedules and exhibits and prepared the proposed form of "GOB Sale Guidelines." All other bidders waited until the auction and simply adopted all of the Horse Agent's form of agreement, exhibits, and guidelines with minor revisions.

119. In short, the Break-up Fee enabled the Debtors to maximize the value of the assets and resulted in a clear benefit to the Debtors' estate in the form of a final Agency Agreement that is substantially higher and better (and covers payment of the Break-up Fee) than the terms of the Horse AA. Thus, I believe this Court should approve the Break-up Fee.

120. Pursuant to Agency Agreement, the Agent is authorized to sell Owned FF&E remaining in the Closing Stores following the conclusion of the Store Closing Sales. However, the Debtors may determine that the costs associated with holding and/or selling certain property

and/or FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all. In such event, the property is of in inconsequential value and benefit to the estate and/or may be burdensome to retain.

121.     To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors should be authorized to abandon any of their remaining FF&E or other property located at the Closing Stores without incurring liability to any person or entity.

**M. Emergency Motion for Interim and Final Orders (I) Authorizing (A) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 AND (B) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364 and (II) Scheduling a Final Hearing Thereon**

122.     The Debtors require cash to pay operating expenses, including payroll, as well as the various other items reflected in the Budget. The Debtors do not have sufficient available sources of cash to carry on with these tasks without the use of the Cash Collateral. As Debtors have no unencumbered funds, use of such Cash Collateral is required to fund the day-to-day expenses of the Debtor's operations, its efforts to conduct an orderly liquidation of their assets, and the costs of these bankruptcy cases. Unless the Court authorizes use of Cash Collateral, the Debtors will be unable to pay for services and expenses necessary to preserve and maximize the value of their assets, and will need to immediately cease operations, close their stores, and terminate the employment of thousands of employees, all of which would have a calamitous effect on the Debtors' liquidation efforts and would result in significantly lowered return on the value of the assets. Thus, authorization to use Cash Collateral, pending the Final Hearing, is in the best interests of the Debtors' estates and creditors.

123.     As it became apparent to the Debtors that they would need to file for protection under the Bankruptcy Code, the Debtors entered into negotiations with the Prepetition Secured Lenders as well as the Revolving Loan Lenders (as defined in the Interim Order) regarding an

agreement on the use of Cash Collateral. These negotiations resulted in the agreed to form of the Interim Order.

124.    The following outlines the general terms and conditions under which the Prepetition Agents and the Prepetition Secured Lenders have agreed with the Debtors for the consensual use of cash collateral:

a.      Subject to the terms and conditions of the Interim Order, the Debtors shall be entitled (i) to use Cash Collateral of all Prepetition Secured Lenders upon the later of (a) entry of the Interim Order and (b) the entry and effectiveness of an order authorizing the GOB Sale, and the Debtors' authority to use Cash Collateral on the terms and conditions set forth in the Interim Order shall remain in effect until 11:59 p.m. (Eastern Standard Time) on January 31, 2011 (such period being referred to as the "Interim Cash Collateral Period").  The Debtors shall use the Cash Collateral solely to pay the ordinary and reasonable expenses of operating its business in accordance with the Budget; provided, that in no event shall the Debtors' actual disbursements for any given week during the Interim Cash Collateral Period exceed the sum of (a) 105% of the disbursements projected for such week in the Budget, plus (b) with respect to any line item of the Budget (except for the first week), any unused portion of the disbursements projected for any prior week in the Budget for such line item.

b.      As adequate protection of the interests of the Prepetition Secured Lenders in the Prepetition Collateral, the Debtors shall grant valid, continuing, and automatically perfected first priority security interests and, solely to the extent of any aggregate post-petition Diminution in Value of any pre-petition interests of the Prepetition Secured Lenders in their respective collateral and subject to the terms and conditions of the Interim Order, replacement liens in and upon all of the Debtors' properties and assets, real or personal.

c.      As additional adequate protection, solely to the extent of any aggregate post-petition Diminution in Value of any pre-petition interests of the Prepetition Secured Lenders in their respective collateral and subject to the Carve-Out provided for in the Interim Order, the Prepetition Secured Lenders shall be granted, as and to the extent provided in section 503(b) and 507(b) of the Bankruptcy Code, allowed superpriority administrative expense claims against each of the Debtors.

d.      The Debtors shall provide Adequate Protection Payments to the Prepetition Secured Lenders as further protection of the interests of the Prepetition Secured Lenders in the Cash Collateral.

125.     The urgent need to preserve the Debtors' business and avoid immediate and irreparable harm to the estates, as set forth in this Motion, makes it imperative that the Debtors be authorized to use Cash Collateral pursuant to the terms set forth in the Interim Order.  It is critical that the Debtors maintain the confidence of employees, suppliers and customers in the Debtors' ability to meet their obligations while they provide for the orderly liquidation of the Debtors' businesses. Continued cash availability is essential to the Debtors' ability to achieve this important aim. The denial of use of Cash Collateral for these purposes would result in the immediate shut-down of the Debtors' operations, resulting in the sale of assets at fire-sale prices, likely less of the benefits under the Agency Agreement, irreparably damaging the Debtors' ability to maximize the value of their assets and causing substantial prejudice to the Debtors' estates and their creditors.

126.     Accordingly, this Court should enter an order authorizing the Debtors' use of their Cash Collateral pursuant to the terms set forth in the proposed Interim Order pending a Final Hearing and should schedule a final hearing pursuant to Bankruptcy Rule 4001.

## CONCLUSION

For the reasons described herein and in the First Day Motions, I believe that the prospects

for an efficient and successful orderly liquidation will be substantially enhanced if this Court

grants the relief requested in each of the First Day Motions.

Dated: January 11, 2011
       Corona, California

                        Thomas A. Shaw, Interim Chief Executive
                        Officer, Senior Vice President, Chief Financial
                        Officer and Treasurer of the Debtors