## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Anchor Blue Holding Corp., <u>et al.</u>,[1] | Case No. 11-10110 (_) |
| Debtors. | Joint Administration Requested |

## MOTION OF THE DEBTORS FOR ENTRY OF ORDER AUTHORIZING AND APPROVING (I) ASSUMPTION OF AGENCY AGREEMENT, (II) CONTINUED STORE CLOSING SALES, (III) GRANTING OF LIEN TO AGENT, (IV) ABANDONMENT OF PROPERTY, (V) PAYMENT OF A <u>BREAK-UP FEE, AND (VI) OTHER RELATED RELIEF</u>

The above-captioned debtors and debtors-in-possession (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") hereby submit this motion (the "<u>Motion</u>"), pursuant to Sections 105(a), 363, 364, 365, and 554 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") and Rules 6004, 6006, 6007 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") for the entry of an order substantially in the form attached hereto as <u>Exhibit A</u>, authorizing and approving (i) the assumption of the Agency Agreement (the "<u>Agency Agreement</u>") dated January 5, 2011, attached hereto as <u>Exhibit B</u>, providing for the liquidation of the Debtors' merchandise inventory and other assets by a joint venture of Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC  as liquidating agent ("<u>GB/Hilco</u>" or the "<u>Agent</u>"), (ii) continued store closing sales (the "<u>Store Closing Sales</u>") at all of the Debtors' retail locations pursuant to the terms of the Agency Agreement; (iii) the Debtors' grant of a first priority secured lien to the Agent in connection with the Store Closing Sales, (iv) payment of the proceeds of the Store Closing Sales to the Debtors' prepetition lenders; and

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Anchor Blue Holding Corp. (1314) and Anchor Blue, Inc. (9916).  The mailing address for both of the Debtors is 1260 Corona Pointe Ct Corona, CA 92879.

(v) other related relief as set forth herein.  The facts and circumstances supporting this Motion are set forth in the concurrently filed *Declaration of Thomas A. Shaw, Interim Chief Executive Officer, Senior Vice President, Chief Financial Officer and Treasurer of the Debtors, in Support of First Day Motions* (the "First Day Declaration").  In further support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief sought herein are sections 105(a), 363, 364, 365, and 554 of the Bankruptcy Code and Bankruptcy Rules 6004, 6006, and 6007.

## BACKGROUND

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or official committee of unsecured creditors has been appointed in the Debtors' cases.

5.      Additional information about the Debtors' business, the events leading up to the Petition Date and the facts and circumstances surrounding the Debtors' chapter 11 cases can be found in the First Day Declaration on file in these cases.  The First Day Declaration is incorporated by reference as if fully set forth herein.[2]

---

[2] Capitalized terms used but not defined in this Motion shall have the meanings ascribed to them in the First Day Declaration or the Agency Agreement, as applicable.

**The Store Closing Sales and Agency Agreement**

6.      Prior to the Petition Date, the Debtors, in consultation with their advisors, investigated various reorganization alternatives.  To that end, as with many retail business in today's economic times, the Debtors concluded that the business was not likely to be viable and that the best means of maximizing the value of their assets was to conduct Store Closing Sales at all of the Debtors' retail locations (the "Closing Stores") through the use of a professional liquidator.

7.      In an effort to streamline and expedite the liquidation process, the Debtors created an on-line data room and contacted various liquidating agents and entered into confidentiality agreements (and diligence) with three competing liquidators.  The Debtors then entered into a "stalking horse" agency agreement with SB Capital Group, LLC, Great American Group, LLC, Hudson Capital Partners, LLC, and Tiger Capital Group, LLC (collectively, the "Horse Agent," and such agreement, the "Horse AA").  On January 5, 2011, the Debtors conducted an auction between the competing liquidators based upon the form of and terms in the Horse AA.  The auction lasted for approximately 4 hours, was attended by the Prepetition Lenders and the Debtors and their professionals (as well as the bidders) and was duly transcribed.  After more than 10 rounds of bidding (and a significant increase in the guaranteed minimum price), and careful consideration of the submitted bids, the Debtors determined (in consultation with the Prepetition Lenders) that the bid from GB/Hilco represented the highest and best offer, and that entry into the Agency Agreement with GB/Hilco to conduct the Store Closing Sales was in the Debtors' best interest and the best interest of their creditors.

8.      Accordingly, on January 5, 2011, the Debtors executed the Agency Agreement with GB/Hilco.  On January 6, 2011, the Agent officially commenced the Store Closing Sales at

all of the Debtors' retail locations in accordance with the terms of the Agency Agreement and the Store Closing Guidelines[3] therein.

9. Pursuant to the Agency Agreement, GB/Hilco is the exclusive Agent to the Debtors for purposes of conducting the Store Closing Sales at all of the Debtors' retail locations and disposing of the Debtors' inventory merchandise and remaining furniture, fixtures, and equipment ("FF&E"), free and clear of all liens, claims, and encumbrances.

10. Below is a brief highlight of the material provisions of the Agency Agreement and is qualified by reference to the executed Agency Agreement attached hereto as Exhibit B.[4]

(a) Services: The Agent shall serve as the exclusive agent for conducting the Store Closing Sales and disposing of the Owned FF&E pursuant to the terms of the Agency Agreement. In addition, to the extent that Proceeds exceed the sum of (i) the Guaranteed Amount, (ii) Expenses of the Sale, and (iii) two percent (2%) of the aggregate Retail Value of the Merchandise (the sum of (i), (ii) and (iii), the "Sharing Threshold"), then all Proceeds of the Sale above the Sharing Threshold shall be shared equally between the Debtors and the Agent. (Any amounts to be received by the Debtors in excess of the Sharing Threshold shall be referred to as the "Recovery Amount.")

(b) Guaranteed Amount: The Agent has guaranteed a minimum recovery of twenty-seven and one-tenth (27.1%) of the aggregate Retail Value of the Merchandise included in the Sales (the "Guaranteed Amount").

(c) Sale of FF&E: The Agent shall sell the Owned FF&E free and clear of any liens, claims and encumbrances in any such Stores and shall have the right to retain all proceeds received from such sales, net only of sales taxes (and such FF&E sales proceeds shall not be deemed "Proceeds"). The Agent shall be responsible for payment of expenses incurred in connection with the disposition of the Owned FF&E. In exchange, the Agent shall, in addition to all other amounts contemplated by the Agency Agreement, pay to the Debtors on the Payment Date, four hundred fifty thousand dollars ($450,000).

(d) Payment and Security to the Debtors: Eighty-five percent (85%) of the Guaranteed Amount shall be payable on a date (the "Payment Date") not later than one

---

[3] A copy of the Store Closing Guidelines is attached as an Exhibit to the Agency Agreement. A copy is also attached to this Motion as Exhibit C.

[4] To the extent anything contained herein differs from the terms set forth in the Agency Agreement, the Agency Agreement shall control.

(1) business day following the entry of this Order and the execution of the Agency Agreement. The Agent shall pay to the Debtors the remaining undisputed Guaranteed Amount no later than the earlier of: (i) the date that is thirty (30) business days following the Sale Commencement Date, and (ii) the second business day following the issuance of the audit report of the aggregate Retail Value of the Merchandise by the Inventory Taking Service. To secure Agent's payment of the remaining unpaid Guaranteed Amount, the Agent shall deliver to the Debtors, naming Lender Agent as beneficiary, an irrevocable standby letter of credit (the "<u>Agent Letter of Credit</u>") in the original face amount equal to the unpaid portion of the Estimated Guaranteed Amount as of the Payment Date.

(e)     <u>Compensation to the Agent</u>:  As compensation for its services, the Agent shall be entitled to the Proceeds of the Sale after payment of the Guaranteed Amount, Expenses of the Sale, Recovery Amount, and all other amounts payable to the Debtors from the Proceeds thereof.  In addition, provided that no Event of Default has occurred and continues to exist on the part of the Agent, and after all payments have been made to the Debtors pursuant to the terms of the Agency Agreement, all remaining Merchandise following the Sale Termination Date shall become property of the Agent, free and clear of all liens, claims, and encumbrances, and the proceeds from the disposition of such remaining Merchandise shall constitutes Proceeds under the Agency Agreement.

(f)     <u>Expenses of the Store Closing Sales</u>:  The Agent shall be responsible for all Store level operating expenses of conducting the Sale which arise during the Sale Term (the "<u>Expenses</u>").  To secure payment of the Expenses, the Agent shall deliver an irrevocable and unconditional standby letter of credit, naming Lender Agent as beneficiary, in the original face amount equal to two (2) weeks estimated Occupancy Expenses and Payroll Expenses.  Additionally, the Debtors shall fund an Expense Retainer prior to the Debtors' filing of their bankruptcy petitions, in the amount of $400,000 for advertising and supervision Expenses, which Expense Retainer shall be returned to the Debtors on the Payment Date (subject to any applicable setoff provisions under the Agency Agreement).

(g)     <u>Sale Period</u>:  The Agent shall complete the Sale on or before February 28, 2011 unless the Sale is extended by mutual agreement between the Agent, Debtors, and Lender Agent, provided that the Agent may also terminate the Sale at any retail store location upon seven (7) days' notice to the Debtors.  At the conclusion of the Sale, the Agent agrees to vacate the Stores in "broom clean" condition, ordinary wear and tear excepted, and except for unsold items of Owned FF&E.

(h)     <u>Additional Goods</u>:  Subject to authorization by the Court, and at the Agent's sole cost and expense, the Agent may (but is not required to) supplement the Merchandise in the Stores with goods of like kind and quality as is customarily sold in the Stores ("<u>Additional Goods</u>"), not to exceed 20% of the aggregate Retail Value of the Merchandise.  Sales of the Additional Goods shall run through the Debtors' cash register systems, provided that the Agent shall mark the Additional Goods so as to distinguish the sale of Additional Goods from the sale of Merchandise. At all times and for all purposes, the Additional Goods and their proceeds shall be the exclusive property, and remain

subject to the exclusive control, of the Agent, and the Agent shall, at its sole cost and expense, insure the Additional Goods. As consideration for allowing the Agent to supplement the Merchandise with Additional Goods, the Agent shall pay to the Debtors seven percent (7%) of the gross proceeds of the sale of Additional Goods after payment of applicable Sales Taxes.

(i)     Employee Matters: The Agent may use the Debtors' employees in the conduct of the Sale, and the Agent may select and schedule the number and type of the Debtors' employees so required (the "Retained Employees"). The Retained Employees shall at all times remain employees of the Debtors and shall not be deemed to be employees of the Agent. The Agent may, in its discretion, stop using any Retained Employee at any time during the Sale, and shall provide the Debtors with at least seven (7) days' prior notice so that the Debtors may coordinate the termination of such employee. During the Sale Term, the Debtors shall process the base payroll for all Retained Employees and any former and temporary labor retained by the Agent. In addition, the Agent shall have the right to elect to pay (as an Expense of the Sale), retention bonuses (the "Retention Bonuses") up to a maximum of 10% of base payroll for all Retained Employees who do not voluntarily leave employment and are not terminated "for cause." Such Retention Bonuses shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through the Debtors' payroll system.

(j)     Terms of Sale to Customers: All sales of Merchandise will be on a "final sales" and "as is" basis, and all advertisements and sales receipts will reflect the same. The Agent shall accept the Debtors' gift certificates/cards and Store credits issued by the Debtors prior to the Sale Commencement Date until January 17, 2011, but will not honor other customer programs required by the Store Closing Guidelines, including but not limited to all customer satisfaction programs for items purchased prior to the commencement of the Sale. The Agent will accept returns of Merchandise sold by the Debtors prior to the Sale Commencement Date until January 17, 2011.

(k)     Security Interest: In consideration of the Agent's payment of the Guaranteed Amount Deposit, Expenses, and the provision of services, the Agent shall have, as of the Payment Date, a valid and perfected first priority security interest in and lien upon the Merchandise, the Owned FF&E and all proceeds from the sale of the Owned FF&E, and the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods, and the Proceeds, junior only to (1) the unpaid portion of the Guaranteed Amount, (2) any amount owed by the Agent to the Debtors on account of Expenses (subject to the Agent's setoff rights, if any), (3) the Recovery Amount, and (4) any other amounts owed by the Agent to the Debtors under the Agency Agreement, without the necessity of filing financing statements to perfect its security interest.

## RELIEF REQUESTED AND BASIS THEREFOR

11.     By this Motion, the Debtors seek the entry of an order authorizing and approving

the (i) assumption of the Agency Agreement attached hereto as Exhibit B and the terms of the

Store Closing Guidelines attached hereto as <u>Exhibit C</u>, (ii) Debtors' continued Store Closing Sales at all of the Debtors' retail locations pursuant to the terms of the Agency Agreement, (iii) grant of a security interest in the inventory and FF&E to the Agent in connection with such Store Closing Sales, (iv) payment of a break-up fee to the Horse Agent in the amount of approximately $165,000, (v) payment of proceeds of the Store Closing Sales to the Debtors' prepetition lenders, and (vi) abandonment of any remaining property at the Closing Stores upon the conclusion of the Store Closing Sales.

**I.     This Court Should Approve the Assumption of the Agency
         Agreement as an Exercise of the Debtors' Sound Business Judgment**

        ***A.***        <u>***Assumption Of The Agency Agreement Is Beneficial To The Estate***</u>

12.     Pursuant to section 365(a) of the Bankruptcy Code, a debtor may "assume or reject any executory contract or unexpired lease." The decision to assume or reject is governed by the business judgment rule. <u>See</u> <u>In re HQ Global Holdings, Inc.</u>, 290 B.R. 607, 511 (Bankr. D. Del. 2003) (noting that the business judgment standard applies to a debtor's determination to reject an executory contract and can be overturned only if such decision was the product of bad faith, whim, or caprice); <u>Trak Auto Corp. v. Ramco-Gershenson (In re Trak Auto Corp.)</u>, No. 01-72167-DHA, 2002 WL 32129975 at *2 (Bankr. E.D. Va. Jan. 9, 2002) (stating "[t]he traditional test courts use to evaluate a debtor's decision to assume an unexpired lease is that of business judgment") (<u>citing</u> <u>N.L.R.B. v. Bildisco and Bildisco</u>, 465 U*.S. 513 (1984)).

13.     In applying the business judgment standard, deference should be given to the debtor's determination to assume or reject. "The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." <u>Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.</u>, 147 B.R. 650, 656

(S.D.N.Y. 1992) (quoting <u>Smith v. Van Gorkom</u>, 488 A.2d 858, 872 (Del. 1985)).  <u>See</u> <u>also</u>

<u>Summit Land Co. v. Allen (In re Summit Land Co.)</u>, 13 B.R. 310, 315 (Bankr. D. Utah 1981)

(stating that absent extraordinary circumstances, court approval of a debtor's decision to assume

or reject an executory contract "should be granted as a matter of course").

14.     Here, the Debtors believe that assumption of the Agency Agreement will provide

numerous benefits to the estate and its stakeholders.  First, utilizing a professional liquidating

agent with substantial experience and expertise to conduct orderly simultaneous Store Closing

Sales will maximize profits for the Debtors in a short amount of time.  In particular, the terms of

the Agency Agreement provides for a guaranteed return for the Merchandise (with an additional

increased potential shared recovery in accordance with certain thresholds), which minimizes the

Debtors' risks and motivates the Agent to maximize proceeds from the Store Closing Sales.

15.     Second, assumption of the Agency agreement will reduce the Debtors'

administrative expenses associated with the Closing Stores.  Under the Agency Agreement, the

Agent is obligated to pay certain costs of conducting the Store Closing Sales such as the post-

petition rent and other carrying costs for the leased Closing Stores during the Sale Term and, in

the Agent's discretion, retention bonuses to those eligible store employees.  These significant

cost savings increases the overall recovery for the estate's creditors.

16.     Third, the Debtors have already expended substantial efforts soliciting bids and

negotiating with other national liquidation firms pre-petition before selecting GB/Hilco as the

best offer.  GB/Hilco is not an "insider" (as such term is defined in section 101(3) of the

Bankruptcy Code) and the terms of the Agency Agreement are the results of an arms' length

transaction.  The Agency Agreement contains the best terms the Debtors could obtain and tested

through a fair auction process.  In addition, the Store Closing Guidelines are standard industry

guidelines used by professional agents in almost every liquidation sale (and similar to guidelines routinely approved in this District) and should be approved. Likewise, the terms of sale to customers and the public in the Agency Agreement are reasonable, including honoring prepetition gift cards, and accepting returns of merchandise, until a specified and duly advertised "cut-off" date.

17.     If the Agency Agreement were not assumed, there would be tremendous harm to all stakeholders. The estate would lose the benefit of the momentum and preparation that has already been started by GB/Hilco in conducting the Store Closing Sales -- all while Debtors (rather than the Agent) paid the carrying costs for the retail stores. The Debtors and their advisors would also have to devote further time, expense, and efforts in securing an alternative liquidating agent, who then has to become familiar with the Debtors' operations and undertake additional preparations in restarting the Store Closing Sales. Finally, while the Debtors would continue to negotiate for the best possible terms, it is not at all certain that an alternative agency agreement would provide terms as favorable to the Debtors as those in the GB/Hilco Agency Agreement.

### B.     *Grant Of Security Interest Is Appropriate*

18.     Pursuant to the Agency Agreement, the Debtors' obligations thereunder are entitled to the status of superpriority claims in these Chapter 11 cases, which claims shall be equal in priority to claims under section 364(c)(1) of the Bankruptcy Code and have priority over all other administrative expenses of the kinds specified in, without limitation, sections 105, 326, 503(b), 507(a) or 507(b) of the Bankruptcy Code. Further, such superpriority claims shall be secured under section 364(d) of the Bankruptcy Code by a valid and perfected first priority security interest in and lien (i) upon the Merchandise, the Owned FF&E and all proceeds from

9

the sale of the Owned FF&E, and the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods, and the Proceeds; and (ii) junior in priority only to (a) an amount equal to the unpaid portion of the Guaranteed Amount, (b) any amount owed by the Agent to the Debtors for Expenses, (c) the Recovery Amount, and (d) any other amount owed by the Agent to the Debtors pursuant to the Agency Agreement (the "<u>Agent Security Interest</u>").

19.     The Agent Security Interest should be properly perfected without the necessity of filing financing statements or further documentation.  The liens, claims, and security interests and other protections granted to the Agent herein shall continue and shall maintain their priority until all of the Debtors' obligations to the Agent have been indefeasibly paid in full.  The Prepetition Lenders have further agreed that, upon payment of the Guaranteed Amount Deposit, application of a portion of the Guaranteed Amount Deposit necessary to satisfy the outstanding secured claims of the lenders under the Revolving Credit Agreement in full, and the delivery of the Agent Letter of Credit (as set forth in the Agency Agreement), any presently existing liens or security interest on or in any or all of the Merchandise or the Proceeds shall attach only to the Guaranteed Amount, the FF&E Payment, and the amounts to be reimbursed by the Agent to the Debtors.  The Agent and its officers, employees and agents are not liable for such Liens pursuant to the terms of the Agency Agreement.

20.     The Agent's extension of credit, as well as the other financial accommodations, as set forth in the Agency Agreement, constitute the extension of credit in good faith under section 364(e) of the Bankruptcy Code and, as such, the reversal or modification on appeal of the Court's authorization to consummate the transactions contemplated by the Agency Agreement, and the security interest granted thereunder, should not affect the validity of such transactions unless such authorization has been stayed pending appeal.

21.     The Debtors submit that the consideration provided by the agent pursuant to the Agency Agreement is fair and constitutes reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Transfer Act and Uniform Fraudulent Conveyance Act and other applicable Federal and State laws of the United States, any territory or possession, and the District of Columbia.

22.     Based upon the foregoing, the Debtors have exercised their sound business judgment in seeking to assume the Agency Agreement.  The Debtors request that this Court authorize the assumption of the Agency Agreement and approve the terms therein (including the grant of the Agent's security interest and the Store Closing Guidelines), and find that the Agent has acted in good faith within the meaning of section 363(m) of the Bankruptcy Code.

## II.     Continuation of the Store Closing Sales is Warranted Under the Debtors' Reasonable Business Judgment and Should be Approved

### A.     *Sale Of Inventory Should Be Free And Clear Of Liens, Claims And Encumbrances*

23.     Section 363 of the Bankruptcy Code provides in relevant part that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Where a debtor has shown some "articulated business justification," the sale of assets under section 363 should be approved.  See In re Ames Dept. Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that going-out-of-business sales are governed by §363(b)); In re Delaware and Hudson Riv. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (noting that the Third Circuit has adopted the "sound business judgment" test for §363 asset sales); Myers v. Martin (in re Martin), 91 F.3d 389, 395 (3d. Cir. 1996) (citing Fulton State Bank v. Schipper (in re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d. Cir. 1986) (applying business judgment rule); In re Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983) (same).

11

24.     Ample business reasons exist for continuing the conduct of the Store Closing Sales.  As previously described, the Debtors and FTI had exhaustively analyzed the Debtors' business and various reorganization strategies and determined that an immediate liquidation of the Debtors' retail locations would maximize recoveries for the estate and its creditors and stop the deterioration of the Debtors' business and assets.  There are significant levels of inventory merchandise and FF&E that will be monetized most efficiently and quickly through an orderly process conducted by an experienced liquidation firm.

25.     Moreover, immediate Store Closing Sales in accordance with the terms of the Agency Agreement will minimize the administrative expenses of the estate by reallocating a significant portion of the risks and costs of the Store Closing Sales to the Agent.  If the Debtors are not allowed to continue the Store Closing Sales, the estate would suffer significant detriment from the resulting delay, added post-petition expenses, depreciation in the value of the assets, and further time and efforts the Debtors must expend to reformulate a different liquidation strategy.

26.     To facilitate the sale of the Assets, the Debtors requests authority to sell the Assets through the Store Closing Sales on a final, "as is" basis, free and clear of all liens, claims, encumbrances, mortgages, security interests, conditional sales, or title retention agreements, pledges, hypothecations, judgments or claims of any kind or nature and other interests (including, without limitation, all "claims" within the meaning of section 101(5) of the Bankruptcy Code) (collectively, the "Liens") in accordance with section 363(f) of the Bankruptcy Code, with any such Liens in the Assets attaching to the Guaranteed Amount in the same order or priority and with the same force, validity and effect with respect to such Assets prior to the Store Closing Sales.

27. Section 363(f) of the Bankruptcy Code allows a debtor to sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is met:

    (1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

    (2)    the party asserting the lien, claim or interest consents to the sale;

    (3)    the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property;

    (4)    the interest is the subject of a bona fide dispute; or

    (5)    such entity could be compelled to accept a money satisfaction of such claim.

11 U.S.C. § 363(f); see also In re Elliott, 94 B.R. 343 345 (E.D. Pa 1988) (noting that section 363(f) is written in the disjunctive, thereby allowing sales "free and clear" if any one of the subsections is met).

28. In the instant case, the Prepetition Lenders have consented, conditioned upon (a) the payment in full of the outstanding obligations under the Revolving Credit Facility out of the Guaranteed Amount Deposit and (b) entry of the Proposed Cash Collateral Order, to the conduct of the Store Closing Sales by the Agent pursuant to the terms of the Agency Agreement. Thus, the sale of the Assets, to the extent such Assets are subject to the Prepetition Lenders' collateral, is authorized pursuant to section 363(f)(2). In addition, as the Debtors' obligations under the Prepetition Revolving Loan can be satisfied by the payment of the Proceeds from the Store Closing Sales, the Assets can also be sold free and clear pursuant to section 363(f)(5). Furthermore, the terms of the Agency Agreement provide sufficient protection to the Prepetition Lenders, including, for example, provisions for the payment of a Guaranteed Amount Deposit

YCST01:10575787.2
070040.1001

and delivery of an irrevocable standby Agent Letter of Credit. Therefore, this Court should allow the sale of the Assets through the Store Closing Sales free and clear of all Liens.

**B.** ***Restrictive Documents And Provisions That May***
***Impede The Store Closing Sales Are Unenforceable***

29. The Debtors lease all of their retail store locations and thus, the Store Closing Sales may be inconsistent with certain provisions of the governing leases or other documents to which the Debtors are a party, whether or not filed of record, with respect to any of the leased Closing Stores, including, for example, reciprocal easements, "go dark" provisions, landlord recapture rights, and other covenants that purport to restrict or prohibit the Debtors from conducting store closing or similar themed sales. Such restrictive provisions are unenforceable in bankruptcy as they constitute an impermissible restraint on a debtor's ability to effectively administer its estate and maximize the value of its assets under the Bankruptcy Code. See In re Ames Dep't Stores, 136 B.R. at 359 (holding that enforcement of lease restrictions would "contravene overriding federal policy requiring Debtors to maximize estate assets"); In re R.H. Macy and Co., Inc., 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (finding that landlord could not recover for breach of covenant to stay open because debtor had a duty to maximize value to the estate by conducting a store closing sale and closing the store); In re Tobago Bay Trading Co., 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (concluding that a debtor's reorganization would be significantly impaired if lease provisions prohibiting inventory liquidation were enforced); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where debtor sought to conduct GOB sale).

30. Similarly, to the extent there are restrictive provisions in any of the governing leases dictating the manner, method, dimensions relating to or otherwise prohibiting the use of advertising materials or signage to be used relating to the conduct of the Store Closing Sales, the

Debtors request that such restrictive provisions be invalidated as improper interference with the Debtors' ability to effectively conduct the Store Closing Sales and maximize the liquidation value of the Assets. Courts in this and other jurisdictions have routinely granted similar relief and held that restrictive lease provisions affecting store closing sales in Chapter 11 cases are unenforceable. See In re Bernie's Audio Video TV Appliance Co., Inc., Ch. 11 Case No. 10-20087 (ASD) (Bankr. D. Conn. Jan. 29, 2010) (final order granting debtors' first day motion for, among other things, continued store closing sales and use of signage and materials in accordance with store closing guidelines); In re Circuit City Stores, Inc., Ch. 11 Case No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 10, 2008) (final order authorizing debtors to assume agency agreement to continue store closing sales and invalidating restrictive lease provisions that hinders store closing sales); In re Drug Fair Group, Inc., Ch. 11 Case No. 09-10897 (BLS) (Bankr. D. Del. Apr. 1, 2009) (final order approving continued store closing sales, agency agreement, and sale guidelines); In re Goody's LLC, Ch. 11 Case No. 09-10124 (CSS) (Bankr. D. Del. Jan. 20, 2009) (final order authorizing debtor to continue store closing sales pursuant to terms of agency agreement and store closing guidelines); In re Sportsman's Warehouse, Inc., Ch. 11 Case No. 09-10990 (CSS) (Bankr. D. Del. Mar. 23, 2009) (final order authorizing store closing sales and proposed store closing guidelines, including use of signage).

31. Accordingly, to the extent that any provisions or restrictions exist in any of the leases governing the Closing Stores, the Debtors respectfully request that this Court invalidate such provisions and authorize the Debtors and/or the Agent to conduct the Store Closing Sales in accordance with the Store Closing Guidelines without interference by any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

YCST01:10575787.2 070040.1001

### C.     The Store Closing Sales Should Be Exempt From Federal, State, And Local Laws, Statutes, Rules And Ordinances Relating To Liquidations

32.     The Debtors operate their retail locations across numerous States which may have cumbersome state and local laws, statutes, regulations, rules and ordinances governing store closing, liquidation, or similar themed sales, that require long waiting periods, special licenses and permits, or restrictions against bulk sales and augmentation (collectively, "Liquidation Laws").  However, some state statutes provide that where a liquidation or bankruptcy sale is court authorized, then a company need not comply with such Liquidation Laws.  See e.g., Tex. Bus. & Com. Code § 17.91 (2004).  Moreover, the federal Bankruptcy Code preempts state and local laws that conflicts with its underlying policies, and this Court has the authority, under section 105(a) of the Bankruptcy Code, to permit the Store Closing Sales notwithstanding contrary Liquidation Laws.  See generally Belculfine v. Aloe (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) (noting that debtors have unique fiduciary and legal obligations pursuant to the Bankruptcy Code and that state statutes "cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.")

33.     Here, the Debtors' ability to use and sell its assets (including through GOB sales) pursuant to section 363 of the Bankruptcy Code, in order to maximize recovery for the estate's creditors, would be severely undermined if the Court does not provide for a waiver of the Liquidation Laws.  Similar relief has been granted by this Court and other courts in comparable retail bankruptcy proceedings involving store closing sales.  See e.g., In re Drug Fair Group, Inc., Ch. 11 Case No. 09-10897 (BLS) (Bankr. D. Del. Apr. 1, 2009) (final order approving continued store closing sales and excluding compliance with local GOB laws); In re Sportsman's Warehouse, Inc., Ch. 11 Case No. 09-10990 (CSS) (Bankr. D. Del. Mar. 23, 2009) (final order

authorizing continued store closing sales and waives further showing of compliance with local liquidation laws); In re Goody's Family Clothing, Inc., Ch. 11 Case No. 08-11133 (Bankr. D. Del. Jan. 15, 2009) (order authorizing store closing sales in accordance with sale guidelines and waiving compliance with GOB laws); In re Whitehall Jewelers Holdings, Inc., Ch. 11 Case No. 08-11261 (KG) (Bankr. D. Del. Aug. 8, 2008) (granting motion to conduct of store closing sales in accordance with proposed store closing guidelines); In re S&K Famous Brands, Inc., Ch. 11 Case No. 09-30805 (KRH) (Bankr. E.D. Va. Feb. 26, 2009) (authorizing store closing sales without need to show compliance with GOB laws); In re Circuit City Stores, Inc., Ch. 11 Case No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 10, 2008) (same).

34.　　　Compliance by the Debtors of each state's applicable local liquidation laws would be extremely burdensome and adjudication of disputes with local authorities over the application and interpretation of local laws would be tremendously expensive for the estates. Moreover, in the context of the a bankruptcy proceeding, waiving compliance with Liquidations Laws is entirely appropriate as the Debtors and their assets are subject to this Court's exclusive jurisdiction and this Court would be able to supervise and ensure proper conduct of the Store Closing Sales. Additionally, governmental units and parties in interest will receive notice of this Motion and the opportunity to be heard on any objections. Thus, the Debtors respectfully request that the Court expressly approve the Store Closing Guidelines and authorize the Debtors and/or the Agent to conduct the Store Closing Sales without the added costs and delay of complying with applicable local Liquidation Laws.[5]

---

[5] The requested waiver is narrowly tailored to facilitate the successful conduct of the Store Closing Sales. The Debtors are not seeking a general waiver of all state and local laws, but only those specifically governing liquidation or similarly themed sales. The Debtors fully intend to comply with applicable state and local environmental, tax, employment, public health and safety laws, and consumer protection laws (regulating deceptive practices).

### III.    The Break-up Fee Requested is Reasonable and Justified

35.    Rule 6004-1(c)(i)(C) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") provides that a sale motion must highlight "[a]ny provisions providing an initial or 'stalking horse' bidder a form of bid protection," including the payment of a break-up fee.

36.    As set forth above, the Debtors initially entered into the Horse AA, pursuant to which the Debtors shall pay the Horse Agent a break-up fee equal to approximately $165,000 (the "<u>Break-up Fee</u>") on the second business day following the receipt of the proceeds of the winning bidder from the auction (if the Horse Agent is not the successful bidder and the Horse AA is not consummated).

37.    The standard for approving a break-up fee was established by the Third Circuit in <u>Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)</u>, 181 F.3d 527 (3d Cir. 1999) (hereinafter, "<u>O'Brien</u>").  There, the Court concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." <u>O'Brien</u>, 181 F.3d at 535.

38.    The Third Circuit identified at least two instances in which bidding incentives may benefit the estate.  First, a break-up fee or reimbursement of expenses may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." <u>Id.</u> at 537.

39.    Second, if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other

bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  Id.

40.     Further, the O'Brien Court reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee.  Such factors are:

(1)     the presence of self-dealing or manipulation in negotiating the break-up fee;
(2)     whether the fee harms, rather than encourages, bidding;
(3)     the reasonableness of the break-up fee relative to the purchase price;
(4)     whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;
(5)     the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;
(6)     the correlation of the fee to a maximization of value of the debtor's estate;
(7)     the support of the principal secured creditors and creditors committees of break-up fee;
(8)     the benefits of the safeguards to the debtor's estate; and
(9)     the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

41.     Here, the requested Break-up Fee is entirely appropriate under the Third Circuit's "administrative expense" standard and the factors considered above.  First, the Break-up Fee is fair and reasonable in amount (representing only 2% of the guaranteed recovery under the Horse AA), particularly in light of the efforts and expenses that the Horse Agent has undertaken in, its due diligence review, negotiating the terms of the Horse Agreement (which served as the basis against which all other competing bids were submitted and compared), and preparing for the commencement of the Store Closing Sales.  Second, the Horse AA enabled the Debtors to secure a committed proposal from a liquidator to serve as the agent for the Store Closing Sales, and establish a minimum floor for the subsequent auction.  Third, the Break-up Fee has resulted in multiple bids (including the initial overbid that covers the payment of the Break-Up Fee) that are

YCST01:10575787.2                                                                                      070040.1001

materially higher that in the Horse AA. The winning bid, as reflected in Agency Agreement, represents a significantly better proposal and was achieved in part due to the Break-up Fee.[6]

42.     Courts in this District have granted similar provisions in other retail bankruptcy cases.  See, e.g., In re Mervyn's Holdings, LLC, Ch. 11 Case No. 08-11586 (KG) (Bankr. D. Del. October 27, 2008) (granting break-up fee to stalking horse agent in amount of $2.5 million); In re Sharper Image Corp., No. 08-10322 (KG) (Bankr. D. Del. May 30, 2008) (authorizing break up fee of 2% of purchase price and expense reimbursement capped at $500,000 in connection with auction of debtor's assets in 363 sale); In re Tweeter Home Entm't Group, Inc., Ch. 11 Case No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) (approving payment of termination fee to stalking horse); In re Ameriserve Good Distribution, Inc., Ch. 11 Case No. 99-04497-PJW (Bankr. D. Del., Dec. 29, 1999) (allowing a 3.6% break up fee).

43.     In short, the Break-up Fee enabled the Debtors to maximize the value of the assets and resulted in a clear benefit to the Debtors' estate in the form of a final Agency Agreement that is substantially higher and better (and covers payment of the Break-up Fee) than the terms of the Horse AA.  Thus, the Debtors respectfully request that this Court approve payment of the Break-up Fee to the Horse Agent.

## IV.    The Debtors Should be Authorized to Abandon Certain Property at the Closing Stores Following the Conclusion of the Store Closing Sales

44.     After notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. §554(a).  See also Hanover Ins. Co. v. Tyco Indus., Inc., 500 F.2d 654, 657 (3d Cir. 1974)

---

[6]  In fact, of all the multiple interested potential bidders, the Horse Agent was the only party who negotiated a full agency agreement, signed an agreement, prepared and submitted the numerous key schedules and exhibits and prepared the proposed form of "GOB Sale Guidelines." All other bidders waited until the auction and simply adopted all of the Horse Agent's form of agreement, exhibits, and guidelines with minor revisions.

(a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim").

45.     Pursuant to the Agency Agreement, the Agent is authorized to sell Owned FF&E remaining in the Closing Stores following the conclusion of the Store Closing Sales.  However, the Debtors may determine that the costs associated with holding and/or selling certain property and/or FF&E exceeds the proceeds that will be realized upon its sale, or that such property is not sellable at all.  In such event, the property is of in inconsequential value and benefit to the estate and/or may be burdensome to the estate to retain.

46.     To maximize the value of the Debtors' assets and to minimize the costs to the estates, the Debtors respectfully request authority to abandon any of their remaining FF&E or other property located at the Closing Stores without incurring liability to any person or entity. The Debtors further request that the landlords of each Closing Store with any abandoned FF&E or other property be authorized to dispose of such property without liability to any third parties.

## NOTICE

47.     The Debtors shall provide notice of this Motion by facsimile and/or overnight mail to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) counsel to the Debtors' prepetition first lien lender; (iv) counsel to the agent for the Debtors' prepetition second lien lenders; (v) counsel to the Debtors' prepetition subordinated lender; (vi) the Internal Revenue Service; (vii) the Office of the United States Attorney for the District of Delaware; (viii) counsel to the Debtors' equity sponsor; (ix) applicable state regulatory authorities/the Attorney General's office for each state where the Store Closing Sales are being held; and (x) the landlords to the

Closing Stores. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Del. Bankr. L.R. 9013-1(m).[7]

## REQUEST FOR WAIVER OF STAY

48.     The Debtors further request that, to the extent applicable, the 14-day stay required under Bankruptcy Rule 6004(h) be waived. As set forth above, time is of the essence that the Debtors be able to assume the Agency Agreement and immediately continue the Store Closing Sales that are already underway. In order to maximize the value of the assets and minimize the estate's unnecessary administrative expenses, the Debtors believe a waiver of the 14-day stay is in the best interest of the estate and its stakeholders.

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit A, (A) authorizing and approving the (i) assumption of the Agency Agreement with GB/Hilco attached hereto as Exhibit B, and the terms contained therein, including the proposed Store Closing Guidelines, attached hereto as Exhibit C, (ii) Debtors' continued Store Closing Sales at all of the Debtors' retail locations pursuant to the Agency Agreement, (iii) Debtors' grant of a first priority secured lien to the Agent in connection with such Store Closing Sales, (iv) payment of the Break-up Fee to the Horse Agent; and (v) abandonment of any remaining property at the Closing Stores upon the conclusion of the Store Closing Sales; and (B) granting such other and further relief as the Court may deem just and proper.

---

[7] The proposed Order also provides that landlords, a Creditors Committee and governmental agencies shall have the opportunity and right to have a subsequent hearing in this Court if they wish to object to the relief granted in this "first day" order.

Dated: Wilmington, Delaware
          January 11, 2011

YOUNG CONAWAY STARGATT & TAYLOR, LLP


*/s/ Kenneth J. Enos*
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Kenneth J. Enos (No. 4544)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

MORGAN LEWIS & BOCKIUS LLP
Neil E. Herman
Annie C. Wells
101 Park Avenue
New York, New York  10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

*Proposed Counsel for Debtors and Debtors-in-Possession*

23

070040.1001