**EXHIBIT B TO MOTION**

**[Agency Agreement]**

# AGENCY AGREEMENT

This Agency Agreement (the "<u>Agreement</u>") is made as of this 5th day of January, 2011, by and between the joint venture of Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (collectively, the "<u>Agent</u>") and Anchor Blue Holding Corp., a Delaware Corporation with a principal place of business at 1260 Corona Pointe Ct., Corona, CA 92879, and its direct and indirect subsidiaries (collectively, the "<u>Merchant</u>").

## RECITALS

WHEREAS, the Merchant operates retail stores in the United States and desires that the Agent act as the Merchant's exclusive agent for the limited purpose of : (a) selling all of the Merchandise (as hereinafter defined) located in Merchant's retail store location(s) identified on <u>Exhibit 1</u> attached hereto (each individually a "<u>Store</u>," and collectively the "<u>Stores</u>"), and all of the Merchandise located at Merchant's distribution center (collectively, the "<u>Distribution Center</u>") that has been or will be transferred by Merchant to the Stores, by means of a "store closing", "sale on everything", "everything must go", "going out of business" or similar themed sale (as further described below, the "<u>Sale</u>"); and (b) disposing of the Owned FF&E.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.  <u>Defined Terms</u>.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
|---|---|
| Additional Goods | Section 8.10(a) |
| Agency Accounts | Section 7.2(a) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent Claim | Section 12.5 |
| Agent Indemnified Parties | Section 13.1 |
| Agent Letter of Credit | Section 3.3(b) |
| Agent's Fee | Section 3.1(b) |
| Agreement | Preamble |
| Applicable Retail Value | Section 5.4(a) |
| Approval Order | Section 2.2 |
| Benefits Cap | Section 4.1(b) |
| Branded Merchandise | Section 5.3(a) |
| Central Service Expenses | Section 4.1 |
| Retail Value | Section 5.4(a) |
| Defective Merchandise | Section 5.3(a) |
| Designated Merchant Accounts | Section 7.2(b) |
| Display Merchandise | Section 5.3 |
| Distribution Center Merchandise | Section 5.3 |

| Defined Term | Section Reference |
| --- | --- |
| Distribution Centers | Recitals |
| Estimated Guarantee Amount | Section 3.3(a) |
| Events of Default | Section 14 |
| Excluded Benefits | Section 4.1 |
| Excluded Defective Merchandise | Section 5.3(a) |
| Expense L/C | Section 4.2(b) |
| Expenses | Section 4.1 |
| FF&E | Section 5.3(a) |
| Final Reconciliation | Section 5.2(b) |
| PNC | Section 3.3(b) |
| PNC Account | Section 3.3(a) |
| Gross Rings | Section 6.3 |
| Guaranteed Amount | Section 3.1(a) |
| Guaranteed Amount Deposit | Section 3.3(a) |
| Guaranty Percentage | Section 3.1(a) |
| Inventory Completion Date | Section 5.1 |
| Inventory Date | Section 5.1 |
| Inventory File | Section 5.4(a) |
| Inventory Report | Section 3.3(a) |
| Inventory Taking | Section 5.1 |
| Inventory Taking Instructions | Section 5.1 |
| Inventory Taking Service | Section 5.1 |
| Layaway Merchandise | Section 5.3 |
| Lender Agent | Section 3.3(b) |
| Merchandise | Section 5.3 |
| Merchant | Preamble |
| Merchant Account Usage Period | Section 7.2(a) |
| Merchant Consignment Goods | Section 5.3(a) |
| Occupancy Expenses | Section 4.1 |
| Owned FF&E | Section 16.9(a) |
| Payment Date | Section 3.3(a) |
| Petition Date | Recitals |
| Private Label Merchandise | Section 5.3 |
| Proceeds | Section 7.1 |
| Recovery Amount | Section 3.1(b) |
| Remaining Merchandise | Section 3.2(b) |
| Retained Employee | Section 9.1 |
| Retention Bonus | Section 9.4 |
| Returned Merchandise | Section 8.5 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 2.2 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3 |

| Defined Term | Section Reference |
|---|---|
| Sales Taxes Account | Section 8.3 |
| Sharing Threshold | Section 3.1(b) |
| Stores | Recitals |
| Supplies | Section 8.4 |
| Term Loan Agent | Section 3.3(c) |
| Term Loan Secured Parties | Section 3.3(c) |
| WARN Act | Section 9.1 |
| Weekly Sales Reconciliations | Section 5.2(a) |

Section 2.  Appointment of Agent.

2.1     Appointment of Agent.  Effective on the date hereof, the Merchant hereby irrevocably appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and disposing of Merchant's Owned FF&E, in accordance with the terms and conditions of this Agreement.

2.2     As soon as practicable after Merchant's execution of this Agreement, Merchant shall apply to the United States Bankruptcy Court for the District in which it commences a chapter 11 proceeding ("Bankruptcy Court") for an order or orders approving the assumption of this Agreement in its entirety in form and substance satisfactory to Agent (the "Approval Order").  The Approval Order shall be satisfactory to PNC and Term Loan Agent and shall provide, among other things, that: (i) this Agreement is in the best interests of Merchant, Merchant's estate, creditors, and other parties in interest; (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) upon the payment of the Guaranteed Amount Deposit and delivery of the Agent Letter of Credit and Expense L/C, Agent shall be entitled to sell all Merchandise and Owned FF&E hereunder free and clear of all liens, claims, or encumbrances thereon; (v) subject to  the payment of the Guaranteed Amount Deposit and delivery of the Agent Letter of Credit and the Expense L/C to Lender Agent, any presently existing liens encumbering all or any portion of the Merchandise or the Proceeds shall attach only to the Guaranteed Amount, the FF&E Payment, the Recovery Amount and amounts reimbursed by the Agent to Merchant on account of Expenses; (vi) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment, and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person; (vii) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs, and otherwise promote the Sale as a "store closing", "sale on everything", "everything must go", "going out of business" or similar themed sale, without further consent of any person (other than Merchant as provided for herein), in accordance with the terms and conditions of this Agreement and the form of sale guidelines attached hereto as Exhibit 2 (as the same may be modified and approved by the Bankruptcy Court and subject to the reasonable satisfaction of Agent) and without further compliance with applicable federal, state or local laws governing, *inter alia*, the conduct of store closing sales (the "Liquidation Sale Laws"), other than those designed to protect

public health and safety (the "Sale Guidelines"); (viii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, customer lists, and logos relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; (ix) each and every federal, state, or local agency, department, or governmental authority with regulatory authority over the Sale and all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including (without limitation) the conducting and advertising of the Sale in the manner contemplated by this Agreement, and no further approval, license, or permit of any governmental authority shall be required; (x) all utilities, landlords, creditors, and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body that in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (xi) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xii) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement, and Agent shall have no successor liabilities whatsoever; (xiii) Agent's security interest provided herein and sales of Merchandise shall be protected in the event that the Approval Order is reversed or modified on appeal pursuant to Sections 364(e) and 363(m); (xiv) any amounts owed by Merchant to Agent under this Agreement shall be granted the status of administrative expense claims in Merchant's bankruptcy case pursuant to Section 503(b) and 507(a) of the Bankruptcy Code and secured by valid and perfected first-priority security interests in accordance with Section 15 of this Agreement; (xv) a finding that time is of the essence in assuming the Agency Agreement and continuing the Sale at the Stores uninterrupted; (xvi) a finding that the Debtors' decisions to (a) assume this Agreement and (b) continue performance under and payments required by the Agency Agreement is a reasonable exercise of the Debtors' sound business judgment consistent with their fiduciary duties and is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; (xvii) a finding that this Agreement was negotiated in good faith and at arms' length between the Debtors and Agent; (xviii) a finding that Agent's performance and continued performance under this Agreement was and will be, and payment of the Guaranteed Amount under this Agreement was and will be so made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code; (xix) this Agreement is assumed pursuant to Bankruptcy Code section 365; (xx) in the event any or all of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code section 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the liens or priority authorized or created under this Agreement or the Approval Order.

Section 3.  Guaranteed Amount and Other Payments.

    3.1    Payments to Merchant.

(a)    As a guaranty of Agent's performance hereunder, but subject to adjustment as provided, inter alia, in Sections 3.1(c), 11.1(r) and 11.1(s) below, Agent shall pay Merchant an amount equal to twenty-seven and one-tenth percent (27.1%) (the "Guaranty Percentage") of the aggregate Retail Value of the Merchandise included in the Sale (the "Guaranteed Amount") which Guaranteed Amount shall be paid at such time and in such manner as specified in Section 3.3 below.

(b) To the extent that Proceeds exceed the sum of (i) the Guaranteed Amount, (ii) Expenses of the Sale and (iii) two percent (2%) of the aggregate Retail Value of the Merchandise (the "Agent's Fee") (the sum of (i), (ii) and (iii), the "Sharing Threshold"), then all Proceeds of the Sale above the Sharing Threshold shall be shared fifty percent (50%) to Merchant and fifty percent (50%) to Agent.  All amounts, if any, to be received by Merchant from Proceeds in excess of the Sharing Threshold shall be referred to as the "Recovery Amount."  To the extent that Merchant is entitled to receive a Recovery Amount from the Proceeds, the Agent shall pay such Recovery Amount as part of the Final Reconciliation under Section 5.2(b), as soon as commercially reasonable after the Sale Termination Date.

(c)    Agent shall pay to Merchant the Guaranteed Amount in the manner and times specified in Section 3.3 below.  The Guaranteed Amount will be calculated based upon the aggregate Retail Value of the Merchandise as determined by (A) the final certified report of the inventory taking service after verification and reconciliation thereof by Agent and Merchant, (B) the aggregate Retail Value of the Distribution Center Merchandise included in the Sale; and (c) amount of Gross Rings, as adjusted for shrinkage per this Agreement.

    3.2    Compensation to Agent.  Subject to entry of the Approval Order:

(a) Payments to Agent.  As its compensation for services rendered to Merchant, Agent shall be entitled to all Proceeds of the Sale after payment of the Guaranteed Amount, Expenses of the Sale,  Recovery Amount and all other amounts payable to Merchant from Proceeds thereof.

(b) Provided that no Event of Default has occurred and continues to exist on the part of the Agent, and after all payments are made to Merchant as required hereunder, all Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise") shall become the property of Agent, free and clear of all liens, claims and encumbrances of any kind or nature, and the proceeds received by Agent from the disposition, in a commercially reasonable manner, of such unsold Merchandise shall constitute Proceeds hereunder.  Notwithstanding the foregoing, Agent shall exercise commercially reasonable efforts to dispose all of the Merchandise during the Sale Term.

3.3    Time of Payments.

(a)  No later than one (1) business day after the later of (x) entry of the Approval Order and (y) execution hereof (the "Payment Date"), Agent shall pay eighty-five percent (85%) of the Guaranteed Amount (the "Guaranteed Amount Deposit") (reduced by any amounts paid prior to the payment of the Guaranteed Amount Deposit) in readily available funds, which amount shall be wired to the following account: PNC Bank, National Association, ABA# 031207607, Account # 8026261117, Account Name; Anchor Blue Inc. for the benefit of PNC Bank, National Association, Reference: Anchor Blue (the "PNC Account"), Agent shall calculate the amount of the Guaranteed Amount Deposit based upon the Retail Value of the Merchandise as of the Sale Commencement Date as reflected in Merchant's books and records (the "Estimated Guarantee Amount").  Agent shall pay the unpaid and undisputed balance of the Guaranteed Amount in readily available funds, which amount shall be wired to the PNC Account no later than the earlier of (i) the date that is thirty (30) business days after the Sale Commencement Date (in which case payment shall be of the undisputed portion of the balance of the Estimated Guaranteed Amount) and (ii) the second business day following the issuance of the audit report of the aggregate Retail Value of the Merchandise by the Inventory Taking Service, after verification thereof by Agent and Merchant (the "Inventory Report"), and Agent's failure to pay such balance or undisputed portion shall entitle the Lender Agent on behalf of Merchant to draw upon the Agent Letter of Credit (as defined below) in accordance with Section 3.3(b) to the extent of such balance or undisputed portion.  In the event that after the issuance of the Inventory Report as verified, the Guaranteed Amount is greater than the sum of the Guaranteed Amount Deposit plus the payment of the undisputed portion of the Estimated Guaranteed Amount, Agent shall pay the remainder of the Guaranteed Amount to the Lender Agent for the benefit of Merchant within two (2) business days after the Inventory Report has been issued.  In the event that there is a dispute with respect to the reconciliation of the aggregate Retail Value of the Merchandise following the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 5.2(c) hereof.

(b)  To secure payment of the unpaid portion of the Guaranteed Amount from Agent to Merchant hereunder, Agent shall deliver to Merchant an irrevocable standby letter of credit, naming Lender Agent as beneficiary, substantially in the form of Exhibit 3.3(b) attached hereto, in the original face amount equal to the unpaid portion of the Estimated Guaranteed Amount as of the Payment Date (as amended and in effect from time to time, the "Agent Letter of Credit") and shall contain terms, provisions and conditions mutually acceptable to Merchant, Lender Agent, PNC Business Credit, and Agent.  As used in this Agreement, "Lender Agent" shall mean PNC Business Credit, as Agent ("PNC") so long as PNC has not been paid in full from the Estimated Guaranteed Amount; provided, further, that, once PNC has been paid in full, Lender Agent shall mean the Term Loan Agent so long as the Term Loan Agent has not been paid in full from the Estimated Guaranteed Amount; provided, further, that, thereafter Lender Agent shall mean Merchant.  Agent shall cause the Agent Letter of Credit to be delivered to Lender Agent no later than the Payment Date (or, in the event that the Payment Date falls on a weekend, no later than the next business day).  The Agent Letter of Credit shall expire no less than sixty (60) days after the Sale Termination Date; provided, however, that (x) the Lender Agent,

Merchant, and Agent agree that after payment of the unpaid portion of the Guaranteed Amount (whether the Estimated Guaranteed Amount or the Guaranteed Amount calculated pursuant to the Inventory Report) pursuant to Section 3.3(a), the face amount of the Agent Letter of Credit shall be reduced in an amount(s) to be agreed upon by Merchant, Lender Agent, and Agent, but in any event not less than the sum of any and all amounts then due or to be due and payable from Agent in connection with the Guaranteed Amount and (y) unless Lender Agent shall have received written notice that Merchant and Agent shall have mutually agreed that they have completed the final reconciliation under this Agreement on or prior to a date that is at least thirty (30) days prior to the initial or any subsequent expiry date of the Agent Letter of Credit, then, at least thirty (30) days prior to the initial or any subsequent expiry date of the Agent Letter of Credit, Lender Agent shall receive an amendment to the Agent Letter of Credit solely extending (or further extending, as the case may be) the expiry date of the Agent Letter of Credit by at least sixty (60) days.  If Lender Agent does not receive such amendment to the Agent Letter of Credit by a date which is at least thirty (30) days prior to the initial or any subsequent expiry date of the Agent Letter of Credit, then all amounts hereunder shall become immediately due and payable and Lender Agent shall be permitted to draw under the Agent Letter of Credit in payment of amounts owed and Lender Agent shall hold the balance of the amount drawn under the Agent Letter of Credit as security for amounts that may become due and payable to Lender Agent and Merchant hereunder.  The Agent Letter of Credit shall not be amended without the prior written consent of the Lender Agent.

        (c)      As used in this Agreement, "Term Loan Agent" shall mean Ableco Finance LLC, in its capacity as administrative agent for the Term Loan Secured Parties; and "Term Loan Secured Parties" shall mean, collectively, the Term Loan Agent and the lenders party to the Financing Agreement dated August 14, 2009 among the Merchant, the Term Loan Agent and the lenders party thereto.  If and to the extent that Agent over-funds any amounts in respect of the Guaranteed Amount, then Merchant agrees to promptly reimburse such undisputed overpayment amounts to Agent.  To the extent that any over-funded amounts in respect of the Guaranteed Amount have been received by PNC or the Term Loan Agent and have not been reimbursed by Merchant, Agent shall inform PNC and the Term Loan Agent of such overpayment in writing in respect of the Guaranteed Amount hereunder on account of the Merchandise and such reimbursement shall be paid (x) first, from the Term Loan Agent for the Term Loan Secured Parties to the extent of and until all amounts received by the Term Loan Agent and the Term Loan Secured Parties from the Guaranteed Amount hereunder shall have been exhausted and (ii) second, from PNC to the extent of and until all amounts received by PNC hereunder from the Guaranteed Amount shall have been exhausted.  Each of PNC and Term Loan Agent agrees to disgorge such overpayment required above in respect of the Guaranteed Amount hereunder on account of the Merchandise to Agent within two (2) business days of such written notice.

        (d)      Merchant agrees that if at any time during the Sale Term Merchant holds any amounts due to Agent as Proceeds hereunder, Agent may, in its discretion, after 5 business days notice to Merchant and Lender Agent, offset such Proceeds being held by Merchant against any amounts due and owing to Merchant pursuant to this Section 3.3 or otherwise under this Agreement.  In addition, Merchant and

Agent further agree that if at any time during the Sale Term, Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after 5 business days notice to Merchant and Lender Agent, offset such amounts being held by it against any amounts due and owing by, or required to be paid by, Merchant hereunder.

(e)     Upon execution of this Agreement and completion of the auction determining Agent to be the successful party to conduct the Sale, and in any event prior to Merchant filing a bankruptcy petition, Merchant will fund an Expense retainer with Agent in the amount of  $400,000 to pay advertising and supervision Expenses to be paid by Agent prior to the assumption of this Agreement ("Expense Retainer").  On the Payment Date, Agent shall return the Expense Retainer to Merchant (subject to the offset provisions hereof relating to any Proceeds or other amounts due from Merchant to Agent hereunder).

Section 4.     Sale Expenses.

4.1     Expenses.  Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale.  As used herein, "Expenses" shall mean all Store-level operating expenses of the Sale which arise during the Sale Term (except as to subparagraph m) limited to the following:

(a)     all payroll for all Retained Employees used by Agent in connection with the Sale for actual days/hours worked during the Sale Term as well as payroll for any of Merchant's former employees or temporary labor retained by Agent for the Sale;

(b)     any amounts payable by Merchant for benefits for Retained Employees including FICA, unemployment taxes, worker's compensation, and health care insurance and paid time-off benefits that accrue during the Sale Term used by Agent in connection with the Sale, in an amount not to exceed 16.00% of the aggregate base payroll for all Retained Employees in the Stores (the "Benefits Cap");

(c)     50% of the fees and costs of the Inventory Taking Service to conduct the Inventory Taking at the Stores;

(d)     advertising, direct mailing, and internal and external signage expenses;

(e)     local, leased line, satellite broadband connections and long distance telephone expenses incurred in the conduct of the Sale;

(f)     credit card, bank card fees, chargebacks, discounts, bad debt expense, and any other bank charges relating to Store or corporate accounts used in connection with the Sale;

(g)     costs of all security in the Stores, including without limitation personnel and alarm services in the Stores as well as cash shortfalls in registers;

(h)  on-site supervision, including base fees and bonuses of Agent's field personnel, travel to and from the Stores, and incidental out-of-pocket and commercially reasonable travel expenses relating thereto(including reasonable and documented corporate travel to monitor and manage the Sale);

(i)  a pro-rata portion of Merchant's insurance attributable to the Merchandise;

(j)  any and all costs relating to the processing, transfer or consolidation of Merchandise between and among Stores, including delivery and freight costs;

(k)  Retention Bonuses as described in Section 9.4 below;

(l)  Actual Occupancy Expenses for the Stores on a per location and per diem basis in an amount equal to the per Store per diem amount set forth on Exhibit 4.1(l) hereto excluding pro rata portion of percentage and/or overage rent attributable to Agent based on sales generated during the Sale Term as a proportion of sales generated by Merchant and Agent for the applicable percentage rent measurement period under each lease that contains a provision for percentage or overage rent ("Percentage Rent");

(m)  Agent's actual cost of capital, reasonable attorney's fees, letter of credit fees, insurance costs, and other transaction costs;

(n)  costs for additional Supplies as requested by Agent;

(o)  Central Service Expenses of $10,000.00 per week during the Sale Term;

(p)  all fees and charges required to comply with Applicable Laws;

(q)  housekeeping, cleaning services, and trash removal;

(r)  third party payroll processing fees; and

(s)  Postage, courier, overnight mail charges.

There will be no double payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.  Notwithstanding anything herein to the contrary, to the extent that an Expense listed in Section 4.1 is also included on Exhibit 4.1(l), then Exhibit 4.1(l) shall control and such Expense shall not be double counted.

As used herein, the following terms have the following respective meanings:

"Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including (without limitation) MIS services,

payroll processing, point-of-sale systems, accounting system, cash reconciliation, inventory processing and handling, and data processing and reporting.

"Excluded Benefits" means (i) the following benefits arising or accruing prior to the Sale Commencement Date: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, termination or severance pay and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including any payments due under the Worker Adjustment Retraining Notification Act ("WARN Act").

"Occupancy Expenses" means base rent, Percentage Rent, utilities, CAM, telecom/phone costs, real estate and use taxes, POS maintenance, store security systems, repairs and maintenance, taxes and licenses, insurance (including without limitation general liability, property, crime, umbrella, bond and flood insurance), store supplies, cleaning expenses and equipment rental all of the foregoing as categorized and described on Exhibit 4.1(l) attached hereto.  For the avoidance of doubt, Agent shall not be responsible for Percentage Rent, except to the extent included in Exhibit 4.1(l).

"Expenses" shall not include: (i) Excluded Benefits; (ii) Central Service Expenses in excess of the $10,000 per week included in subsection (o), above; (iii) any Occupancy Expenses in excess of the aggregate amounts for each Store set forth on  Exhibit 4.1(l); and (iv) any other costs, expenses, or liabilities arising during the Sale Term in connection with the Sale, other than the Expenses listed above, all of which shall be paid by Merchant promptly when due during the Sale Term.

4.2     Payment of Expenses.  Effective from and after entry of the Approval Order:

(a)     Agent shall be responsible for the payment of all Expenses whether or not there are sufficient Proceeds collected to pay such Expenses after the payment of the Guaranteed Amount.  All Expenses incurred during each week of the Sale (i.e., Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 5.2, provided, however, in the event that the actual amount of an expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amount, which amount will be reconciled once the actual amount of such Expense becomes available.  Agent and/or Merchant may review or audit the Expenses at any time. Agent shall be obligated to pre-fund any Occupancy Expenses and payroll-related expenses consistent with the Merchant's customary rent and payroll funding practices and timing.

(b)     To secure payment of the Expenses, Agent shall deliver to Lender Agent an irrevocable and unconditional standby letter of credit, naming Lender Agent, as beneficiary, in the original face amount equal to two (2) weeks estimated Occupancy Expenses and payroll Expenses, substantially in the form of Exhibit 4.2(b) attached hereto (as amended and in effect from time to time, the "Expense L/C").  The

Expense L/C shall be delivered to Lender Agent on the Payment Date (or, in the event that the Payment Date falls on a weekend, no later than the next business day), shall be issued by a bank selected by Agent and reasonably acceptable to Merchant and Lender Agent, and shall contain terms, provisions and conditions mutually acceptable to Merchant, Lender Agent, and Agent.  The Expense L/C shall expire no earlier than sixty (60) days after the Sale Termination Date.  Unless the Lender Agent shall have received written notice that Agent and Merchant shall have mutually agreed that they have completed the final reconciliation under this Agreement at least thirty (30) days prior to the initial or any subsequent expiry date of such Expense L/C, then, at least thirty (30) days prior to the initial or any subsequent expiry date of such Expense L/C,  Lender Agent shall receive an amendment to the Expense L/C solely extending (or further extending, as the case may be) the expiry date by at least sixty (60) days.  If Lender Agent does not receive such amendment to the Expense L/C no later than thirty (30) days before the expiry date of the Expense L/C, then all amounts hereunder shall become immediately due and payable and Lender Agent shall be permitted to draw under the Expense L/C in payment of amounts owed and Lender Agent shall hold the balance of the amount drawn under the Expense L/C as security for amounts that may become due and payable to Lender Agent and Merchant hereunder.

Section 5.     Inventory Valuation; Merchandise.

5.1     (a)     Inventory Taking.  Subject to the provisions of this paragraph, the parties have agreed to use the current book value of inventory as of the Sale Commencement Date, to determine the aggregate Retail Value of the Merchandise located in the Stores on the Sale Commencement Date in accordance with this Agreement.  In order to test the validity of the aggregate Retail Value of the Merchandise as reflected on Merchant's current books and records, subject to the availability of the Inventory Taking Service and the agreement of Merchant and Agent as to the schedule of the Inventory Taking at the Test Stores, on or within ten (10) business days after the Sale Commencement Date (the "Inventory Completion Date"), Merchant and Agent shall cause to be taken an SKU physical inventory and retail inventory (the "Inventory Taking") of the Merchandise located in 30 of the Stores, each with a representative sampling of Merchandise located in each district (each a "Test Store" and collectively, the "Test Stores"), which Test Stores shall be jointly selected by Merchant and Agent.  (The date of the Inventory Taking at each Test Store shall be referred to as the "Inventory Date" for such Test Store).  Merchant and Agent shall jointly employ RGIS or another mutually acceptable inventory taking service to conduct the Inventory Taking (and, if applicable, the Additional Inventory Taking, as defined below) in accordance with procedures set forth on **Exhibit 5.1** annexed hereto.  Agent shall be responsible as a Sale Expense hereunder for fifty percent (50%) of the fees and expenses of the Inventory Taking Service.  Except for the Inventory Taking costs payable to the Inventory Taking Service, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking.  Merchant and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the conduct of the Inventory Taking in each of the Stores, the applicable Stores shall be closed to the public and no sales or other transactions shall be conducted.  Merchant and the Agent further agree that until the

Inventory Taking in each particular Store is completed, neither Merchant nor Agent shall: (i) transfer any Merchandise to or from that Store to other Stores, (ii) move Merchandise within or about the Store so as to make any such items unavailable for counting as part of the Inventory Taking, and/or (iii) remove any hang tags, price tickets or inventory control tags affixed to any Merchandise.  Inventory may continue to be shipped from the Distribution Center to the Stores prior to the Inventory Taking.  Merchant and Agent agree to cooperate with each other to conduct the Inventory Taking commencing at a time that would minimize the number of hours that such locations would be closed for business.

(b)  The results of the Inventory Taking at the Test Stores and the Additional Test Stores (as defined below), if any (the "Test Store Results") shall be used to determine any adjustment as may be required to the calculation of the aggregate Retail Value of the Merchandise located in the Stores on the Sale Commencement Date, as follows:

(i)  For purposes of calculating the aggregate Retail Value of the Merchandise at the Test Stores and Additional Test Stores, if any (collectively, the "Inventoried Stores"), the actual Test Store Results for the Inventoried Stores, as adjusted by Gross Rings for the period between the Sale Commencement Date and the applicable Inventory Date (the "Gross Rings Period"); provided, that the Gross Rings Period for the Non-Inventoried Stores shall mean the period between the Sale Commencement Date and last Inventory Date.

(ii)  For purposes of calculating the aggregate Retail Value of the Merchandise at the Stores that do not constitute Inventoried Stores (the "Non-Inventoried Stores"), the actual Test Store Results at the Inventoried Stores shall be compared to the "roll-forward" book value of the Merchandise at the Inventoried Stores, as of the Sale Commencement Date (i.e., Gross Rings and receipts at each of the Inventoried Stores during the Gross Rings Period) (the "Adjusted Book Inventory"), and an average variance shall be calculated (the "Variance"), and the Variance shall be applied to adjust Adjusted Book Inventory of the  Merchandise located at the Non-Inventoried Stores; provided however, for the purposes of calculating the Variance, the Inventoried Stores having the results from the one Inventoried Store with highest and one Inventoried Store with the lowest variance percentage shall be excluded.  In the event that the initial Variance at the Inventoried Stores is greater than three percent (3%) of the current book value of the Merchandise in the Inventoried Stores, then either Merchant or Agent shall have the right to request an Inventory Taking at additional Stores (the "Additional Test Stores"), to be mutually and reasonably agreed upon by the parties (the "Additional Inventory Taking"), to establish whether an adjustment to the Variance is required, with the costs and fees associated with the Additional Inventory Taking, to be shared equally by Merchant and Agent.

(c)  The Agent and Merchant agree that they will, and agree to cause their respective representatives to, cooperate and assist in the preparation and the calculation of the aggregate Retail Value of the Merchandise included in the Sale,

including, without limitation, the making available to the extent necessary of books, records, work papers and personnel.

(d)     With respect to Distribution Center Merchandise, such Distribution Center Merchandise shall be counted and reconciled within two Store business days after receipt of such goods in the Stores in accordance with the procedures set forth herein ("Reconciled DC Merchandise Receipts"), and absent prior notification and agreement of Merchant, failure to report any variance between the received shipment from the respective shipping documents (each a "Shipping Variance"), within such two Store business day period shall, result in such receipts being automatically confirmed received consistent with the applicable shipping documents.  Merchant shall have two Distribution Center business days to verify a timely issued Shipping Variance (each a "Shipping Variance Response"), and absent prior notification and agreement of Agent, failure to respond to an asserted Shipping Variance within such two Distribution Center business day period shall result in such Shipping Variance being deemed valid.  If Merchant timely issues a Shipping Variance Response that disputes the asserted Shipping Variance, Merchant and Agent shall cooperate with each other to verify and resolve such dispute.

5.2     Reconciliation

(a) On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant shall cooperate to jointly prepare a reconciliation of the weekly Proceeds of the Sale, Expenses, and any other Sale related items that either party may reasonably request (the "Weekly Sales Reconciliations").  Upon Lender Agent's request, Merchant and Agent shall provide Lender Agent with a copy of such Weekly Sales Reconciliations.

(b) Within thirty (30) days after the Sale Termination Date, Agent and Merchant shall jointly prepare a final reconciliation of the Sale, including (without limitation) a summary of Proceeds, Expenses, and any other accounting required hereunder (the "Final Reconciliation") and deliver the same to each other and to Lender Agent the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.  Within five (5) days of completion of the Final Reconciliation, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds and Expenses to review and audit such records.

(c) In the event that there is a dispute with respect to the Final Reconciliation, such dispute shall be promptly (and in no event later than the third business day following the request by either Merchant or Agent) submitted to the Bankruptcy Court for a determination.  Merchant and Agent hereby agree to submit to the jurisdiction of the Bankruptcy Court for such determination.

5.3     Merchandise Subject to this Agreement.

(d)          For purposes of this Agreement, "<u>Merchandise</u>" shall mean (i) all saleable finished goods inventory that is owned by Merchant and located at the Stores as of the Sale Commencement Date, including, (A) Defective Merchandise, (B) Display Merchandise, and (C) Merchandise subject to Gross Rings; (ii) subject to Section 5.4(b), Distribution Center Merchandise .  Notwithstanding the foregoing, "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) furnishings, trade fixtures, equipment and/or improvements to real property which are located in the Stores, as set forth on Exhibit 11.1(c)(1) attached hereto (collectively, "<u>FF&E</u>"), <u>provided that</u>, Agent shall have the right to dispose of Owned FF&E (as such terms are defined below) in accordance with the terms and conditions of this Agreement; (4) Excluded Defective Merchandise; (5) Merchant Consignment Goods; (6) any additional inventory that was on-order by the Debtors prior to the Sale Commencement Date or other product designated for the Debtors that is acquired by Agent in connection with the Agreement; (7) return to vendor merchandise; (9) Bulk Merchandise; (10) skus with a retail value of $0.00 (11) #3 Ecommerce Inventory; and (12) 99 Aged Inventory  NEJ ((1) through (12), collectively, "<u>Excluded Goods</u>").  As used in this Agreement the following terms have the respective meanings set forth below:

"<u>Bulk Merchandise</u>" means those items of merchandise that have a cost of less than one dollar ($1.00)

"<u>Defective Merchandise</u>" means any goods reasonably agreed upon by the Merchant's representative and the Agent's representative during the Inventory Taking as defective or otherwise not saleable in the ordinary course of Merchant's business, as to which Merchant and Agent mutually agree as to the Retail Value of such Defective Merchandise.

"<u>Display Merchandise</u>" means those items of inventory used in the ordinary course of business as displays or floor models, including inventory that has been removed from its original packaging where such items of inventory have been removed from its original packaging for the purpose of putting such item on display, which goods are not otherwise damaged or defective. Display Merchandise shall not per se be deemed to be Defective Merchandise.

"<u>Distribution Center Merchandise</u>" means those items of inventory currently located at Merchant's Distribution Centers as identified on <u>Exhibit 5.3</u> annexed hereto, not to exceed $5,400,000 at Retail Value, which goods shall be delivered by Merchant at Merchant's cost but at Agent's direction to the Stores in accordance with Section 11.1(r).

"<u>Excluded Defective Merchandise</u>" means (i) those items of Defective Merchandise that are not saleable because they are so damaged or defective that such inventory cannot be used for the purpose for which they were intended; and (ii) items of Defective Merchandise for which the Merchant and the Agent cannot agree upon a Retail Value.

"Merchant Consignment Goods" shall have the meaning assigned to such term in Section 5.5 below.

    5.4    Valuation.

    (a)    For purposes of this Agreement, "Retail Value" shall mean with respect to each item of Merchandise, the lower of (i) the Retail price for unique style identifierfor such item of Merchandise as reflected in the "On Hand Inventory File as of 12_26_10.xls" included in the Merchant's due diligence electronic data room on December 28, 2010, and for reference purposes retained in paper format in the offices of each of Merchant and Agent (the "Inventory File") and (ii) the lowest ticketed, shelf marked, register or file price as of the Sale Commencement Date.

    (b)    Distribution Center Merchandise received in the Stores after the DC Transfer Deadline as defined in Section 11.1(r), will be valued at the applicable Retail Value (determined consistently with Section 5.4(a) above) for each such item multiplied by the inverse of the prevailing discount on similar items of Merchandise as of the date of receipt in the Stores.

    (c)    Excluded Defective Merchandise located in the Stores, shall be identified and counted during the Inventory Taking, and thereafter removed from the sales floor and segregated from Merchandise. The procedure for counting and segregating the Excluded Defective Merchandise is set forth on Exhibit 5.1.

    5.5    Excluded Goods. Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder. If Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale as "Merchant Consignment Goods" at prices established by the Agent. The Agent shall retain 15% of the sale price (less Sales Taxes) for all sales of Merchant Consignment Goods, and Merchant shall receive 85% of the receipts in respect of such sales (less Sales Taxes). Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly Sale reconciliation by Merchant and agent pursuant to Section 5.2(a) above. If Merchant does not elect to have Agent sell Excluded Defective Merchandise, then all such items will be removed by Merchant from the Stores at its expense as soon as practicable after the Sale Commencement Date. Except as expressly provided in this Section 5.5, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

    Section 6.    Sale Term.

    6.1    Term. The Sale shall commence at the Stores on January 7, 2011 (the "Sale Commencement Date"). Agent shall complete the Sale at the Stores, and shall vacate all of the Store premises on or before February 28, 2011 (the "Sale Termination Date") unless the Sale is extended by mutual agreement of Agent and Merchant and Lender Agent following a commensurate extension of the expiry date of any Agent Letter of Credit

or the Expense L/C, provided that Agent may terminate the Sale at any retail store location upon seven (7) days' notice (the "Vacate Notice") to Merchant (the end of such notice period, as to each such Store, as applicable, the "Vacate Date"). The period from the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "Sale Term."

        6.2      Vacating the Stores. At the conclusion of the Sale, Agent agrees to leave the Stores in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E. Agent shall vacate the Stores on or before the Sale Termination Date, as provided for herein, at which time Agent shall surrender and deliver the Store premises and Store keys to Merchant. Agent's obligations to pay all Occupancy Expenses for each Store subject to Vacate Notice shall continue until the applicable Vacate Date for such Store; provided however, if Agent shall vacate a Store prior to the 15th day of the calendar month, then Agent shall be obligated to pay Occupancy Expenses (up to the per diem amount set forth in Exhibit 4.1(l)) actually paid by Merchant from the Vacate Date through the 15th day for each such Store.  Subject to Section 16.10 below, all assets of Merchant used by Agent in the conduct of the Sale (e.g., FF&E, etc.) shall be returned by Agent to Merchant or left at the Store at the end of the Sale Term to the extent the same have not been used in the conduct of the Sale or sold (e.g., FF&E). Agent shall be responsible for all Occupancy Expenses (irrespective of any per diem cap on Occupancy Expenses) for a Store for which Merchant is or becomes obligated resulting from Agent's failure to timely vacate.

        6.3      Gross Rings. In the event that the Sale commences at any Store subject to Inventory Taking prior to the completion of the Inventory Taking at such Store, then for the period from the Sale Commencement Date for such Store until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), and (ii) cash reports of sales within such Store. Agent and Merchant shall keep a strict count of register receipts and reports to determine the actual Retail Value and Retail Price of the Merchandise sold by SKU. All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice. Any Merchandise included in the Sale using the Gross Rings shall be included in Merchandise using the Gross Rings method and, as soon as determinable, Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of 102% of the aggregate Retail Value of the Merchandise (without taking into account any of Agent's point of sale discounts or point of sale markdowns) sold during the Gross Rings period.

      Section 7.      Sale Proceeds.

        7.1      Proceeds.  For purposes of this Agreement, "Proceeds" shall mean the aggregate of:  (a) the total amount (in U.S. dollars) of all sales of Merchandise to consumers made under this Agreement, exclusive of Sales Taxes, and (b) any proceeds of Merchant's insurance for loss or damage to Merchandise or loss of cash arising from events occurring during the Sale Term.  Proceeds shall also include any and all proceeds received

by Agent from the disposition of unsold Merchandise at the end of the Sale whether through salvage, bulk sale or otherwise.

7.2     Deposit of Proceeds.

(a)     Prior to the payment of the Guaranteed Amount Deposit, all Proceeds of the Sale, to the extent elected by Agent, proceeds from the sale of Owned FF&E, and proceeds of Additional Goods (including credit card proceeds) shall be collected and deposited on a daily basis into depository accounts designated by the Merchant for the Stores, which accounts shall be designated solely for the deposit of Proceeds of the Sale, proceeds from the sale of Owned FF&E, and proceeds of Additional Goods (including credit card proceeds), and the disbursement of amounts as provided herein (the "Designated Deposit Accounts").  The Designated Deposit Accounts shall be dedicated solely to the deposit of such proceeds and the disbursement of amounts payable hereunder, and Merchant shall exercise sole signatory authority and control with respect to the Designated Deposit Accounts.  Upon request, Merchant shall deliver to Agent and Lender  Agent copies of all bank statements and other information relating to the Designated Deposit Accounts.  From the Sale Commencement Date through the Payment Date, Proceeds in the Designated Deposit Accounts shall be disbursed, on a weekly basis, as follows: (i) first, to reimburse for Expenses paid during the previous week; (ii) second, to the Lender Agent, until the Guaranteed Amount is paid in full; (iii) third, to the Agent, until the Agent's Fee is paid in full; (iv) fourth, to the Merchant, in payment of the Recovery Amount, and (v) fifth, to the Agent, the remainder.

(b) Following the payment of the Guaranteed Amount Deposit, within twenty (21) days after the Sale Commencement Date, with respect to cash transactions and credit card transactions (as and where applicable the "Merchant Account Usage Period"), Agent shall use its best efforts to establish its own accounts (the"Agency Accounts") , dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder, which accounts may be the Designated Merchant Accounts (as defined herein) and Merchant shall promptly upon Agent's request execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, in the event that Agent establishes a reasonable business justification therefore, Merchant and Lender Agent shall consent to an appropriate extension of the Merchant Account Usage Period.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts; provided, however, upon request, Agent shall deliver to Merchant and Lender Agent copies of all bank statements and other information relating to such accounts.  Neither Merchant nor Lender Agent shall be responsible for and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term. Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts.

(c) During the period after the payment of the Guaranteed Amount Deposit and the date Agent establishes the Agency Accounts, all Proceeds of the Sale, to the extent elected by Agent, proceeds from the sale of Owned FF&E, and proceeds of Additional Goods (including credit card proceeds), shall be collected by Agent and

deposited on a daily basis into the Designated Merchant Accounts or such other accounts as approved in writing by Merchant and Lender Agent as the Designated Merchant Accounts, and on each business day the Proceeds of the Sale, to the extent elected by Agent proceeds from the sale of Owned FF&E and, and proceeds of Additional Goods (including credit card proceeds) shall be segregated from the Merchant's existing accounts, provided, that upon Lender Agent's request, Merchant shall provide to Lender Agent an accounting of all such Proceeds deposited in the Designated Merchant Accounts. Commencing on the first business day following the payment of the Guaranteed Amount Deposit and the posting of the Expense L/C, and on each business day thereafter (or as soon thereafter as is practicable), Merchant shall promptly pay to Agent by wire funds transfer all collected funds constituting Proceeds, (as well as proceeds from the sale of Owned FF&E and Additional Goods to the extent deposited in such accounts) deposited in such accounts (but not any other funds, including, without limitation, any proceeds of Merchant's inventory sold prior to the Sale Commencement Date, if any). During the period after the payment of the Guaranteed Amount Deposit and the date Agent establishes the Agency Accounts, or such other extended date as shall be agreed between and among Merchant, Agent and Lender Agent, Lender Agent agrees not to take any action with respect to such Proceeds deposited into the Designated Merchant Accounts; provided, however, Lender Agent retains all of its rights and remedies with respect to the proceeds deposited into such Designated Merchant Accounts that do not constitute Proceeds of the Sale.

7.3    Credit Card Proceeds.  Agent shall use its reasonable best efforts to establish its own merchant identification numbers under Agent's name to enable Agent to process all credit card sales for Agent's account prior to the expiration of the Merchant Account Usage Period.  Until such time as Agent establishes its own identification numbers, Agent shall have the right (but not the obligation) to use Merchant's credit card facilities (including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant identification number(s) and existing bank accounts) for credit card Proceeds.  In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures.  Without limiting the foregoing, Merchant shall cooperate with Agent to down-load data from all credit card terminals each day during the Sale Term and to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's Merchant identification number(s).  All credit card Proceeds will constitute the property of Agent and shall be deposited into the Designated Merchant Accounts or Agency Accounts, as the case may be. To the extent credit card Proceeds are deposited into the Designated Merchant Accounts, Merchant shall transfer such Proceeds to Agent daily (within one business day) by wire transfer of immediately available funds, provided, that upon Lender Agent's request, Merchant shall provide to Lender Agent an accounting of all such credit card Proceeds deposited into the Designated Merchant Accounts.  At Agent's request, Merchant shall cooperate with Agent to establish merchant identification numbers under Agent's name to enable Agent to process all credit card Proceeds for Agent's account.  Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term.

7.4    <u>Petty Cash</u>. In addition to the Guaranteed Amount, after entry of the Approval Order, Agent shall reimburse Merchant on and as of the start of business on the Sale Commencement Date for all cash in the Stores. Agent shall purchase, on a dollar for dollar basis, all cash located in the Stores, which shall be determined as of the Sale Commencement Date and paid for on the Payment Date.

Section 8.    <u>Conduct of the Sale</u>.

8.1    <u>Rights of Agent</u>.  Agent shall be permitted to conduct the Sale in accordance with the Sale Guidelines.  In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the right, limited only by the Sale Guidelines:

(a)    to establish and implement advertising and promotion programs consistent with a "going out of business", "store closing", "sale on everything", "everything must go",  or similar theme (including, without limitation, by means of media advertising, A-frame, similar interior and exterior signs and banners, and use of sign walkers) in a manner consistent with the Sale Guidelines and the Approval Order;

(b)    to establish Store hours that are consistent with the terms of applicable leases, and local laws and regulations, including without limitation Sunday closing laws;

(c)    except as otherwise expressly included in an Expense, to use without charge during the Sale Term all FF&E, advertising materials, Merchant's customer lists and email lists to the extent Merchant can make such lists available through diligent efforts, computer hardware and software, existing supplies located at the Stores, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed);

(d)    to use subject to Section 4.1(o) Merchant's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale; <u>provided</u>, <u>however</u>, that in the event that Agent expressly requests Merchant to provide services other than those normally provided in liquidations such as this to the Stores and relating to the sale of Merchandise by Merchant, Agent shall be responsible for the actual incremental cost of such services as an Expense.  Agent shall exercise due care and return to the Merchant immediately at the end of the sale all materials and supplies except materials and supplies expended; and

(e)    to transfer Merchandise between and among the Stores, the costs of which shall be paid by Agent as an Expense of the Sale; <u>provided</u>, <u>however</u>, the Agent shall not transfer Merchandise between Inventoried Stores unless the Inventory Taking at the transferring and receiving Inventoried Stores has been completed.

8.2    Terms of Sales to Customers.

(a)    Final/As Is Sales.  All sales of Merchandise will be "final sales" and "as is", and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash, nationally recognized bank credit cards and Merchant's private label credit card.

(b)    Gift Certificates.  Through January 17, 2011 (or such later date as the Merchant may agree or as the Bankruptcy Court may order), Agent will accept Merchant's gift certificates and Store credits, issued by Merchant prior to the Sale Commencement Date, and will not honor other customer programs required by the Sale Guidelines, including but not limited to all customer satisfaction programs for items purchased prior to the commencement of the Sale.  Merchant shall reimburse Agent in cash for such amounts during the Weekly Sale Reconciliation.

8.3    Sales Taxes.  (a)  During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise and Additional Goods as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and Additional Goods and collected by Agent, on Merchant's behalf.  All Sales Taxes shall be deposited into the segregated accounts by Merchant designated by Merchant and Agent solely for the deposit of such Sale Taxes (the "Sales Taxes Account").  Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities.  Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)    Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that as Agent is conducting the Sale solely as agent for Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4    Supplies.  Agent shall have the right to use all existing supplies (e.g., boxes, bags, twine) (the "Supplies") located at the Stores and the Distribution Center at no charge to Agent.  In the event that additional supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent if available, for

which Agent shall reimburse Merchant at Merchant's cost therefor.  Merchant does not warrant that the existing Supplies as of the Sale Commencement Date are adequate for the purposes of the Sale.

8.5     Returns of Merchandise.  Through January 17, 2011 (or such later date as the Merchant may agree or as the Bankruptcy Court may order), Agent shall accept returns of merchandise sold by Merchant prior to the Sale Commencement Date ("Returned Merchandise"), provided that such return is accompanied by the original Store register receipt and is otherwise in compliance with Merchant's return and price adjustment policy in effect as of the date such item was purchased.  If such Returned Merchandise is saleable as first-quality Merchandise, it shall be included in Merchandise, and valued at the Retail Value applicable to such item as of the Sale Commencement Date multiplied by the inverse of the prevailing discount on similar items of Merchandise as of the date of the return.   In the event that Returned Merchandise constitutes Defective Merchandise ("Returned Defective Merchandise"), Merchant and Agent shall mutually agree upon the Retail Value for such item of Returned Defective Merchandise; provided, however, in the event that Merchant and Agent cannot mutually agree upon the Retail Value for such Returned Defective Merchandise, or such Returned Defective Merchandise constitutes Excluded Defective Merchandise, then such Returned Defective Merchandise shall constitute Merchant Consignment Goods or Excluded Defective Merchandise and shall be excluded from the Sale.  The aggregate Retail Value of the Merchandise shall be increased by the Retail Value of any Returned Merchandise included in Merchandise (determined in accordance with this Section 8.5), and the Guaranteed Amount shall be adjusted accordingly.  Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Returned Merchandise; provided, however, to the extent that the Guaranteed Amount has been paid in full, unless and until Merchant and Agent agree to a mutually acceptable escrow or reserve sufficient to insure that Merchant will have sufficient funds to reimburse Agent pursuant to this Section 8.5, Agent shall have no further obligations pursuant to this Section 8.5.  Any increases in the Guaranteed Amount in connection with returned Merchandise shall be accounted for on a weekly basis.

8.6 Force Majeure.  If any casualty or act of God or act of terrorism prevents or substantially inhibits the sale of any Merchandise or the conduct of business in the ordinary course at any Store, then such Store and the remaining Merchandise located at such Store shall be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise or business interruption shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant, Term Loan Agent and/or the Lender Agent, as the case may be, shall reimburse Agent for the amount the Guaranteed Amount is so reduced prior to the end of the Sale Term.

8.7     Merchant's Right to Monitor.  Merchant shall have the right to monitor the Sale and activities attendant thereto, and to be present in the Stores during the

hours when the Stores are open for business, provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale. Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation, and shall promptly notify Agent of such emergency. Any expenses incurred in connection with this paragraph shall be borne by Merchant.

Section 8.8     Additional Goods.

(a)     Subject to authorization in the Approval Order, Agent may (but shall not be required to), at Agent's sole cost and expense (which cost and expense may be recovered by Agent as set forth in subparagraph (b) below), supplement the Merchandise in the Stores with goods, of like kind and quality, as is customarily sold in the Stores (the "Additional Goods") not to exceed 20% of the aggregate Retail Value of the Merchandise. Sales of Additional Goods shall be run through Merchant's cash register systems, provided, however, that Agent shall mark the Additional Goods using either a "dummy" SKU or department number or in such other manner so as to distinguish the sale of Additional Goods from the sale of Merchandise. Merchant and Agent agree that the transactions relating to the Additional Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes. At all times and for all purposes, the Additional Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity (including, without limitation, Merchant) shall have any claim against any of the Additional Goods or their proceeds, except to the extent set forth in Section 8.8. The Additional Goods shall at all times remain subject to the exclusive control of Agent, and Agent shall, at Agent's sole cost and expense (and not as an Expense of the Sale), insure the Additional Goods and, if required, promptly file any proofs of loss with regard thereto with Agent's insurers. Merchant and Agent shall reconcile the proceeds from the sale of Additional Goods as part of the Weekly/Final Sales Reconciliation process.

(b)     As consideration for allowing the Agent to supplement the Merchandise with Additional Goods pursuant to the terms and conditions of Section 8.8(a), Agent shall pay to Merchant seven percent (7%) of the gross proceeds of the sale of Additional Goods after payment of applicable Sales Taxes.

Section 9.     Employee Matters.

9.1     Merchant's Employees. Agent may use Merchant's employees in the conduct of the Sale to the extent Agent in its sole discretion deems expedient, and Agent may select and schedule the number and type of Merchant's employees required for the Sale. Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date. Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent. Merchant and Agent agree that nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating

to any of Merchant's employees including, without limitation, payroll, benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees. Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of its employees in anticipation of the Sale or prior to the Sale Termination Date. Merchant has not terminated and shall not during the Sale Term terminate any employee benefits or benefit programs.

9.2     Termination of Employees. Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein. In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least seven (7) days prior thereto so that Merchant may coordinate the termination of such employee; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (which shall consist of dishonesty, fraud or breach of employee duties), the ten (10) day notice period shall not apply, provided further, however, that Agent shall immediately notify Merchant of the basis for such "cause" so that Merchant can arrange for termination of such employee. From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent. Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee.

9.3     Payroll Matters. During the Sale Term, Merchant shall process the base payroll for all Retained Employees and any former employees and temporary labor retained by Agent. Each Tuesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Merchant shall transfer, or to the extent that the Payment Date has passed, Agent shall transfer, to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, worker's compensation and benefits for such week which constitute Expenses hereunder.

9.4     Employee Retention Bonuses. Agent shall have the right to elect to pay, as an Expense, retention bonuses (each a "Retention Bonus") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable), up to a maximum of 10% of base payroll, for all Retained Employees who do not voluntarily leave employment and are not terminated "for cause". Subject only to limitation of 10% of base payroll, the actual amount to be paid shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system. Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within two (2) business days after the Sale Commencement Date.

Section 10.     Conditions Precedent and Subsequent. The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement are directly

conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)     All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects and no Event of Default (as defined herein) shall have occurred at and as of the date hereof and as of the Sale Commencement Date.

(b)     Merchant shall have obtained any necessary consent to the Sale from its secured lenders.

Section 11.     <u>Representations and Warranties</u>.

11.1     <u>Merchant's Representations, Warranties Covenant, and Agreements</u>. Merchant hereby represents, warrants, covenants, and agrees in favor of Agent as follows:

(a)     Merchant: (i) is a corporation duly organized, validly existing and in good standing under the laws of the state of its organization stated above; (ii) has all requisite power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including the jurisdiction in which the Stores are located.

(b)     Subject to Bankruptcy Court approval, Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations thereunder.  Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor.  No contract or other agreement to which Merchant is a party or by which Merchant is otherwise bound will prevent or impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)     Merchant owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise, and Owned FF&E (Owned FF&E being identified in <u>Exhibit 11.1(c)(1)</u>) to be included in the Sale free and clear of all liens, claims and encumbrances of any nature, other than the liens listed on <u>Exhibit 11.1(c)</u> and any applicable statutory liens.  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any

of the Merchandise, Owned FF&E or the Proceeds (including any proceeds from the sale of Owned FF&E) other than as provided for herein (including those listed on Exhibit 11.1(c)). Any Approval Order shall provide that all such liens shall be transferred to and attach only to the Guaranteed Amount or other amounts payable to Merchant hereunder.

(d)     Merchant has maintained its pricing files (including the Inventory File) in the ordinary course of business, and prices charged to the public for goods (whether in-Store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdown).   All pricing files and records (including the Inventory File) requested by Agent relative to the Merchandise have been and will continue to be made available to Agent.  All such pricing files and records (including Inventory File) are and shall continue to be true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods as of the dates and for the periods indicated therein. Merchant represents that (a) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (b) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)     Merchant has not since December 1, 2010 marked up or raised, and shall not up to the Sale Commencement Date, mark up or raise the price of any items of Merchandise, or removed or altered any tickets or any indicia of clearance, supervalue, closeout or reduced price merchandise.

(f)     Merchant shall ticket or mark all items of inventory received at the Stores prior to and after the Sale Commencement Date in a manner consistent with similar inventory located at the Stores and in accordance with Merchant's historic practices and policies relative to pricing and marking inventory.

(g)     Since December 1, 2010, Merchant has not and shall not purchase any merchandise or goods outside the ordinary course, except as otherwise set forth herein.

(h)     Except as may be restricted by virtue of Merchant's chapter 11 filing, Merchant covenants to continue to operate the Stores in the ordinary course of business from the date of this Agreement to the Sale Commencement Date, in that  (i) Merchant shall continue selling inventory during such period at customary prices, (ii) Merchant shall not promote or advertise any sales or in-store promotions (including POS promotions) to the public except for Merchant's historic and customary promotions for all of its locations, (iii) Merchant shall not return inventory to vendors, (iv) Merchant shall not make any management personnel moves or changes at the Stores without Agent's prior consent (which consent will not be unreasonably withheld), and v) Merchant shall continue to handle Return to Vendor, to be repaired and damaged merchandise in the ordinary course.

(i)     No action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(j)     To the best of Merchant's knowledge, all Merchandise is in compliance with all applicable federal, state, or local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices regarding product recalls prior to the Sale Commencement Date.

(k)     Throughout the Sale Term, Agent shall have the right to the uninterrupted use and occupancy of, and peaceful and quiet possession of the Stores, the assets currently located at the Stores, and the services provided at the Stores.  Except any amounts owing as a result of the commencement of the Chapter 11 Cases, Merchant shall throughout the Sale Term maintain in good working order, condition and repair, at its sole expense (except to the extent such amounts are included in Occupancy Expenses), all cash registers, heating systems, air conditioning systems, elevators, escalators, Store alarm systems, and all other mechanical devices used in the ordinary course of operation of the Stores.

(l)     Except any amounts owing as a result of the commencement of the Chapter 11 Cases, Merchant has paid and will continue to pay throughout the Sale Term, (i) all self-insured or Merchant funded employee benefit programs for employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs, (ii) all casualty, liability, workers' compensation and other insurance premiums, (iii) all utilities provided to the Stores, and (iv) all applicable taxes.

(m)     Merchant has not and shall not throughout the Sale Term take any actions the result of which is to increase the Expenses of   the Sale, including, without limitation, increasing salaries or other amounts payable to employees.

(n)     Merchant is not a party to any collective bargaining agreements with its employees at the Stores and, to the best of Merchant's knowledge; no labor unions represent Merchant's employees at the Stores.

(o)     All information provided by Merchant to Agent in the course of Agent's due diligence and preparation and negotiation of this Agreement (including information as to the Store inventories and operating expenses) is as of the date hereof and shall remain true and accurate in all material respects.

(p)     Except with respect to such other sales or promotions as may be approved by the Bankruptcy Code, during the Sale Term, Merchant shall not promote sales outside the ordinary course of business at any of its stores included in the same market as any Store.

(q)     Supplies have not been, since December 29, 2010, and shall not be, prior to the Sale Commencement Date, transferred by Merchant to or from the Stores so as to alter the mix or quantity of supplies at the Stores from that existing on such date, other than in the ordinary course of business.

(r)     After the Sale Commencement Date, Merchant shall transfer the Distribution Center Merchandise at Merchant's cost and expense to the Stores as directed by Agent within seven  (7) days of the Sale Commencement Date (the "DC Transfer Deadline").

(s)     The Guaranteed Percentage has been fixed based upon the aggregate Retail Value of the Merchandise (not including any On-Order Merchandise) being no less than $33,500,000 (the "Merchandise Threshold") and no more than $36,500,000(the "Merchandise Ceiling").  To the extent that the aggregate Retail Value of the Merchandise  included in the Sale is less than the Merchandise Threshold, or more than the Merchandise Ceiling, the Guaranty Percentage shall be adjusted in accordance with Exhibit 11.1(s) annexed hereto

11.2     Agent's Representations and Warranties.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a) Each member of Agent: (i) is validly existing and in good standing under the laws of the state of its organization; (ii) has all requisite power and authority to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b) Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents and to perform its obligations thereunder.  Each of the Agency Documents has been duly executed and delivered by Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c) No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken

or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

Section 12. Insurance.

12.1 Merchant's Liability Insurance. Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Stores, and shall cause Agent to be named an additional named insured with respect to all such policies. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change. In the event of a claim under any such policies Merchant shall be responsible for the payment of all deductibles, retention's or self-insured amounts thereunder, unless it is determined that liability arose by reason of the wrongful acts or omissions or negligence of Agent, or Agent's employees, independent contractors or agents (other than Merchant's employees).

12.2 Merchant's Casualty Insurance. Merchant will provide throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the cost value thereof. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise plus any self insurance amounts and the amount of any deductible (which amounts shall be paid by Merchant), shall constitute Proceeds hereunder and shall be paid to Agent. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3 Worker's Compensation Insurance. Merchant shall at all times during the Sale Term maintain in full force and effect worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements. Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4 Agent's Insurance. Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies. Prior to the

Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonable satisfactory to Merchant.  In the event of a claim under such policies Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors).

12.5    Risk of Loss.  Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Stores or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing.  Merchant and Agent agree that Merchant shall bear all responsibility for liability claims of customers, employees and other persons arising from events occurring at the Stores during and after the Sale Term, except to the extent any such claim arises directly from the acts or omissions of Agent, or its supervisors or employees located at the Stores (an "Agent Claim").  In the event of any such liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's historic policies and procedures, and shall provide a copy of the initial documentation relating to such claim to Agent.  To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide a copy of the initial documentation relating to such claim to Merchant.  In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party.

Section 13.    Indemnification.

13.1    Merchant Indemnification.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)    any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term;

(c)    subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing

authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d)     any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act), except for Agent Claims; and

(e) the negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents or representatives.

13.2     <u>Agent Indemnification</u>.  Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to:

(a)     Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)     any harassment or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its representatives;

(c)     any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment;

(d)     any Agent Claims; and

(e)     the negligence or willful misconduct of Agent or any of its officers, directors, employees, agents or representatives.

Section 14.     <u>Defaults</u>.  The following shall constitute "<u>Events of Default</u>" hereunder:

(a)     Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured ten (10) days after receipt of written notice thereof to the defaulting party;

(b)     Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made and throughout the Sale Term;

(c)     The failure to obtain the entry of an Approval Order on the docket on or before January 14, 2011, which order is not subject to a stay or an application for a stay.

(d)     The Sale is terminated or materially interrupted or impaired at the Stores for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party.

Section 15.     <u>Security Interest</u>.  Without limiting the Agent's offset rights under Section 3.3(d) above, if any, in consideration of Agent's payment of the Guaranteed Amount Deposit, Expenses and the provision of services hereunder to Merchant, the Approval Order shall grant to Agent, subject to  the Payment Date, a valid and perfected first priority security interest in and lien upon the Merchandise, the Owned FF&E and all proceeds from the sale of the Owned FF&E as provided for in Section 16.10, the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.5 hereof, and the Proceeds to secure all obligations of Merchant to Agent hereunder, junior only to (a) an amount equal to the unpaid portion of the Guaranteed Amount, (b) any amount owed by Agent to Merchant for Expenses (to the extent owed after consideration of Agent's offset rights under Section 3.3(d) hereof, if any) (c) the Recovery Amount, and (d) any other amounts owed by Agent to Merchant hereunder without the necessity of filing financing statements to perfect the security interests. Merchant shall execute all such documents and take all such other actions as are reasonably required to perfect and maintain such security interest as a valid and perfected first priority security interest.

Section 16.     <u>Miscellaneous</u>.

16.1     <u>Third Party Beneficiary</u>.  PNC and Term Loan Agent each shall be a third party beneficiary under this Agreement.

16.2     <u>Notices</u>.  All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, as follows:

|  |  |
|---|---|
| If to Agent: | Gordon Brothers Retail Partners, LLC |
|  | 101 Huntington Avenue, 10th Floor |
|  | Boston, MA 02199 |
|  | Attention: Michael Chartock |
|  | Phone: 617-210-7116 |
|  | Email: mchartock@gordonbrothers.com |
|  |  |
|  | Hilco Merchant Resources, LLC |
|  | 5 Revere Drive |
|  | Northbrook, IL  60062 |
|  | Attention: Joseph Malfitano |
|  | Phone: 847-504-3257 |

Email: jmalfitano@hilcotrading.com

With copies to:        Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
Attention: Bill Bowden, Esq.
Phone: 302-654-1888
Email: wbowden@ashby-geddes.com

If to Merchant:        Anchor Blue, LLC.
1260 Corona Pointe Ct. Corona, CA 92879
Attn:  Tom Shaw, CEO & CFO
Phone:  (951) 817-6310
Fax:  (951) 817-6444

With copies to:        Morgan, Lewis and Bockius LLP
101 Park Avenue
New York,  NY  10178-0600
Phone:  (212) 309-6000
Fax:    (212) 309-6001

If to Lender's Agent:        PNC Bank, National Association
2 North Lake Avenue, Suite 440
Pasadena, California 91101
Attn:   Robin Arriola
Phone: (626) 432-6134
Fax:    (626) 432-6124

With copies to:        PNC Bank, National Association
PNC Agency Services
PNC Firstside Center
500 First Avenue, 4th Floor
Pittsburgh, Pennsylvania 15219
Attn:   Lisa Pierce
Phone: (412) 762-6442
Fax      (412) 762-8672

And to:        Bingham McCutchen LLP
355 South Grand Avenue, Suite 4400
Los Angeles, California 90071
Attn:  Mark Spitzer
Phone:  (213) 680-6400
Fax:  (213) 680-6499

If to Term Loan Agent:        Ableco Finance LLC
299 Park Avenue

New York, New York 10171
Attention:  Daniel Wolf
Telecopy No.: (212) 891-1541

With copies to:          Klee, Tuchin, Bogdanoff & Stern LLP
                         1999 Avenue of the Stars, 39th Floor
                         Los Angeles, CA  90067
                         Attention:  Thomas E. Patterson
                         Telecopy No.:  (310) 407-9090


      16.3    <u>Governing Law</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of  New York without regard to conflicts of laws principles thereof. except where governed by the Bankruptcy Code in the event of the commencement of the chapter 11 cases.

      16.4    <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

      16.5    <u>Amendments</u>.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto along with the written consent of the Lender Agent, which consent shall not be unreasonably withheld or delayed.

      16.6    <u>No Waiver</u>.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party. Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

      16.7    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, and their respective successors and assigns including, but not limited to, any chapter 11 or chapter 7 trustee.  The parties hereto acknowledge that Lender Agent is a third party beneficiary of the Agreement.

      16.8    <u>Execution in Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

      16.9    <u>Section Headings</u>.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.10 <u>FF&E.</u>

(a)    With respect to the FF&E owned by the Merchant (the "<u>Owned FF&E</u>") and located at the Stores, Agent shall sell the Owned FF&E  and shall have the right to retain all proceeds received from such sales, net only of sales taxes (and for the avoidance of doubt, such FF&E sales proceeds shall not be deemed "Proceeds").  The Agent shall be responsible for payment of expenses incurred in connection with the disposition of the Owned FF&E.  The Owned FF&E shall consist of at least the items identified on Exhibit 11.1(c)(1).  As of the Sale Termination Date, the Agent may abandon, in place, any unsold Owned FF&E, at the Stores.  In consideration of the rights granted to Agent pursuant to this Section 16.10, Agent shall, in addition to all other amounts contemplated by this Agreement, pay to Merchant on the Payment Date, four hundred fifty thousand dollars ($450,000).

16.11   <u>Reporting</u>. If requested, Agent shall furnish Merchant (and upon Lender Agent's request, Lender Agent) with weekly reports including, without limitation, reports that comply with the Merchant's current weekly cash reporting to its central office, reflecting the progress of the Sale which shall specify the Proceeds received to date and shall furnish Merchant with such other information regarding the Sale as Merchant reasonably requests. The Agent will maintain and provide to Merchant sales records to permit calculation of and compliance with any percentage rent obligations under Store leases. During the course of the Sale, Merchant shall have the right to have representatives continually act as observers of the Sale in the Stores so long as they do not interfere with the conduct of the Sale.

<u>16.12 Agent</u>. All references to "Agent" hereunder shall mean Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC.

<u>16.13 Survival</u>.  All representations, warranties, covenants and agreements made by the parties hereto shall be continuing, shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

GORDON BROTHERS RETAIL PARTNERS, LLC
HILCO MERCHANT RESOURCES, LLC

By: Michael Chartock
Title: For the Joint Venture

MERCHANT: ANCHOR BLUE, LLC.

By: Tom Shaw
Its: CEO & CFO

ACKNOWLEDGED AND AGREED TO
As to Paragraphs 3.3, 8.6, 15 and 16.1

PNC BANK, NATIONAL ASSOCIATION,
as initial Lender Agent

By: Robin Arriola
Its: Vice President

ACKNOWLEDGED AND AGREED TO
As to Paragraphs 3.3, 8.6, 15, and 16.1

ABLECO FINANCE LLC,
as Term Loan Agent

By:
Its:

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

GORDON BROTHERS RETAIL PARTNERS, LLC
HILCO MERCHANT RESOURCES, LLC

By: _____
Title:

MERCHANT:  ANCHOR BLUE, LLC.

By:  Tom Shaw
Its:  CEO & CFO

ACKNOWLEDGED AND AGREED TO
As to Paragraphs 3.3, 8.6, 15 and 16.1

PNC BANK, NATIONAL ASSOCIATION,
as initial Lender Agent

By: ~~Robin Arriola~~    Scott J. Ward
Its:  Senior Vice President

ACKNOWLEDGED AND AGREED TO
As to Paragraphs 3.3, 8.6, 15, and 16.1

ABLECO FINANCE LLC,
as Term Loan Agent

By: _____
Its:

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

GORDON BROTHERS RETAIL PARTNERS, LLC
HILCO MERCHANT RESOURCES, LLC


_____
By:
Title:


                                              MERCHANT:  ANCHOR BLUE, LLC.


                                              _____
                                              By:  Tom Shaw
                                              Its:  CEO & CFO


ACKNOWLEDGED AND AGREED TO
As to Paragraphs 3.3, 8.6, 15 and 16.1


PNC BANK, NATIONAL ASSOCIATION,
as initial Lender Agent


_____
By:  Robin Arriola
Its:  Vice President


ACKNOWLEDGED AND AGREED TO
As to Paragraphs 3.3, 8.6, 15, and 16.1

ABLECO FINANCE LLC,
as Term Loan Agent


_____
By:  Dan Wolf
Its:  President

List of Exhibits:

| | |
|---|---|
| 1 | Store List |
| 2 | Form of Sale Guidelines |
| 3.3(b) | Form of Agent Letter of Credit |
| 4.1(l) | Occupancy Expenses Schedule |
| 4.2(b) | Form of Expense L/C |
| 5.1 | Inventory Taking Instructions |
| 5.3 | Distribution Center Merchandise Summary |
| 11.1(c) | Existing Liens |
| 11.1(c)(1) | Composition of Owned FF&E |
| 11.1(s) | Guaranty Percentage Step Down Schedule |

| # | Store No. | Mall Name | Address | City | State | Zip |
|---|---|---|---|---|---|---|
| 1 | 11 | VALLEY PLAZA | 2701 MING AVENUE | BAKERSFIELD | CA | 93304 |
| 2 | 12 | VISALIA FAIR MALL | 2055 S MOONEY BLVD | VISALIA | CA | 93277 |
| 3 | 15 | VINTAGE FAIRE MALL | 3401 DALE ROAD SP M01 | MODESTO | CA | 95356 |
| 4 | 16 | NORTHRIDGE CENTER | 410 NORTHRIDGE CENTER | SALINAS | CA | 93906 |
| 5 | 18 | YUMA PALMS | 1329 SOUTH YUMA PALMS PKWY F2 | YUMA | AZ | 85365 |
| 6 | 22 | PANORAMA CITY MALL | 8425 VAN NUYS BLVD #38 | PANORAMA CITY | CA | 91402 |
| 7 | 25 | SIERRA VISTA MALL | 1050 SHAW AVE SP 1019A | CLOVIS | CA | 93612 |
| 8 | 26 | CITADEL OUTLETS | 100 CITADEL DRIVE 723 | COMMERCE | CA | 90040 |
| 9 | 28 | FIESTA MALL | 1445 W. SOUTHERN #1116 | MESA | AZ | 85202 |
| 10 | 29 | THE BOULEVARD MALL | 3528 MARYLAND PKWY. SUT. 204 | LAS VEGAS | NV | 89169 |
| 11 | 32 | LAKEWOOD MALL | 40 LAKEWOOD CENTER MALL | LAKEWOOD | CA | 90712 |
| 12 | 33 | STONEWOOD CENTER | 250 STONEWOOD STREET | DOWNEY | CA | 90241 |
| 13 | 35 | MT SHASTA MALL | 900 DANA DRIVE SUITE A-41 | REDDING | CA | 96002 |
| 14 | 36 | PUENTE HILLS MALL | 1600 SOUTH AZUSA AVE. STE 557 | CITY OF INDUSTRY | CA | 91748 |
| 15 | 38 | LOS CERRITOS CENTER | 465 LOS CERRITOS CTR | CERRITOS | CA | 90701 |
| 16 | 39 | BUENA PARK MALL | 8346 ON THE MALL | BUENA PARK | CA | 90620 |
| 17 | 40 | BREA MALL | 2067 B BREA MALL | BREA | CA | 92821 |
| 18 | 41 | WESTMINSTER MALL | 2027 WESTMINSTER MALL | WESTMINSTER | CA | 92683 |
| 19 | 42 | PICO RIVERA/TOWN CENTER | 8828 WASHINGTON BLVD | PICO RIVERA | CA | 90660 |
| 20 | 44 | SANTA MARIA TOWN CEN | 263 TOWN CENTER EAST | SANTA MARIA | CA | 93454 |
| 21 | 45 | LAGUNA HILLS MALL | 24155 LAGUNA HILLS MALL #1730 | LAGUNA HILLS | CA | 92653 |
| 22 | 48 | TOWN EAST MALL | 2138 TOWN EAST MALL | MESQUITE | TX | 75150 |
| 23 | 52 | COTTONWOOD MALL | 10000 COORS BYPASS NW SP E-215 | ALBUQUERQUE | NM | 87114 |
| 24 | 53 | LOS AMERICAS CENTER | 4211 CAMINO DE LA PLAZA SPH152 | SAN DIEGO | CA | 92173 |
| 25 | 54 | PLAZA CAMINO REAL | 2525 EL CAMINO REAL #209 | CARLSBAD | CA | 92008 |
| 26 | 55 | CHULA VISTA CENTER | 555 BROADWAY SP #116 | CHULA VISTA | CA | 91910 |
| 27 | 57 | ESPLANADE SHOPPING | 201 W. ESPLANDE DR | OXNARD | CA | 93030 |
| 28 | 59 | ESCONDIDO VILLAGE MA | 1351 E VALLEY PKWY | ESCONDIDO | CA | 92027 |
| 29 | 65 | SANTA ANITA FASHION | 400 S. BALDWIN AVE, SUITE A6 | ARCADIA | CA | 91007 |
| 30 | 66 | GLENDALE GALLERIA | 1186 GLENDALE GALLERIA | GLENDALE | CA | 91210 |
| 31 | 71 | GALLERIA AT TYLER | 1269 GALLERIA AT TYLER SP #E108 | RIVERSIDE | CA | 92503 |
| 32 | 72 | INDIO FASHION PLAZA | 82-227 HIGHWAY 111 | INDIO | CA | 92201 |
| 33 | 73 | THE PLAZA AT WEST CO | 166 PLAZA DRIVE | WEST COVINA | CA | 91790 |
| 34 | 76 | THE MEADOWS | 4300 MEADOWS LANE STE 228 | LAS VEGAS | NV | 89107 |
| 35 | 78 | AURORA MALL | 14200 E ALAMEDA AVE SP1017 | AURORA | CO | 80012 |
| 36 | 79 | PRESCOTT GATEWAY | 3298 GATEWAY BLVD SP1184 | PRESCOTT | AZ | 86303 |
| 37 | 88 | ARIZONA MILLS | 5000 ARIZONA MILLS CIRCLE #609 | TEMPE | AZ | 85282 |
| 38 | 89 | ONTARIO MILLS | ONE MILLS CIRCLE SP 303 | ONTARIO | CA | 91764 |
| 39 | 90 | GREAT MALL OF THE BA | 406 GREAT MALL DRIVE | MILPITAS | CA | 95035 |
| 40 | 91 | THE BLOCK @ ORANGE | 20 CITY BLVD. WEST SP H906 | ORANGE | CA | 92868 |
| 41 | 93 | MONTCLAIR PLAZA | 5154 MONTCLAIR PLAZA LANE | MONTCLAIR | CA | 91763 |
| 42 | 101 | SUN VALLEY | 8405 LAUREL CANYON BLVD | SUN VALLEY | CA | 91352 |
| 43 | 104 | PACIFIC VIEW MALL | 3301 E MAIN ST. SUITE 2260 | VENTURA | CA | 93003 |
| 44 | 109 | RANCHO CUCAMONGA VIC | 12518 N. MAIN STREET | RANCHO CUCAMONGA | CA | 91739 |
| 45 | 110 | CHICO MALL | 1950 E 20TH STREET | CHICO | CA | 95928 |
| 46 | 112 | NEWPARK MALL | 2047 NEWPARK MALL | NEWARK | CA | 94560 |
| 47 | 116 | CHINO TOWNE CENTER | 12125 CENTRAL AVENUE | CHINO | CA | 91710 |
| 48 | 119 | METRO CENTER | 9617 N METRO PKWY WEST #2094 | PHOENIX | AZ | 85051 |
| 49 | 123 | INLAND CENTER | 242 INLAND CENTER DRIVE | SAN BERNARDINO | CA | 92408 |
| 50 | 127 | IMPERIAL VALLEY MALL | 3451 DOGWOOD AVE SP 1474 | EL CENTRO | CA | 92243 |
| 51 | 128 | FLAGSTAFF MALL | 4650-B14 & 16 N HWY 89 | FLAGSTAFF | AZ | 86001 |
| 52 | 129 | DEL AMO FASHION CENT | 21880 HAWTHORNE BLVD | TORRANCE | CA | 90503 |
| 53 | 131 | DESERT SKY MALL | 7611 WEST THOMAS RD. SUITE F20 | PHOENIX | AZ | 85033 |
| 54 | 133 | NORTHRIDGE FASHION C | 9301 TAMPA AVE SP 91 | NORTHRIDGE | CA | 91324 |
| 55 | 136 | MALL OF ORANGE | 1500 EAST VILLAGE WAY STE 2239 | ORANGE | CA | 92865 |
| 56 | 137 | MERCED MALL | 250 MERCED MALL | MERCED | CA | 95348 |
| 57 | 140 | CODDINGTOWN CENTER | 356 CODDINGTOWN CENTER | SANTA ROSA | CA | 95401 |
| 58 | 141 | MESILLA VALLEY MALL | 700 S. TELSHOR SP 1536 | LAS CRUCES | NM | 88011 |
| 59 | 150 | EASTRIDGE MALL | 2200 EASTRIDGE LOOP STE-2050 | SAN JOSE | CA | 95122 |
| 60 | 151 | SOLANO MALL | 1350 TRAVIS BLVD STE 1479-A | FAIRFIELD | CA | 94533 |
| 61 | 153 | PLAZA BONITA | 3030 PLAZA BONITA ROAD SP 1206 | NATIONAL CITY | CA | 91950 |
| 62 | 155 | TACOMA MALL | 4502 SOUTH STEEL ST #476-A | TACOMA | WA | 98409 |
| 63 | 158 | TUCSON MALL | 4500 NORTH ORACLE SP289 | TUCSON | AZ | 85705 |
| 64 | 161 | SANTA ROSA PLAZA | 2005 SANTA ROSA PLAZA | SANTA ROSA | CA | 95401 |
| 65 | 173 | ROGUE VALLEY MALL | 1600 NORTH RIVERSIDE AVE #1045 | MEDFORD | OR | 97501 |
| 66 | 174 | ALDERWOOD MALL | 3000 184TH ST. S.W. #140 | LYNNWOOD | WA | 98037 |

| # | Store No. | Mall Name | Address | City | State | Zip |
|---|---|---|---|---|---|---|
| 67 | 177 | VANCOUVER | 8700 NE VANCOUVER MALL DR #157 | VANCOUVER | WA | 98662 |
| 68 | 178 | BELLIS FAIR MALL | 350 BELLIS FAIR MALL | BELLINGHAM | WA | 98226 |
| 69 | 184 | COLUMBIA CENTER | 353 COLUMBIA CENTER BLVD | KENNEWICK | WA | 99336 |
| 70 | 186 | LANCASTER MALL | 831 LANCASTER DR NE #147 | SALEM | OR | 97301 |
| 71 | 190 | ANIMAS VALLEY MALL | 4601 EAST MAIN STREET | FARMINGTON | NM | 87402 |
| 72 | 195 | RIO WEST MALL | 1300 WEST I-40 FRONTAGE STE314 | GALLUP | NM | 87301 |
| 73 | 196 | ARDEN FAIR | 1689 ARDEN WAY SPACE #2095 | SACRAMENTO | CA | 95815 |
| 74 | 198 | PARKWAY PLAZA | 335 PARKWAY PLAZA | EL CAJON | CA | 92020 |
| 75 | 202 | VISTA RIDGE MALL | 2401 SOUTH STEMMONS FRWY #2186 | LEWISVILLE | TX | 75067 |
| 76 | 203 | HULEN MALL | 4800 S. HULEN STE 1092 | FORT WORTH | TX | 76132 |
| 77 | 204 | LAKELINE MALL | 11200 LAKELINE MALL DR. SP N07 | AUSTIN | TX | 78613 |
| 78 | 205 | COLLIN CREEK MALL | 811 N. CENTRAL EXPRESSWAY 1495 | PLANO | TX | 75075 |
| 79 | 206 | THE PARKS AT ARLINGT | 3811 SOUTH COOPER ST. SP 1180 | ARLINGTON | TX | 76015 |
| 80 | 208 | DEERBROOK MALL | 20131 HIGHWAY 59 NORTH SP 2038 | HUMBLE | TX | 77338 |
| 81 | 223 | PARADISE VALLEY MALL | 4568 EAST CACTUS RD SP C050 | PHOENIX | AZ | 85032 |
| 82 | 225 | VALENCIA TOWN CENTER | 24201 VALENCIA BLVD. STE 1265 | VALENCIA | CA | 91355 |
| 83 | 231 | MONTGOMERY PLAZA | 5011 MONTGOMERY BLVD #A30 | ALBUQUERQUE | NM | 87109 |
| 84 | 235 | PACIFIC CENTER | 5952 PACIFIC BLVD | HUNTINGTON PARK | CA | 90255 |
| 85 | 237 | SIERRA VISTA MALL | 2200 EL MERCADO LOOP SP 1226 | SIERRA VISTA | AZ | 85635 |
| 86 | 257 | WEBERSTOWN MALL | 4950 PACIFIC AVENUE #221 | STOCKTON | CA | 95207 |
| 87 | 259 | SOUTHLAND MALL | 384 SOUTHLAND MALL | HAYWARD | CA | 94545 |
| 88 | 265 | GALLERIA @ SOUTH BAY | 1815 HAWTHORNE BLVD #102 | REDONDO BEACH | CA | 90278 |
| 89 | 269 | UNIVERSITY MALL | 575 E UNIVERSITY PARKWAY #E72 | OREM | UT | 84097 |
| 90 | 272 | GALLERIA AT SUNSET | 1300 SUNSET RD SP 2209 | HENDERSON | NV | 89014 |
| 91 | 285 | MONTEBELLO TOWN CENT | 2139 MONTEBELLO TOWN CENTER | MONTEBELLO | CA | 90640 |
| 92 | 292 | CORONADO CENTER | 6600 MENAUL BLVD NE STE 65 | ALBUQUERQUE | NM | 87110 |
| 93 | 294 | STONERIDGE MALL | 1448 STONERIDGE MALL ROAD | PLEASANTON | CA | 94566 |
| 94 | 295 | HILLTOP MALL | 2327 HILLTOP MALL ROAD SP B227 | RICHMOND | CA | 94806 |
| 95 | 300 | SUN VALLEY MALL | 303 SUN VALLEY MALL | CONCORD | CA | 94520 |
| 96 | 301 | FASHION FAIRE | 697 EAST SHAW AVENUE | FRESNO | CA | 93710 |
| 97 | 310 | NORTH COUNTY FAIR | 200 E. VIA RANCHO PKWY. #461 | ESCONDIDO | CA | 92025 |
| 98 | 321 | THE MALL AT VICTOR V | 14400 BEAR VALLEY ROAD SP 621 | VICTORVILLE | CA | 92392 |
| 99 | 333 | WEST VALLEY MALL | 3200 SOUTH NAGLEE RD. SP 460 | TRACY | CA | 95304 |
| 100 | 353 | SOUTH TOWN CENTER | 10450 SOUTH STATE ST STE 2328 | SANDY | UT | 84070 |
| 101 | 364 | BAYSHORE MALL | 3300 BROADWAY SP 417 | EUREKA | CA | 95501 |
| 102 | 366 | HANFORD MALL | 1675 WEST LACEY BLVD SP B-5 | HANFORD | CA | 93230 |
| 103 | 367 | PORTERVILLE TOWN CEN | 940 HENDERSON | PORTERVILLE | CA | 93257 |
| 104 | 370 | THE PROMENADE MALL | 40820 WINCHESTER SP 1210 | TEMECULA | CA | 92591 |
| 105 | 377 | CLACKAMAS | 12000 SE 82ND STE 2185 | PORTLAND | OR | 97266 |
| 106 | 379 | COUNTY EAST MALL | 2550 SOMERSVILLE RD SP85 | ANTIOCH | CA | 94509 |
| 107 | 381 | THE MALL AT YUBA CTY | 1215 COLUSA AVE SP 701 | YUBA CITY | CA | 95991 |
| 108 | 384 | SAN TAN VILLAGE | 2270 E. WILLIAMS FLD RD. SP748 | GILBERT | AZ | 85296 |
| 109 | 385 | SUPERSTITION SPRINGS | 6555 E. SOUTHERN AVE. #2208 | MESA | AZ | 85208 |
| 110 | 386 | ANTELOPE VALLEY MALL | 1233 W AVENUE P SP 840 | PALMDALE | CA | 93551 |
| 111 | 387 | CIELO VISTA MALL | 8401 GATEWAY BLVD WEST SP Q-01A | EL PASO | TX | 79925 |
| 112 | 389 | MORENO VALLEY MALL @ | 22500 TOWNGATE CIRCLE SP 1171 | MORENO VALLEY | CA | 92553 |
| 113 | 392 | MAINPLACE SANTA ANA | 2800 N MAIN ST SUITE 828 | SANTA ANA | CA | 92705 |
| 114 | 393 | ANAHEIM PLAZA[1] | 586 N EUCLID ST | ANAHEIM | CA | 92801 |
| 115 | 397 | SERRAMONTE CENTER | 8-D SERRA MONTE CENTER | DALY CITY | CA | 94015 |
| 116 | 398 | ARROWHEAD TOWN CENTE | 7770 W ARROWHEAD TWN CTR #1226 | GLENDALE | AZ | 85308 |
| 117 | 399 | HEMET VALLEY MALL | 2200 W FLORIDA AVE STE 260 | HEMET | CA | 92544 |

**Note:**
1) Store #393, Anaheim Plaza will be closing on January 31, 2011.

**Exhibit 2**

**Debtors' Proposed Store Closing Sale Guidelines**

The following procedures shall apply to the Sale[1] to be held at the Stores:

1. The Sale shall be conducted so that the Stores in which sales are to occur remain open no longer than the normal hours of operation provided for in the respective leases or other occupancy agreements for the Stores.

2. The Sale shall be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no sale shall be conducted on Sunday unless the Merchant had been operating such Store on a Sunday.

3. All in-Store display and hanging signs used by the Merchant and the Agent in connection with Sale shall be professionally produced and all hanging signs shall be hung in a professional manner. The Merchant and the Agent may advertise the Sale as a "going out of business" "store closing" or similar handle. The Merchant and the Agent shall not use neon or day-glo signs. Furthermore, with respect to enclosed mall locations no exterior signs or signs in common areas of a mall shall be used. Nothing contained herein shall be construed to create or impose upon the Merchant and the Agent any additional restrictions not contained in the applicable lease or other occupancy agreement. In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at non-enclosed mall Stores; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected store and shall not be wider than the storefront of the Store. In addition, the Merchant and the Agent shall be permitted to utilize sign walkers. .

4. Conspicuous signs shall be posted in the cash register areas of each Store to the effect that all sales are "final" and that customers with any questions or complaints subsequent to the conclusion of the Sale may contact a named representative of the Merchant at a specified telephone number.

5. Within a "Shopping Center", the Agent shall not distribute handbills, leaflets or other written materials to customers outside of any of the Stores, unless permitted by the applicable lease or, if distribution is customary in the shopping center in which the Store is located. Otherwise, the Agent may solicit customers in the Stores themselves. The Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

6. At the conclusion of the Sale, Agent shall vacate the Stores in "broom-clean" condition, and shall otherwise leave the Stores in the same condition as on the commencement of the Sale, ordinary wear and tear excepted; provided, however, that the Merchant and/or the Agent shall be authorized to leave any Abandoned Property (as that term is defined herein) in the Stores; provided, further, that the Merchant hereby does not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agency Agreement.

Merchant and Agent may abandon any Owned FF&E or other materials, including Supplies (the "Abandoned Property") not sold in the Sale at the Store premises at the conclusion of the Sale. Any Abandoned Property left in a Store after a lease is rejected shall be deemed abandoned with the landlord having the right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord and without waiver of any damage claims against the Merchant or Agent.

7. The Merchant and/or the Agent may sell the Owned FF&E located in the Stores during the Sale subject to Section 16.10 of the Agreement. The Merchant or the Agent, as the case may be, may advertise the sale of the Owned FF&E consistent with the guidelines provided in paragraphs 3 and 5 hereof. Additionally, the purchasers of any Owned FF&E sold during the Sale shall only be permitted to remove the Owned FF&E either through the back shipping areas or through other areas after store business hours.

8. Landlords will be provided with the name and telephone number of a representative of the Merchant to notify of any problem arising during the Sale.

9. The Agent shall not make any alterations to interior or exterior Store lighting. No property of any landlord of a Store shall be removed or sold during the Sale. The hanging of exterior banners or other signage shall not constitute an alteration to a Store.

10. At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have reasonable access to the Stores' premises as set forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

11. The Merchant shall notify a representative of the relevant landlord of the date on which the Sale is scheduled to conclude at a given Store, within three business days of the Merchant's receipt of such notice from the Agent.

# LETTER OF CREDIT

Bank of America

100 Federal Street

Boston, MA 02109

Irrevocable Standby Letter of Credit     Number:

Beneficiary:    PNC Business Credit, as Agent

                                             Credit Number:
                                             Opener's Reference No:

Ladies and Gentlemen:

BY ORDER OF: Gordon Brothers Retail Partners LLC and Hilco Merchant Resources, LLC

We hereby open in your favor our Irrevocable Standby Letter of Credit for the account of the joint venture of Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC for a sum or sums not exceeding a total of _____ _____ DOLLARS ($_____) available by your draft(s) at SIGHT on OURSELVES, effective immediately, and expiring at OUR COUNTERS in Boston, MA or New York, NY on _____ __, 2011, or such earlier date on which the Beneficiary shall notify us in writing that this Standby Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original Letter of Credit and a signed statement in the form attached hereto as Exhibit A, signed by PNC Business Credit, as Agent (the "Beneficiary")

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from the Beneficiary in the form attached as Exhibit B.

If a drawing is received by        at or prior to 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the account designated by Beneficiary, as directly below, in immediately available funds on the same Business Day. If however, a drawing is received by
After 12:00 noon, Eastern Time, on a Business Day, and provided that such drawing conforms to the terms and conditions hereof, payment of the drawing amount shall be made to the account designated by Beneficiary in immediately available funds on the next Business Day.

As used in the Letter of Credit "Business Day" shall mean any day other than a Saturday, Sunday, or a day on which Banking Institutions in Massachusetts are required or authorized to close.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No._____, dated _____ of Bank of America, Scranton, PA."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 600."

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above-mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, Bank of America, 100 Federal Street, Boston, MA 02109, mentioning our reference number as it appears above. Telephone inquiries can be made to Valerie DeLaura at (800) 370-7519.

Very truly yours,

_____

Authorized Official

EXHIBIT A

TO IRREVOCABLE LETTER OF CREDIT NO._____

Re: Drawing for Amounts Due to:

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____(the "Letter of Credit"). The undersigned duly authorized officer of PNC Business Credit, as Agent (the "Beneficiary") in its capacity as the Beneficiary of the Letter of Credit hereby certifies to you that:

      (i)    The joint venture of Gordon Brothers Retail Partners, LLC and Hilco Merchant Resources, LLC (the "Agent") has not made a payment when due of or for the Guaranteed Amount due by Agent to Anchor Blue Holding Corp. (the "Merchant"), pursuant to, and as such terms are defined in, that certain Agency Agreement dated as of January 5, 2011 between Merchant on the one hand, and Agent, on the other ("Agency Agreement").

      (ii)    Beneficiary, as Merchant's designee has given Agent five (5) business days written notice of Merchant's intention to draw on this Letter of Credit.

      (iii)    No Event of Default on the part of the Merchant under the Agency Agreement has occurred, exists or is continuing as of this date and no event now exists which solely with the passage of time or giving of notice or both would constitute an Event of Default on the part of the merchant under the Agency Agreement.

      (iv)    The amount to be drawn is $_____ (the "Amount Owing")

      (v)    Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the letter of credit, less any prior drawings, as of the date hereof.

      (vi)    The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

      (vii)    In accordance with the terms of the letter of Credit, the payment hereby demanded is requested to be made by wire transfer to the following account.

IN WITNESS WHEREOF, I have executed and delivered this letter as of this __ day of _____, 201_.

                    Very truly yours,
                    PNC Business Credit, as Agent

                    By:_____
                    Duly Authorized Officer
                    Print Name:

EXHIBIT B

TO IRREVOCABLE STANDY LETTER OF CREDIT NO. _____

Re: Reduction of Face Amount:

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officer of PNC Business Credit, as Agent, in its capacity as Beneficiary under this Letter of Credit, hereby confirm to you that the face amount of the Letter of Credit No. _____ hereby shall be reduced from its original face amount to a new face amount of _____ DOLLARS ($_____).

    IN WITNESS WHEREOF, I have executed and delivered this certificate as of this ___ day of _____, 201_.

                    Very truly yours,
                    PNC Business Credit, as Agent

                    By:_____
                    Duly Authorized Officer
                    Print Name:

**Anchor Blue**
**Exhibit 4.1 - Store Occupancy Per Diem**

| # | Store Name | Rent & CAM | Taxes & License Fees | Merchant Dues | Utilities | Trash Disposal | Repair & Maintenance | Total |
|---|---|---|---|---|---|---|---|---|
| 11 | Bakersfield Valley Plaza | $ 1,092.73 | $ 12.55 | $ 2.54 | $ 115.57 | $ - | $ 13.78 | $ 1,237.17 |
| 12 | Visalia Fair Mall | 428.35 | 10.66 | 0.78 | 86.02 | 9.58 | 26.71 | 562.11 |
| 15 | Modesto Vintage Faire Mall | 798.42 | 83.08 | 37.55 | 62.98 | 7.39 | 20.87 | 1,010.29 |
| 16 | Salinas Northridge Center | 655.31 | 16.21 | - | 72.60 | 10.04 | 33.82 | 787.98 |
| 18 | Yuma Palms, AZ | 306.62 | 40.23 | 15.07 | 86.58 | 2.36 | 39.44 | 490.30 |
| 22 | Panorama City Mall | 579.92 | 10.41 | - | 46.60 | 5.75 | 22.10 | 664.78 |
| 25 | Fresno Sierra Vista Mall | 311.93 | 8.19 | - | 20.92 | - | 4.06 | 345.11 |
| 26 | The Citadel Commerce | 51.60 | 4.17 | 19.31 | 2.47 | - | - | 77.56 |
| 28 | Mesa AZ Fiesta Mall | 94.71 | 11.22 | - | 78.99 | 4.55 | 23.45 | 212.92 |
| 29 | Las Vegas NV The Boulevard | 342.73 | 12.63 | - | 87.60 | 9.54 | 29.64 | 482.15 |
| 32 | Lakewood Mall | 973.37 | 6.13 | - | 88.81 | 7.05 | 37.80 | 1,113.16 |
| 33 | Downey Stonewood Center | 740.06 | 85.37 | 39.26 | 52.07 | 4.58 | 27.62 | 948.96 |
| 35 | Redding MT Shasta Mall | 86.96 | 4.29 | - | 61.29 | - | 6.28 | 158.82 |
| 36 | Puente Hills Mall - Industry | 246.51 | 5.10 | - | 53.32 | - | 20.58 | 325.51 |
| 38 | Cerritos Los Cerritos Center | 929.36 | 5.26 | - | 134.44 | 11.06 | 41.72 | 1,121.85 |
| 39 | Buena Park Mall | 274.19 | 8.32 | - | 52.20 | 8.00 | 30.00 | 372.70 |
| 40 | Brea Mall | 490.03 | 16.11 | - | 49.87 | - | 13.37 | 569.38 |
| 41 | Westminster Mall | 367.25 | 14.68 | - | 168.46 | - | 8.04 | 558.43 |
| 42 | Pico Rivera/Towncenter | 119.62 | 9.36 | - | 35.55 | - | 5.75 | 170.28 |
| 44 | Santa Maria Towne Center | 287.32 | 5.48 | - | 66.29 | 11.20 | 21.05 | 391.33 |
| 45 | Laguna Hills Mall | 153.76 | 4.57 | - | 82.80 | - | 27.12 | 268.26 |
| 48 | Mesquite, TX Town East Mall | 153.45 | 10.79 | - | 111.74 | 5.87 | 13.12 | 294.98 |
| 52 | Albuquerque Nm Cottonwood Mall | 455.40 | 40.03 | 24.17 | 59.22 | - | 11.10 | 589.91 |
| 53 | San Ysidro - Los Americas | 548.38 | 7.38 | - | 67.36 | 7.49 | 28.54 | 659.14 |
| 54 | Carlsbad/Plaza Camino Real | 310.70 | 206.19 | 24.57 | 82.39 | 5.78 | 24.03 | 653.66 |
| 55 | Chula Vista | 90.79 | 4.89 | - | 71.83 | 9.54 | 42.01 | 219.06 |
| 57 | Oxnard Esplandade Shopping | 158.05 | 10.88 | - | 77.93 | - | 22.37 | 269.23 |
| 59 | Escondido Village Mall | 271.25 | 6.46 | - | 87.56 | 3.72 | 27.75 | 396.74 |
| 65 | Arcadia Santa Anita Fashion | 395.03 | 111.43 | 26.78 | 85.54 | 10.90 | 39.83 | 669.50 |
| 66 | Glendale Galeria, CA | 518.28 | 13.36 | - | 42.03 | 6.81 | 27.45 | 607.93 |
| 71 | Riverside Galleria At Tyler | 562.51 | 10.74 | - | 66.41 | 12.06 | 22.59 | 674.31 |
| 72 | Indio Fashion Plaza | 87.37 | 9.27 | - | 49.51 | - | 22.28 | 168.43 |
| 73 | West Covina Plaza | 681.37 | 174.93 | 25.88 | 141.76 | 12.28 | 58.11 | 1,094.33 |
| 76 | Las Vegas NV The Meadows | 562.48 | 17.85 | 2.56 | 137.24 | 12.23 | 37.73 | 769.90 |
| 78 | Aurora CO Aurora Mall | 205.63 | 4.77 | - | 37.49 | - | 4.61 | 252.50 |
| 79 | Prescott - Gateway | 60.24 | 4.18 | - | 74.26 | 2.46 | 12.37 | 153.50 |
| 88 | Tempe Arizona Mills | 439.23 | 2.07 | - | 47.85 | 7.97 | 58.87 | 555.98 |
| 89 | Ontario Mills | 1,048.02 | 68.86 | 49.13 | 91.22 | 6.01 | 41.08 | 1,304.32 |
| 90 | Milpitas Great Mall Of The Bay | 486.59 | 15.80 | - | 104.22 | - | 26.37 | 632.98 |
| 91 | The Block At Orange | 342.73 | 9.24 | - | 72.55 | - | 27.84 | 452.36 |
| 93 | Montclair Plaza | 548.00 | 18.85 | - | 153.58 | 6.25 | 32.69 | 759.37 |
| 101 | Sun Valley | 240.91 | 42.04 | - | 74.82 | 8.76 | 35.50 | 402.03 |
| 104 | Ventura Pacific View Mall | 504.50 | 11.52 | - | 41.13 | - | 6.66 | 563.81 |
| 109 | Victoria Gardens/Rncho Cuca | 646.18 | 104.34 | - | 68.76 | 12.91 | 43.50 | 875.68 |
| 110 | Chico Mall | 436.10 | 34.13 | 17.65 | 87.46 | - | 12.40 | 587.75 |
| 112 | Newark Newpark Mall | 411.28 | 3.55 | - | 53.55 | 6.65 | 22.81 | 497.84 |
| 116 | Chino Towne Center | 337.54 | 11.83 | - | 167.99 | 12.70 | 48.43 | 578.49 |
| 119 | Phoenix Metro Center | 239.75 | 17.14 | - | 137.58 | 8.16 | 33.46 | 436.10 |
| 123 | San Bernardino/Inland Center | 703.81 | 113.29 | 28.55 | 71.38 | 13.63 | 26.13 | 956.80 |
| 127 | El Centro/Imperial Valley Mall | 584.37 | 43.74 | 37.82 | 134.21 | 7.79 | 34.01 | 841.94 |
| 128 | Flagstaff Mall | 83.38 | 3.24 | - | 56.95 | 4.31 | 15.77 | 163.65 |
| 129 | Torrance Del Amo Fashion Cente | 869.11 | 9.11 | - | 158.47 | 1.53 | 12.93 | 1,051.14 |
| 131 | Phoenix Desert Sky Mall | 339.51 | 4.09 | - | 82.84 | 3.13 | 11.31 | 440.88 |
| 133 | Northridge Fashion Center | 860.81 | 15.49 | - | 51.32 | 9.28 | 25.05 | 961.96 |
| 136 | Orange | 27.66 | 0.34 | - | 27.29 | 2.63 | 24.14 | 82.06 |
| 137 | Merced Mall | 101.05 | 8.00 | - | 88.64 | - | 10.28 | 207.97 |
| 140 | Santa Rosa Coddingtown Center | 191.93 | 6.75 | - | 64.84 | - | 20.55 | 284.08 |
| 141 | Las Cruces Mesilla Valley Mall | 274.13 | 4.79 | - | 61.16 | - | 0.18 | 340.26 |
| 150 | San Jose Eastridge Mall | 116.98 | 8.64 | - | 85.78 | 4.79 | 15.94 | 232.13 |
| 151 | Solano | 45.05 | 1.01 | - | 5.00 | - | 6.63 | 57.69 |
| 153 | National City/Plaza Bonita | 446.00 | 187.37 | 18.10 | 83.01 | 7.77 | 33.24 | 775.49 |
| 155 | Tacoma Mall | 411.27 | 19.18 | - | 43.82 | - | 18.69 | 492.95 |
| 158 | Tucson Mall | 865.19 | 9.27 | - | 96.32 | 5.88 | 25.31 | 1,001.96 |
| 161 | Santa Rosa Plaza | 563.28 | 7.52 | - | 149.95 | - | 10.01 | 730.75 |
| 173 | Medford OR, Rogue Valley Mall | 256.99 | 5.18 | - | 27.96 | 4.19 | 15.86 | 310.18 |
| 174 | Lynnwood WA, Alderwood Mall | 339.20 | 16.31 | - | 27.47 | 15.22 | 34.48 | 432.68 |
| 177 | Vancouver | 14.11 | 1.59 | - | 7.65 | - | 5.97 | 29.33 |
| 178 | Bellingham WA, Bellis Fair Mali | 144.90 | 14.05 | - | 37.74 | 8.44 | 19.07 | 224.20 |
| 184 | Kennewick WA, Columbia Center | 517.85 | 13.32 | - | 38.95 | - | 12.54 | 582.65 |
| 186 | Salem OR, Lancaster Mall | 264.59 | 6.19 | - | 28.79 | 9.88 | 20.18 | 329.64 |
| 190 | Farmington NM Animas Valley | 499.21 | 3.00 | 0.81 | 24.32 | 7.06 | 16.87 | 551.26 |
| 195 | Gallup NM Rio West Mall | 491.00 | 3.33 | - | 56.44 | 9.18 | 15.44 | 575.39 |
| 196 | Sacramento Arden Fair | 548.36 | 17.79 | - | 47.25 | 2.33 | 12.83 | 628.56 |
| 198 | El Cajon/Parkway Plaza | 414.92 | 138.56 | 25.03 | 110.66 | 10.71 | 28.30 | 728.18 |
| 202 | Lewisville Vista Ridge Mall | 97.54 | 11.70 | - | 78.23 | 10.25 | 35.00 | 232.71 |
| 203 | Fort Worth Hulen Mall | 119.19 | 17.26 | - | 53.52 | 7.90 | 25.50 | 223.38 |

| # | Store Name | Rent & CAM | Taxes & License Fees | Merchant Dues | Utilities | Trash Disposal | Repair & Maintenance | Total |
|---|---|---|---|---|---|---|---|---|
| 204 | Austin Lakeline Mall | 137.04 | 10.74 | - | 63.88 | - | 3.86 | 215.52 |
| 205 | Plano Collin Creek Mall | 81.41 | 13.67 | - | 52.95 | 8.02 | 16.83 | 172.88 |
| 206 | Arlington The Parks | 193.23 | 18.55 | - | 81.51 | 10.18 | 27.67 | 331.16 |
| 208 | Humble Deerbrook Village | 153.33 | 13.22 | - | 60.53 | 8.55 | 39.42 | 275.05 |
| 223 | Phoenix Paradise Valley Mall | 58.48 | 22.83 | - | 77.31 | 3.67 | 10.91 | 173.20 |
| 225 | Valencia Towne Center | 430.67 | 110.41 | 12.39 | 76.28 | 8.99 | 22.03 | 660.77 |
| 231 | Albuquerque Montgomery Plaza | 246.47 | 24.40 | - | 45.84 | - | 22.31 | 339.03 |
| 235 | Huntington Park Pacific Ctr | 493.55 | 112.18 | - | 147.51 | 6.93 | 34.01 | 794.18 |
| 237 | Sierra Vista Mall | 287.42 | 1.68 | - | 61.04 | 5.44 | 24.21 | 379.80 |
| 257 | Stockton Weberstown Mall | 622.39 | 10.31 | - | 100.11 | 8.04 | 15.87 | 756.71 |
| 259 | Hayward Southland Mall | 538.13 | 6.40 | - | 67.93 | 13.14 | 40.85 | 666.46 |
| 265 | Redondo Beach Galleria | 322.77 | 8.89 | - | 78.69 | 9.75 | 33.30 | 453.39 |
| 269 | Orem | 59.21 | 0.44 | - | 12.15 | 1.91 | 48.75 | 122.45 |
| 272 | Henderson | 9.76 | 0.79 | - | 1.79 | - | 2.27 | 14.62 |
| 285 | Montebello Towne Center | 849.22 | 166.44 | 22.52 | 105.47 | 5.30 | 25.71 | 1,174.66 |
| 292 | Albuquerque Coronado Center | 991.42 | 7.90 | 1.16 | 58.61 | - | 13.75 | 1,072.84 |
| 294 | Pleasanton Stoneridge Mall | 411.23 | 4.28 | - | 127.33 | - | 7.39 | 550.23 |
| 295 | Richmond Hilltop Mall | 219.34 | 4.49 | - | 75.65 | - | 33.68 | 333.17 |
| 300 | Concord Sun Valley Mall | 891.12 | 10.90 | - | 0.40 | 2.25 | 14.04 | 918.70 |
| 301 | Fresno Fashion Faire | 842.70 | 92.55 | 35.44 | 102.31 | 4.31 | 19.41 | 1,096.72 |
| 310 | Escondido North County Fair | 377.70 | 125.60 | 24.55 | 119.14 | 10.32 | 30.19 | 687.50 |
| 321 | Victorville/Mall At Victorvill | 814.33 | 14.09 | - | 88.41 | 9.51 | 33.30 | 959.64 |
| 333 | Tracy West Valley Mall | 95.94 | 6.87 | - | 75.71 | 8.42 | 29.07 | 216.01 |
| 353 | Sandy UT, South Towne Center | 395.91 | 2.52 | - | 45.73 | 3.25 | 15.34 | 462.74 |
| 364 | Eureka Bayshore Mall | 94.13 | 15.36 | - | 37.23 | 9.85 | 20.15 | 176.71 |
| 366 | Hanford/Hanford Mall | 79.95 | 1.21 | - | 31.70 | 2.08 | 31.84 | 146.78 |
| 367 | Porterville Towne Center | 301.63 | 45.93 | - | 73.28 | 4.09 | 21.05 | 445.97 |
| 370 | Temecula Promenade Mall | 521.46 | 8.24 | - | 48.14 | 11.83 | 32.44 | 622.12 |
| 377 | Portland OR Clackamas | 427.02 | 3.37 | - | 48.14 | 5.46 | 15.96 | 499.95 |
| 379 | Antioch County East Mall | 68.82 | 8.86 | - | 56.37 | 4.74 | 13.53 | 152.32 |
| 381 | Yuba City/Mall Of America | 55.73 | 0.55 | - | 48.47 | 0.88 | 23.35 | 128.98 |
| 384 | Santan, AZ  Santan Village | 50.57 | 4.61 | - | 36.77 | 4.17 | 7.41 | 103.52 |
| 385 | Mesa AZ Superstition Springs | 90.46 | 10.28 | - | 96.58 | 4.76 | 17.77 | 219.85 |
| 386 | Palmdale Antelope Valley Mall | 452.41 | 3.62 | - | 65.40 | 6.74 | 21.00 | 549.17 |
| 387 | El Paso TX Cielo Vista | 785.04 | 14.57 | - | 94.87 | - | 10.45 | 904.94 |
| 389 | Moreno Valley Mall | 593.79 | 7.37 | - | 88.84 | 7.67 | 21.19 | 718.86 |
| 392 | Mainplace Santa Ana | 448.23 | 121.65 | 7.78 | 87.01 | 12.63 | 29.86 | 707.16 |
| 393 | Anaheim Plaza [1] | 381.36 | 99.43 | 5.49 | 74.96 | - | 18.89 | 580.12 |
| 397 | Daly City Serramonte Center | 127.99 | 22.80 | - | 67.84 | 13.96 | 45.49 | 278.07 |
| 398 | Glendale AZ, Arrowhead Town CT | 312.57 | 13.38 | - | 93.84 | 3.89 | 9.14 | 432.82 |
| 399 | Hemet Valley Mall | 246.68 | 4.56 | - | 99.08 | - | 14.39 | 364.72 |
| 117 | **Total** | $  44,824.52 | $  3,212.38 | $  504.90 | $  8,473.19 | $  616.24 | $  2,687.01 | $  60,318.24 |

Note:
1) The Anaheim Plaza store (#393) must be vacated by January 31, 2011 due to the landlord ending the lease.

INVENTORY INSTRUCTIONS
# Anchor Blue Holding Corp
RGIS INVENTORY SERVICE

The intent of these instructions is to be a supplemental amendment (incorporating Agency Agreement language) to the inventory procedures historically used by Anchor Blue Holding Corp (hereinafter known as the Merchant) in the normal course.

Type of count

The counts will be at SKU level and Lowest Retail Price and counted by *RGIS* Inventory Service. In this type of count, the Inventory Service personnel should scan or key in the SKU/UPC and key the quantity and lowest retail price for each item. Some specific kinds of merchandise need to be specifically identified (see Exception Categories below), because this merchandise is subject to special valuation in the Agreement.

We have set up the count to accept scanned bar code (UPC) or keyed bar code (UPC). RGIS will have a UPC validation file which will increase the accuracy of the count.

For purposes of this Agreement, "Retail Value" shall mean with respect to each item of Merchandise, the lower of (i) the Retail price for unique style identifier for such item of Merchandise as reflected in the "On Hand Inventory File as of 12/26" included in the Merchant's due diligence electronic data room on or about January __, 2011 and attached as Exhibit 5.4(a) (the "Inventory File") and (ii) the lowest ticketed, shelf marked, register or file price as of the Sale Commencement Date.

NOTE: The Agency Agreement calls for a sampling of 30 stores to be inventoried. These stores will be mutually agreed upon and the shrink and any other valuation adjustments will be extrapolated across the entire population of stores.

Staffing

The Agent will have at least one representative present at every count, and the Merchant will also have at least a store manager or asset protection manager present.

Controls

1. A primary focus of these counts is on ensuring the accuracy of the piece count. The Service should audit each of their inventory counters during the first hour of the count. This is done by having a Service supervisor testing each crew person by having him or her bring up on their machines the last ten items they counted. The UPC and quantity entered should exactly match the items on the floor. Counters who have any errors should be tested further, i.e. for more UPC's (another 20 or 30 pieces). If you feel the counter's error rate is unreasonably high, direct the Service to not let them key any more. They can be used to do bulk pre-counts, etc., or may even have to be sent home.

Taking counters of the count is YOUR call. Counters who are inaccurate can cost the company a lot of money, and it can cost additional money to recount every section that they counted. INSIST ON ACCURACY.

2. Take care not to count empty boxes. Open all packed away goods, over stock, and new receipts to count the goods inside. NEVER key from a pack away list.

3. Authorized agents of the Merchant and Agent must jointly agree upon any adjustment made to any area.

4. The Service is to furnish representatives of the Merchant and the Agent with a hard copy of the inventory (both units and area numbers) at the completion of the count.

5. Another good test for accuracy is to have the Service print out section detail for specific sections, which you can then use to compare to the merchandise on the shelf.

NOTE: There is a 50% Audit Recount Requirement on all Items of inventory. All F1 Summary's should be printed out and initialed that they match the actual product. These Summaries will be required to be sent to Boston in the final Inventory package.

Cutoffs

Make sure all goods in the store are received, processed, and out on the floor for the physical inventory wherever possible

Merchandise

For purposes of this Agreement, "Merchandise" shall mean  (i) all saleable finished goods inventory that is owned by Merchant and located at the Stores as of the Sale Commencement Date, including, (A) Defective Merchandise, (B) Display Merchandise, and (C) Merchandise subject to Gross Rings; (ii) subject to Section 5.4(b), Distribution Center Merchandise .

As stated in under the definition of Merchandise, specific kinds of merchandise are identified as less than full value, with the Agent entitled to an adjustment for these kinds of inventory. It is very important to identify this merchandise and to use the designated areas when counting these goods.

At the beginning of the count, the Agents and Merchant's representatives should walk the store to identify these pieces and remove them from the displays. After this is done, the Service will assign one counter to go around the store and key the exceptions into the correct areas as shown below. Make sure to mark these pieces by removing them from the display and placing them on the floor or in a shopping cart, so that the Service knows NOT to count the merchandise again with the regular areas. Try to use a different marking method for each type of exception merchandise (on the floor, in carts, etc.) so you can tell in what exception bucket the goods are to be counted.

Excluded merchandise                                   Area 9999

Some kinds of merchandise have no sales value. These are specifically defined as goods that are so damaged or defective that such inventory cannot be used for the purpose for which they were intended.  As you walk the store, identify merchandise that is not first quality salable merchandise. *Excluded goods also include goods where the Merchant and Agent cannot agree upon a value.*

Physically remove these goods from the present location and put them in the back stockroom in a designated area, with the damages and defectives.

Damaged and Defective Merchandise                 Areas 9925, 9950, 9975

The Agency Agreement defines as follows:

"Defective Merchandise" means any item of Merchandise which is not new, finished, first-quality, saleable goods. Examples of Defective Merchandise include but are not limited to goods which are damaged, defective, scratched, soiled, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, parts, items typically sold as a set which are incomplete, gift with purchase items, or out of date (e.g., 2010 calendars).

A representative of the Agent and the Merchant should review all Merchandise deemed to be Damaged or Defective and determine the value of the goods. The goods should counted in one of the following agreed upon areas. NOTE: Display goods are not to be considered damaged per se, but should fall under the same scrutiny as all other items of merchandise in determining damages.

| Area 9925 | 25% Off |
| Area 9950 | 50% Off |
| Area 9975 | 75% Off |

As-Is Merchandise                                      Area 9997

Any item of Merchandise clearly marked and priced "AS-IS " MUST be segregated and counted in area 9997.

## DO NOT INVENTORY

Isolate and DO NOT INVENTORY  the any gift cards or gift certificates from outside vendors.

DO NOT COUNT Fixtures or displays as merchandise

## POST COUNT

At the end of the count, please fax the RGIS timesheet as well as the last page of the F1 summary report (inclusive of all above exception areas) to 208-723-1007.  **NOTE: It is IMPERATIVE that the F1 summary report include the signature of the Merchants representative and the Gordon Brothers Consultant.**

<u>Exhibit 5.3</u>

See "8011 on hand SLSIN.xls" file posted to electronic data room on 12/29/10

EXHIBIT 11.1(C)

EXISTING LIENS

| Name | Description |
|------|-------------|
| PNC Bank, National Association | First lien on substantially all assets |
| Ableco Finance LLC | Second lien on substantially all assets |
| Sun Anchor Blue Finance, LLC | Third lien on substantially all assets |
| UPS Supply Chain Solutions, Inc. | Warehouseman lien on inventory merchandise |

Exhibit 11.1(c)(1)

See "FF&E 12-23-10.xls" file posted to electronic data room on 12/28/10

EXHIBIT 11.1 (s)
MERCHANDISE THRESHOLD

## MERCHANDISE THRESHOLD (000'S)

| Decremental Dollars in Merchandise | Retail Value of Merchandise | Guaranty % | Guaranty Percentage Decrease | Cumulative Decremental Percent of Guaranty |
|---|---|---|---|---|
| THRESHOLD | 33,500 | 27.10% | - | - |
| 100 | 33,400 | 26.60% | -0.50% | -0.50% |
| 200 | 33,300 | 26.35% | -0.25% | -0.75% |
| 300 | 33,200 | 26.10% | -0.25% | -1.00% |
| 400 | 33,100 | 25.75% | -0.35% | -1.35% |
| 500 | 33,000 | 25.40% | -0.35% | -1.70% |
| 600 | 32,900 | 25.05% | -0.35% | -2.05% |
| 700 | 32,800 | 24.60% | -0.45% | -2.50% |
| 800 | 32,700 | 24.15% | -0.45% | -2.95% |
| 900 | 32,600 | 23.70% | -0.45% | -3.40% |
| 1,000 | 32,500 | 23.20% | -0.50% | -3.90% |

| Incremental Dollars in Merchandise | Retail Value of Merchandise | Guaranty % | Guaranty Percentage Decrease | Cumulative Decremental Percent of Guaranty |
|---|---|---|---|---|
| 1,000 | 37,500 | 24.50% | -0.35% | -2.60% |
| 900 | 37,400 | 24.85% | -0.30% | -2.25% |
| 800 | 37,300 | 25.15% | -0.30% | -1.95% |
| 700 | 37,200 | 25.45% | -0.30% | -1.65% |
| 600 | 37,100 | 25.75% | -0.25% | -1.35% |
| 500 | 37,000 | 26.00% | -0.25% | -1.10% |
| 400 | 36,900 | 26.25% | -0.25% | -0.85% |
| 300 | 36,800 | 26.50% | -0.20% | -0.60% |
| 200 | 36,700 | 26.70% | -0.20% | -0.40% |
| 100 | 36,600 | 26.90% | -0.20% | -0.20% |
| CEILING | 36,500 | 27.10% | 0.00% | - |

*NOTES:*

*1. Adjustments between the Merchandise threshold and ceiling increments shall be on a pro rata basis.*

*2. In the event the retail value of the Merchandise is greater than 37,500, each 100k (or pro rata portion therof) increment above 37,500 shall decrease the guaranty by -0.40%*

*3. In the event the retail value of the Merchandise is less than 32,500, each 100k (or pro rata portion therof) decrement below 32,500 shall decrease the guaranty by -0.50%*